FILED

2015 MAR 11 PM 2: 57

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY: 9F

Michael A. Hirst (CA Bar No. 131034)
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, California 95616
(530) 756-7700
Fax: (530) 756-7707
Email: michael.hirst@hirstlawgroup.com

Suzanne E. Durrell (Mass. BBO #139280)
DURRELL LAW OFFICE
180 Williams Avenue
Milton, Massachusetts 02186
(617) 371-1072
Fax: (888) 676-7420
Email: suzanne.durrell@verizon.net

Robert M. Thomas, Jr. (Mass. BBO #645600)
THOMAS & ASSOCIATES
20 Park Plaza, Suite 833
Boston, MA 02116-4322
(617) 371-1072
Fax: (888) 676-7420
Email: rmt@thomasandassoc.net

Attorneys for *Qui Tam* Plaintiff [Under Seal]

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

N/S
L/N

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. [UNDER SEAL],<br><br>Plaintiffs,<br><br>v.<br><br>[UNDER SEAL],<br><br>Defendants. | Civil Action No:<br><br>**SACV15-00389** DOC (JC GX)<br><br>**COMPLAINT AND JURY DEMAND**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

PAID

MAR 11 2015

Clerk, US District Court
COURT 4612

Michael A. Hirst (CA Bar No. 131034)
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, California 95616
(530) 756-7700
Fax: (530) 756-7707
Email: michael.hirst@hirstlawgroup.com

Suzanne E. Durrell (Mass. BBO #139280)
DURRELL LAW OFFICE
180 Williams Avenue
Milton, Massachusetts 02186
(617) 371-1072
Fax: (888) 676-7420
Email: suzanne.durrell@verizon.net

Robert M. Thomas, Jr. (Mass. BBO #645600)
THOMAS & ASSOCIATES
20 Park Plaza, Suite 833
Boston, MA 02116-4322
(617) 371-1072
Fax: (888) 676-7420
Email: rmt@thomasandassoc.net

Attorneys for *Qui Tam* Plaintiff Jane Doe

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE of CALIFORNIA ex rel. JANE DOE, <br><br> PLAINTIFFS, <br><br> v. <br><br> THE ENSIGN GROUP, INC.; ENSIGN FACILITY SERVICES, INC.; CITY HEIGHTS HEALTH ASSOCIATES LLC, d/b/a ARROYO VISTA NURSING CENTER; ATLANTIC MEMORIAL HEALTHCARE ASSOCIATES, INC., d/b/a ATLANTIC MEMORIAL HEALTHCARE CENTER; BAYSHORE HEALTHCARE, INC., d/b/a BELLA VISTA TRANSITIONAL CARE CENTER; DOWNEY COMMUNITY CARE LLC, d/b/a BROOKFIELD HEALTHCARE CENTER; RICHMOND SENIOR SERVICES, INC., d/b/a CAMBRIDGE HEALTH & | Civil Action No: <br><br> **COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. §§ 3729 *et seq.*] and the CALIFORNIA FALSE CLAIMS ACT [Cal. Gov't. Code §§ 12650 *et seq.*]** <br><br> **JURY TRIAL DEMANDED** |

1   REHABILITATION CENTER; BERNARDO HEIGHTS )
2   HEALTHCARE, INC., d/b/a CARMEL MOUNTAIN )
    REHABILITATION & HEALTHCARE; CLAREMONT )
3   FOOTHILLS HEALTH ASSOCIATES LLC, d/b/a )
    CLAREMONT CARE CENTER;  OLYMPUS )
4   HEALTH, INC., d/b/a HOLLADAY HEALTHCARE )
    CENTER; GRAND VILLA PHX, INC., d/b/a LAKE )
5   VILLAGE NURSING & REHAB CENTER; LEMON )
6   GROVE HEALTH ASSOCIATES, LLC, d/b/a LEMON )
    GROVE CARE CENTER; MARKET BAYOU )
7   HEALTHCARE, INC., d/b/a MONTEBELLO )
    WELLNESS CENTER; GATE THREE HEALTHCARE )
8   LLC, d/b/a PALM TERRACE HEALTHCARE & )
9   REHABILITATION CENTER;WEST ESCONDIDO )
    HEALTHCARE LLC, d/b/a PALOMAR VISTA )
10  HEALTHCARE CENTER; ENSIGN PANORAMA )
    LLC, d/b/a PANORAMA GARDENS NURSING & )
11  REHAB CENTER; RIVERVIEW HEALTHCARE, )
    INC., d/b/a PROVO REHABILITATION AND )
12  NURSING; BELL VILLA CARE ASSOCIATES LLC, )
13  d/b/a ROSE VILLA HEALTHCARE CENTER; HB )
    HEALTHCARE ASSOCIATES LLC, d/b/a SEA CLIFF )
14  HEALTHCARE CENTER; ROSE PARK )
    HEALTHCARE ASSOCIATES, INC., d/b/a )
15  SHORELINE HEALTHCARE CENTER;  SUCCESSOR )
16  HEALTHCARE, INC., d/b/a ST. JOSEPH VILLA; )
    SILVER LAKE HEALTHCARE, INC., d/b/a SYMBII )
17  HOME HEALTH AND HOSPICE; CHAPARRAL )
    HEALTHCARE, INC., d/b/a THE COURTYARD )
18  REHABILITATION AND HEALTHCARE CENTER; )
    ENSIGN WHITTIER WEST LLC, d/b/a THE )
19  ORCHARD POST ACUTE CARE; LA JOLLA )
    SKILLED, INC., d/b/a THE SPRINGS AT PACIFIC )
20  REGENT LA JOLLA; LIVINGSTON CARE )
21  ASSOCIATES, INC., d/b/a TIMBERWOOD NURSING )
    AND REHABILITATION CENTER; UPLAND )
22  COMMUNITY CARE, INC., d/b/a UPLAND )
    REHABILITATION & CARE CENTER; VISTA )
23  WOODS HEALTH ASSOCIATES LLC, d/b/a VISTA )
24  KNOLL SPECIALIZED CARE; ENSIGN WHITTIER )
    EAST LLC, d/b/a WHITTIER HILLS HEALTHCARE )
25  CENTER; AXIOM MOBILE IMAGING; and DOE )
    DEFENDANTS 1-100. )
26                                                                                  )
                                                                                    )
27  _____ )

           DEFENDANTS.

28        **FALSE CLAIMS ACT *QUI TAM* COMPLAINT**

1

<u>TABLE OF CONTENTS</u>

2

I.     INTRODUCTION ........................................................................................ 2

3

II.    PARTIES .................................................................................................... 6

4

     A.     Plaintiffs ......................................................................................... 6

5

     B.     Defendants ...................................................................................... 6

6

7

III.   JURISDICTION AND VENUE .................................................................. 12

8

IV.    APPLICABLE FEDERAL HEALTHCARE PROGRAMS AND LAWS ....... 13

9

     A.     Overview of Medicare and Medicaid Coverage of Skilled Nursing Care .......... 13

10

     B.     Other Federal and State-Funded Health Care Programs ..................... 16

11

     C.     Federal and State False Claims Acts ................................................ 17

12

     D.     The Federal and California Anti-Kickback Statutes ........................... 20

13

     E.     The Stark Statute .......................................................................... 24

14

V.     ALLEGATIONS ...................................................................................... 27

15

     A.     Summary of Ensign Defendants' Unlawful Conduct ......................... 27

16

     B.     Ensign Defendants Pay Physicians Above Fair Market Value for Medical Director and Other Types of Consultant Services, which Are Often Unnecessary and/or Not Actually Performed ...................................... 29

17

18

19

          1.     Ensign Defendants Routinely Pay More than Fair Market Value for Physician "Medical Director" and "Consulting" Services. ....................... 29

20

21

          2.     Ensign Defendants Hire "Medical Directors" and other "Consultants" to Perform Services without Establishing What Those Services Are or Whether They Are Necessary ................................ 32

22

23

          3.     Ensign Defendants Pay Medical Directors and Consultants for Services without Evidence that the Services Were Actually Performed ................ 34

24

25

     C.     Defendants Ensign and Axiom Mobile Imaging Engaged in an Unlawful Kickback Scheme Known as "Swapping" ........................................... 34

26

27

     D.     Defendants Ensign and its Subsidiaries Knowingly Failed to Report Violations of Their Corporate Integrity Agreement in an Effort to Avoid Paying Penalties Owed to the United States ................................................................ 37

28

VI.    CLAIMS FOR RELIEF..................................................................................39

VII.    PRAYERS FOR RELIEF.............................................................................47

1

2          Through her undersigned attorneys, *qui tam* Plaintiff-Relator Jane Doe ("Relator"),

3    on behalf of the United States of America and the State of California, for this Complaint

4    against Defendants The Ensign Group, Inc.; Ensign Facility Services, Inc.; City Heights

5    Health Associates LLC, d/b/a Arroyo Vista Nursing Center; Atlantic Memorial Healthcare

6    Associates, Inc., d/b/a Atlantic Memorial Healthcare Center; Bayshore Healthcare, Inc., d/b/a

7    Bella Vista Transitional Care Center; Downey Community Care LLC, d/b/a Brookfield

8    Healthcare Center; Richmond Senior Services, Inc., d/b/a Cambridge Health & Rehabilitation

9    Center; Bernardo Heights Healthcare, Inc., d/b/a Carmel Mountain Rehabilitation &

10    Healthcare; Claremont Foothills Health Associates LLC, d/b/a Claremont Care Center;

11    Olympus Health, Inc., d/b/a Holladay Healthcare Center; Grand Villa PHX, Inc., d/b/a Lake

12    Village Nursing & Rehab Center; Lemon Grove Health Associates, LLC, d/b/a/ Lemon Grove

13    Care Center; Market Bayou Healthcare, Inc., d/b/a Montebello Wellness Center; Gate Three

14    Healthcare LLC, d/b/a Palm Terrace Healthcare & Rehabilitation Center; West Escondido

15    Healthcare LLC, d/b/a Palomar Vista Healthcare Center; Ensign Panorama LLC, d/b/a

16    Panorama Gardens Nursing & Rehab Center; Riverview Healthcare, Inc., d/b/a Provo

17    Rehabilitation and Nursing; Bell Villa Care Associates LLC, d/b/a Rose Villa Healthcare

18    Center; HB Healthcare Associates LLC, d/b/a Sea Cliff Healthcare Center; Rose Park

19    Healthcare Associates, Inc., d/b/a Shoreline Healthcare Center; Successor Healthcare, Inc.,

20    d/b/a St. Joseph Villa; Silver Lake Healthcare, Inc., d/b/a Symbii Home Health and Hospice;

21    Chaparral Healthcare, Inc., d/b/a The Courtyard Rehabilitation and Healthcare Center; Ensign

22    Whittier West LLC, d/b/a The Orchard Post Acute Care; La Jolla Skilled, Inc., d/b/a The

23    Springs at Pacific Regent La Jolla; Livingston Care Associates, Inc., d/b/a Timberwood

24    Nursing and Rehabilitation Center; Upland Community Care, Inc., d/b/a Upland

25    Rehabilitation & Care Center; Vista Woods Health Associates LLC, d/b/a Vista Knoll

26    Specialized Care; Ensign Whittier East LLC, d/b/a Whittier Hills Healthcare Center; Axiom

27

28

Mobile Imaging; and Doe Defendants 1-100 (together, the "Defendants"), alleges as follows:

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States of America (the "United States" or the "Government") and the State of California ("California" or the "State Government"), arising from false and/or fraudulent statements, records, and claims made and/or caused to be made by the Defendants and/or their agents and employees in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), and the California False Claims Act, Cal. Gov't Code §§ 12650, *et seq.* (the "California FCA" or the "State FCA"). These violations include breach of a Corporate Integrity Agreement entered into with the United States on October 1, 2013 as part of the settlement of a False Claims Act *qui tam* case then pending in this Court, *United States ex rel. Patterson v. Ensign Group, Inc., et al.*, Civil Action No. 06-6956 (Carney, J.).

2.    This *qui tam* case is brought against Defendants for knowingly defrauding the Government and the State Government in connection with Medicare, Medicaid, and other federal and/or state-funded health care programs.

3.    Defendant The Ensign Group, Inc. ("Ensign") was established in 1999, and has since expanded to include over 140 skilled nursing and assisted living facilities (collectively referred to herein as "SNFs"), mostly in the Western and Southwestern United States. Despite being subject to a Corporate Integrity Agreement arising from a previous False Claims Act settlement, Ensign has fostered a corporate climate that tolerates and encourages its SNFs to pay kickbacks to medical professionals to induce them to refer patients to the SNFs.

4.    The kickbacks take several forms. Most commonly, the SNFs named herein as Defendants (collectively referred to as the "SNF Defendants") pay physicians inflated monthly compensation to work as "Medical Directors," Associate Medical Directors, or in

other "consulting" capacities.  The SNF Defendants pay these physicians substantially above market rate for their services, without a fair market value analysis and with little or no accountability for whether the services are actually performed.  Such payments are not commercially reasonable and would not be made but for the benefits Defendants receive in the form of patient referrals in exchange for the excessive payments.  Other inducements include, without limitation, Advisory Board payments to physicians.

5.      Providing remuneration to physicians in exchange for referrals violates the federal and California Anti-Kickback laws, the federal Stark Statute, and various state laws and ethical canons of the medical profession.  All claims submitted or caused to be submitted by Defendants and/or physician practices for services performed pursuant to referrals from these Stark and kickback-tainted physicians are not lawfully eligible for reimbursement through Medicare, Medicaid, and other federal and state-funded health insurance programs, and thus are false or fraudulent claims within the meaning of the FCA and California FCA.

6.      Several of the SNF Defendants also engaged in an illegal kickback scheme known as "swapping" with Defendant Axiom Mobile Imaging ("Axiom"), a provider of mobile X-rays.  Pursuant to this scheme, the SNF Defendants received below-cost prices on X-rays provided to their Medicare Part A patients in exchange for referring Medicare Part B patients to Axiom.  All claims to federal and state-funded health insurance programs for reimbursement relating to such kickback-tainted X-ray services are false or fraudulent claims within the meaning of the FCA and California FCA.

7.      The conduct alleged in this Complaint also violated the Corporate Integrity Agreement entered into on October 1, 2013, between Defendant Ensign and the Office of Inspector General of the United States Department of Health and Human Services arising from the conduct set forth in *United States ex rel. Patterson v. Ensign Group, Inc., et al.*, Civil Action No. 06-6956 (Carney, J.).  Ensign and its subsidiaries violated the Corporate

Integrity Agreement by, *inter alia*, failing to report to the Government violations of the law described in this Complaint.   By failing to report these violations, Defendants avoided repayments and penalties owed to the United States Government, in violation of the "reverse false claim" provisions of the FCA and California FCA.

8.    Through these actions, Defendants have defrauded the United States and the State of California of millions of dollars.

9.    As noted above, Defendants' conduct alleged herein violates the federal FCA, which was originally enacted during the Civil War.  Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States to recover losses sustained as a result of fraud against it.  The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.  Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

10.    The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the Government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to violate any of these sections of the FCA.  *See* 31 U.S.C. §§ 3729(a)(1)(A)-(C), and (G).  Any person who violates the FCA is liable for a civil penalty of

up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

11.    For purposes of the FCA, to act "knowingly" means that a defendant: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).  The FCA does not require proof that defendants specifically intended to commit fraud.  *Id.*  Unless otherwise indicated, whenever the word "know" and similar words indicating knowledge are used in this Complaint, they mean "knowing" or "knowingly" as defined in the FCA.

12.    The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

13.    Defendants' actions alleged in this Complaint also constitute violations of the California FCA, Cal. Gov't Code §§ 12650 *et seq.*  The California FCA prohibits conduct similar to that prohibited by the FCA, similarly allows plaintiffs to bring an action on the State's behalf, and provides analogous remedies to those provided in the FCA.

14.    Based on the foregoing FCA and California FCA provisions, *qui tam* Plaintiff-Relator Jane Doe seeks through this action to recover all available damages, civil penalties, and other relief for federal and state-law violations alleged in this Complaint in every jurisdiction to which Defendants' misconduct has extended.

## II.    PARTIES

### A.    Plaintiffs

15.    Plaintiff-Relator Jane Doe ("Plaintiff" or "Relator") is a citizen of the United States.  Plaintiff-Relator is familiar with the Defendants' business operations.  Further details regarding Relator and Relator's knowledge have been and will be provided to the United States and the State of California.

16.    The governmental Plaintiffs in this lawsuit are the United States and the State of California.

### B.    Defendants

17.    Defendant The Ensign Group, Inc. (Nasdaq: ENSG) is a Delaware corporation with its principal office and place of business at 27101 Puerta Real, Suite 450, Mission Viejo, California 92691, in Orange County, California.  The Ensign Group, Inc. is the parent holding company that owns the skilled nursing and assisted living facilities listed in paragraphs ¶¶ 19-45 & 47 below.  The Ensign Group, Inc., including all of its subsidiaries, is subject to a Corporate Integrity Agreement entered into on October 1, 2013.

18.    Defendant Ensign Facility Services, Inc. is a Delaware corporation with its principal office and place of business at 27101 Puerta Real, Suite 450, Mission Viejo, California 92691, in Orange County, California.  Defendant Ensign Facility Services, Inc. provides management services to Defendant The Ensign Group, Inc. and to the skilled nursing and assisted living facilities listed in ¶¶ 19-45 & 47 below.  As used herein, the term "Ensign" refers to both The Ensign Group, Inc. and Ensign Facility Services, Inc., and all of their operating subsidiaries.

19.    Defendant City Heights Health Associates LLC, d/b/a Arroyo Vista Nursing Center, is a skilled nursing facility located at 3022 45th Street, San Diego, California 92105.  It is an operating subsidiary of The Ensign Group, Inc.

20.     Defendant Atlantic Memorial Healthcare Associates, Inc., d/b/a Atlantic Memorial Healthcare Center, is a skilled nursing facility located at 2750 Atlantic Avenue, Long Beach, California 90806.  It is an operating subsidiary of The Ensign Group, Inc.

21.     Defendant Bayshore Healthcare, Inc., d/b/a Bella Vista Transitional Care Center, is a skilled nursing facility located at 3033 Augusta Street, San Luis Obispo, California 93401.  It is an operating subsidiary of The Ensign Group, Inc.

22.     Defendant Downey Community Care LLC, d/b/a Brookfield Healthcare Center, is a skilled nursing facility located at 9300 Telegraph Road, Downey, California 90240.  It is an operating subsidiary of The Ensign Group, Inc.

23.     Defendant Richmond Senior Services, Inc., d/b/a Cambridge Health & Rehabilitation Center, is a skilled nursing facility located at 1106 Golfview, Richmond, Texas 77469.  It is an operating subsidiary of The Ensign Group, Inc.

24.     Defendant Bernardo Heights Healthcare, Inc., d/b/a Carmel Mountain Rehabilitation & Healthcare is a skilled nursing facility located at 11895 Avenue of Industry, San Diego, California 92128.  It is an operating subsidiary of The Ensign Group, Inc.

25.     Defendant Claremont Foothills Health Associates LLC, d/b/a Claremont Care Center, is a skilled nursing facility located at 219 East Foothill Boulevard, Pomona, California 91767.  It is an operating subsidiary of The Ensign Group, Inc.

26.     Defendant Olympus Health, Inc., d/b/a Holladay Healthcare Center, is a skilled nursing facility located at 4782 South Holladay Boulevard, Salt Lake City, Utah 84117.  It is an operating subsidiary of The Ensign Group, Inc.

27.     Defendant Grand Villa PHX, Inc., d/b/a Lake Village Nursing & Rehab Center is a skilled nursing facility located at 169 Lake Park Road, Lewisville, Texas 75057.  It is an operating subsidiary of The Ensign Group, Inc.

28.     Defendant Lemon Grove Health Associates LLC, d/b/a Lemon Grove Care Center, is a skilled nursing facility located at 8351 Broadway, Lemon Grove, California 91945. It is an operating subsidiary of The Ensign Group, Inc.

29.     Defendant Market Bayou Healthcare, Inc., d/b/a Montebello Wellness Center, is a skilled nursing facility located at 12350 Wood Bayou Drive, Houston, Texas 77013. It is an operating subsidiary of The Ensign Group, Inc.

30.     Defendant Gate Three Healthcare LLC, d/b/a Palm Terrace Healthcare & Rehabilitation Center is a skilled nursing facility located at 24962 Calle Aragon, Laguna Woods, California 92637. It is an operating subsidiary of The Ensign Group, Inc.

31.     Defendant West Escondido Healthcare LLC, d/b/a Palomar Vista Healthcare Center, is a skilled nursing facility located at 201 North Fig Street, Escondido, California 92025. It is an operating subsidiary of The Ensign Group, Inc.

32.     Defendant Ensign Panorama LLC, d/b/a Panorama Gardens Nursing & Rehab Center, is a skilled nursing facility located at 9541 Van Nuys Boulevard, Panorama City, California 91402. It is an operating subsidiary of The Ensign Group, Inc.

33.     Defendant Riverview Healthcare, Inc., d/b/a Provo Rehabilitation and Nursing, is a skilled nursing facility located at 1001 North 500 West, Provo, Utah 84604. It is an operating subsidiary of The Ensign Group, Inc.

34.     Defendant Bell Villa Care Associates LLC, d/b/a Rose Villa Healthcare Center, is a skilled nursing facility located at 9028 Rose Street, Bellflower, California 90706. It is an operating subsidiary of The Ensign Group, Inc.

35.     Defendant HB Healthcare Associates LLC, d/b/a Sea Cliff Healthcare Center, is a skilled nursing and assisted living facility located at 18811 Florida Street, Huntington Beach, California 92648. It is an operating subsidiary of The Ensign Group, Inc.

36.     Rose Park Healthcare Associates, Inc., d/b/a Shoreline Healthcare Center, is a skilled nursing and assisted living facility located at 4029 East Anaheim St., Long Beach, California 90804. It is an operating subsidiary of The Ensign Group, Inc.

37.     Defendant Successor Healthcare, Inc., d/b/a St. Joseph Villa, is a skilled nursing facility located at 451 Bishop Federal Lane, Salt Lake City, Utah 84115. It is an operating subsidiary of The Ensign Group, Inc.

38.     Defendant Silver Lake Healthcare, Inc., d/b/a Symbii Home Health and Hospice, is a skilled nursing facility located at 451 East Bishop Federal Lane, Salt Lake City, Utah 84115. It is an operating subsidiary of The Ensign Group, Inc.

39.     Defendant Chaparral Healthcare, Inc., d/b/a The Courtyard Rehab and Healthcare Center, is a skilled nursing facility located at 3401 East Airline Road, Victoria, Texas 77901. It is an operating subsidiary of The Ensign Group, Inc.

40.     Defendant Ensign Whittier West LLC, d/b/a The Orchard Post Acute Care (fka Royal Court Healthcare), is a skilled nursing facility located at 12385 E. Washington Blvd, Whittier, CA 90606. It is an operating subsidiary of The Ensign Group, Inc.

41.     Defendant La Jolla Skilled, Inc., d/b/a The Springs at Pacific Regent La Jolla, is a skilled nursing facility located at 3884 Nobel Drive, San Diego, California 92122. It is an operating subsidiary of The Ensign Group, Inc.

42.     Defendant Livingston Care Associates, Inc., d/b/a Timberwood Nursing and Rehabilitation Center, is a skilled nursing facility located at 4001 Highway 59 North, Livingston, Texas 77351. It is an operating subsidiary of The Ensign Group, Inc.

43.     Defendant Upland Community Care, Inc., d/b/a Upland Rehabilitation & Care Center, is a skilled nursing facility located at 1221 East Arrow Highway, Upland, California 91786. It is an operating subsidiary of The Ensign Group, Inc.

44.    Defendant Vista Woods Health Associates LLC, d/b/a Vista Knoll Specialized Care, is a skilled nursing facility located at 2000 Westwood Road, Vista, California 92083. It is an operating subsidiary of The Ensign Group, Inc.

45.    Defendant Ensign Whittier East LLC, d/b/a Whittier Hills Healthcare Center, is a skilled nursing facility located at 10426 Bogardus Avenue, Whittier, California 90603. It is an operating subsidiary of The Ensign Group, Inc.

46.    Defendant Axiom Mobile Imaging is a privately held company with its principal place of business in San Carlos, California. Axiom performs portable x-rays, ultrasounds and cardiac echoes primarily for nursing home residents and homebound patients.

47.    Defendant Does 1 through 100 include other SNFs owned directly or indirectly by Defendant The Ensign Group, Inc. Based on the pattern of conduct among Ensign-owned SNFs named as defendants in this Complaint, and based on the business model and philosophy under which Ensign conducts business at all of the SNFs it owns, Relator believes and therefore alleges that similar misconduct is occurring at these Doe defendants. The Doe entities that Relator at this time believes will likely ultimately prove warranted to name formally as defendants in this action include: Alta Vista Rehabilitation & Healthcare; Arbor Glen Care Center; Arvada Care & Rehabilitation Center; Beatrice Health and Rehabilitation; Bella Vista Health and Rehabilitation Center; Brookside Healthcare Center; California Mission Inn/Rose Manor; Cambridge Square Assisted Living; Canterbury Gardens ILAL Community; Careage Campus of Care/Country View Assisted Living; Careage Home Care; Carrollton Health & Rehabilitation Center; Catalina Post Acute Care and Rehabilitation; Chateau Des Mons Care and Assisted Living; City Creek Post Acute; Cloverdale Healthcare Center; Copper Ridge Health Care; Coronado Healthcare Center; Custom Care Home Health; Custom Care Hospice; Desert Sky Assisted Living; Desert Springs Senior Living; Desert Terrace Healthcare Center; Discovery Care Center; Draper Rehabilitation and Care Center;

Elite Home Health and Hospice; Emblem Hospice; Emerald Hills Rehabilitation and Skilled

Nursing; Englewood Post Acute and Rehabilitation; Gateway Transitional Care Center;

Glenwood Care Center; Golden Acres Living and Rehabilitation/The Cottages; Grand Court

of Mesa; Grand Terrace Rehabilitation & Healthcare; Heritage Gardens Rehabilitation &

Healthcare; Homecare Solutions; Horizon Home Health and Hospice; Horizon Post Acute &

Rehabilitation Center; Hurricane Health and Rehabilitation; La Villa Rehabilitation and

Healthcare Center; Lake Ridge Senior Living; The Lexington Assisted Living; Life's Doors

Home Health and Hospice; Littleton Care and Rehabilitation Center; Monte Vista Hills

Healthcare Center; Montecito Post Acute Care & Rehabilitation; Mountain View

Rehabilitation and Care Center; Mt. Ogden Health & Rehab Center; North Mountain Medical

and Rehabilitation Center; Northeast Rehabilitation & Healthcare Center; Osborn Health and

Rehabilitation; Pacific Care and Rehabilitation; Paramount Health and Rehabilitation; Park

Avenue Health and Rehabilitation Center; Park Manor Rehabilitation Center; Park Place

Assisted Living; Park View Post Acute; Parke View Rehabilitation & Care Center; Pine

Manor Healthcare Center; Pinnacle Nursing and Rehabilitation; Puget Sound Home Health;

Redmond Care & Rehabilitation Center; Redmond Heights Senior Living; Richland Hills

Rehabilitation & Healthcare Center; Rose Court Senior Living; Rosewood Rehabilitation

Center; Sabino Canyon Rehabilitation & Care Center; San Marcos Rehabilitation and

Healthcare Center; Santa Maria Terrace; Sonoma Healthcare Center; Southland & Southland

Living; Stillhouse Rehabilitation & Healthcare Center; Sunview Health and Rehabilitation;

The Grove Care and Wellness; Vesper Hospice; Victoria Care Center; Victoria Healthcare &

Rehabilitation Center; Wellington Place Living & Rehab; West Bend Care Center/Prairie

Creek Assisted Living; Willowbend Nursing & Rehab Center; Wisteria Place Retirement

Living; and Zion's Way Home Health & Hospice.  In addition, Relator believes the following

eight SNFs in the San Diego area that were recently acquired by Ensign will likely ultimately

prove warranted to name formally as defendants in this action: Mission Trails Healthcare, Inc., d/b/a Grossmont Post Acute Care; Nautilus Healthcare, Inc., d/b/a The Cove at LaJolla; Portside Healthcare, Inc., d/b/a Mission Hills Post Acute Care; Bayside Healthcare, Inc., d/b/a South Bay Post Acute Care; Parkside Healthcare, Inc., d/b/a Parkside Health and Wellness Center; Claydelle Healthcare, Inc., d/b/a Somerset Subacute and Care; Anza Healthcare, Inc., d/b/a Victoria Post Acute Care; and Jefferson Healthcare, Inc., d/b/a Magnolia Post Acute Care.

## III.   JURISDICTION AND VENUE

48.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. In addition, this Court also has jurisdiction over the California FCA claims pursuant to 31 U.S.C. § 3732(b), because the California state claims arise from the same transactions and occurrence as the federal claims.  This Court also has supplemental jurisdiction over the state law claims pursuant to 23 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case and controversy under Article III of the United States Constitution.

49.     Although the issue is no longer jurisdictional under the 2010 amendments to the FCA, to Relator's knowledge, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e) and Cal. Gov't Code § 12652(d)(3).  Moreover, whether or not such a disclosure has occurred, Relator would qualify under that section of the FCA as an "original source" of the allegations in this Complaint.  Before filing this action, Relator voluntarily disclosed and provided to the Government and State Government the information on which the allegations or transactions in this action are based.  Additionally, Relator has knowledge about the

misconduct alleged herein that is independent of, and that would materially add to, any

publicly disclosed allegations or transactions that may prove to have occurred without

Relator's knowledge.

50.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §

3732(a) which authorizes nationwide service of process.  Moreover, one or more Defendants

can be found, reside in, or have transacted the business in this District, including business

related to Defendants' concerted misconduct.

51.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because one or

more Defendants can be found, reside in, or have transacted the business that is the subject

matter of this lawsuit in this District.

## IV.    APPLICABLE FEDERAL HEALTHCARE PROGRAMS AND LAWS

### A.    Overview of Medicare and Medicaid Coverage of Skilled Nursing Care

52.     Medicare is a federally-funded health insurance program primarily benefiting

the elderly.  *See* 42 U.S.C. §§ 426 *et seq.* The Medicare program is administered through the

Department of Health and Human Services, Centers for Medicare and Medicaid Services

("CMS").

53.     Medicare was created in 1965 when Title XVIII of the Social Security Act was

adopted and has two parts that are particularly relevant to the instant lawsuit:  Medicare Part

A ("Part A") and Medicare Part B ("Part B").

54.     Part A, the Basic Plan of Hospital Insurance, covers the costs of inpatient

hospital services and post-hospital nursing facility care.  *See* 42 U.S.C. §§ 1395c-1395i-4.

55.     Part B, the Voluntary Supplemental Insurance Plan, covers the cost of

physician services, regardless of where they are provided, and certain other medical services

not generally covered by Part A, including services and supplies incidental to the care

provided by physicians, diagnostic tests, X-rays, and ambulance services. *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s).

56.    In general, Part A will pay for up to 100 days of skilled nursing care for a beneficiary who has been hospitalized for at least three days. Part A will pay a qualified patient's bills in full for the first 20 days. After 20 days, Part A will provide coverage subject to a co-payment obligation (billed separately to, and paid by, the resident, private insurance, or Medicaid).

57.    Part A pays for skilled nursing services only when provided by a skilled nursing facility ("SNF") and when a physician certifies that such intensive nursing care is needed. *See* 42 U.S.C. § 1395f(a)(2)(B).

58.    A healthcare facility is eligible to receive Medicare or Medicaid funds as a SNF if the institution is primarily engaged in providing nursing care and health-related services (above the level of room and board) to residents who, because of their mental or physical condition, require a level of care which can be furnished only in an institutional facility. Institutions primarily for the treatment of mental diseases are specifically excluded. 42 U.S.C.A. § 1396r(a).

59.    SNFs are reimbursed by Part A at a flat, per diem rate for each patient. This is often referred to as a "capitated" rate, and depends in part on the severity of the patient's condition. The capitated payment is intended to cover the routine, ancillary, and capital-related costs associated with the patient's stay, including physical therapy services, occupational therapy services, medications, and diagnostic radiology services.

60.    If a beneficiary exhausts his or her Part A SNF coverage, Part B will provide coverage for some services provided by the SNF. For example, once Part A benefits are exhausted, Part B may be billed for services such as physical therapy, occupational therapy, speech therapy, X-rays, and laboratory services, so long as they are certified and ordered by a

14

physician as medically necessary.  Unlike Part A, Medicare Part B reimburses nursing

facilities and other service providers on a fee schedule basis.

61.    At the end of each month, nursing facilities bill the Medicare program by

submitting an invoice known as Universal Bill 92 ("UB-92") to the appropriate Medicare

Administrative Contractor ("MAC") (formerly known as a fiscal intermediary or carrier) who

acts on behalf of CMS to process and pay both Part A and Part B claims.  A UB-92 is

submitted for each resident and contains the number of billing days, the per diem rate, and

total amount.

62.    Medicaid is a state and federal assistance program that covers medical

expenses for low income patients, including low income residents of nursing facilities.  *See*

42 U.S.C. §§ 1390, *et seq*. Funding for Medicaid is shared between the federal government

and those states that participate in the program.  The federal government reimburses or pays

approximately one-half of the Medicaid bill and the state pays the other half; the federal

reimbursement is called the "federal financial participation" ("FFP"); the federal government

also provides federal funding for Medicaid through support for the Medicare Savings

programs.

63.    Primary regulatory control of state Medicaid programs is left to the states.

Consequently, reimbursement procedures and amounts vary among the states.  The California

Department of Health Care Services is the state agency responsible for administration of the

California State Medicaid Program (Medi-Cal).  FFP is calculated each fiscal year in

accordance with a formula established under Title XIX, with FFP ranging from a low of 50%

in federal funding to more than 75% in FFP, depending on a variety of factors including such

things as the relative wealth of the State and its people and the total amount and kinds of

Medicaid expenditures that are needed or expected.  For example, for fiscal year 2012, the

FFP for California was 50%.

64.     In order to receive payment from the Government for providing health care services and supplies, pursuant to the Medicare and Medicaid statutes and regulations, Defendants prepared claims for payment or approval, billing records, invoices and medical records and presented or caused them to be presented to an agent, officer or employee of the Government.

65.     In order to receive payment from the State of California for providing health care services and supplies covered by the California Medicaid program, Defendants prepared claims for payment or approval, billing records, invoices and medical records and presented or caused them to be presented to an agent, officer or employee of the State Government..

66.     In making claims for payment to the federal Medicare program and to the federal and State Medicaid programs, and as a condition for receiving payment, Defendants' skilled nursing facilities represented, impliedly or directly, that they were in compliance with applicable laws and regulations, including the Anti-Kickback Statute and Stark Statute.

**B.     Other Federal and State-Funded Health Care Programs**

67.     The Federal Government administers other health care programs including, but not limited to, TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program.

68.     TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces, including members of the Uniformed Services and the spouses and children of active duty, retired, and deceased members. *See* 10 U.S.C. §§ 1071-1106.

69.     CHAMPVA, administered by the United States Department of Veterans Affairs ("VA"), is a health care program for the families of veterans with 100-percent service-connected disability or who died from a VA-rated service connected disability.

70.     The Federal Employee Health Benefit Program ("FEHBP"), administered by
the United States Office of Personnel Management, provides health insurance for qualified
federal employees, retirees, and survivors.

71.     The Plaintiff State of California provides health care benefits to certain
individuals, based either on the person's financial need, employment status or other factors.
To the extent those programs are covered by the California FCA, those programs are referred
to in this Complaint as "state funded health care programs."

72.     Together, the above-described federal and/or state funded health care programs
shall be referred to as "Federal Health Care Programs" or "Government Health Care
Programs." Reimbursement claims submitted to any of the above programs that were the
result of the unlawful activities alleged in this Complaint constitute false or fraudulent claims
for reimbursement.

C.     **Federal and State False Claims Acts**

73.     The federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(l), provides for
the award of treble damages and civil penalties against a defendant for, *inter alia*, knowingly
causing the submission of false or fraudulent claims for payment to the Government. When
submitting a claim for payment, a provider does so subject to and under the terms of his
certification to the United States that the services were delivered in accordance with federal
law, including, for example, Government Health Care Program laws and regulations.  Similar
State Medicaid applicable certifications also incorporate relevant state laws and regulations.
Government Health Care Programs require compliance with these certifications as a material
condition of payment, and claims that violate these certifications are false or fraudulent
claims under the False Claims Act.  CMS, its fiscal agents, and relevant State health agencies
will not pay claims for medically unnecessary services or claims for services provided in
violation of relevant state or federal laws.

74.     The FCA, 31 U.S.C. § 3729, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21 ( ("FERA") enacted May 20, 2009, provides, in relevant part:

> Liability for Certain Acts.(1) In General – Subject to paragraph (2), any person who –(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B)…or (G). . . or (G) knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).  The FCA further provides:

> Actions by Private Persons. (1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government.

31 U.S.C. § 3730(b)(1).

75.     The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property" that "is made to a contractor, grantee, or other recipient" if the Government provides "any portion of the money or property" which is "requested or demanded," or if the Government "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested." 31 U.S.C. § 3729(b)(2).

76.     The FCA, 31 U.S.C. § 3729(b)(1), provides that "(1) the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no

proof of specific intent to defraud."

77.    The FCA, 31 U.S.C. § 3729(b)(4), provides that "(4) the term 'material' means

having a natural tendency to influence, or be capable of influencing, the payment or receipt of

money or property."

78.    The  FCA defines an "obligation" to pay as "an established duty, whether or

not fixed, arising from an express or implied contractual, grantor-guarantee, or licensor

licensee relationship, from a fee-based or similar relationship, from statute or regulation, *or

from the retention of any overpayment*." 31 U.S.C. § 3729(b)(3) (emphasis added). Moreover,

in the health care context, such as Medicare and Medicaid, the term "obligation" is further

defined as "Any overpayment retained by a person after the deadline for reporting and

returning the overpayment…is an obligation (as defined [in the FCA])", and an overpayment

must be reported "By the later of…60 days after the date on which the overpayment was

identified…or the date any corresponding cost report is due, if applicable." Patient Protection

and Affordable Care Act, March 23, 2010 ("PPACA"), Pub. L. 111-148 (Mar. 23, 2010),

Section 6404(a), codified at 42 U.S.C. § 1128J9(d). *See also* 42 U.S.C. § 1320a-7k(d).

79.    The State of California has enacted a California FCA which in most instances

tracks closely the FCA.  The California FCA applies*, inter alia,* to the state portion of

Medicaid losses caused by false or fraudulent Medicaid claims to the jointly federal-state

funded Medicaid program or by a conspiracy to do so.  Defendants' acts alleged herein also

constitute violations of the California FCA, Cal. Gov't Code §§ 12650 *et seq*.  The California

FCA above contains *qui tam* provisions authorizing a relator to bring an action on behalf of

the State to recover damages and civil penalties.

80.    Relator seeks to recover damages and civil penalties in the name of the United

States and the State of California arising from the false or fraudulent claims for payment

Defendants submitted or caused other health care providers to submit to the United States and

the State of California and to Government Health Care Programs, and from other violations of

the FCA and California FCA. Defendants' liability arises from violations of Government

Health Care Program laws described above, as well as from violations of the Stark and Anti-

Kickback Statutes described below.

### D. The Federal and California Anti-Kickback Statutes

81.    The Medicare and Medicaid Fraud and Abuse Statute (also known as the

"Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security

Act in 1977. The Anti-Kickback Statute ("AKS") arose out of Congressional concern that

payoffs to those who can influence health care decisions will result in goods and services

being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful

to a vulnerable patient population. To protect the integrity of federal health care programs

from these difficult to detect harms, Congress enacted a prohibition against the payment of

kickbacks in any form, regardless of whether the particular kickback actually gives rise to

overutilization or poor quality of care.

82.    The Anti-Kickback Statute prohibits any person or entity from making or

accepting payment to induce or reward any person for referring, recommending, or arranging

for the purchase of any item for which payment may be made under a federally-funded health

care program. 42 U.S.C. § 1320a-7b(b). The statute's prohibition applies to both sides of an

impermissible kickback relationship (*i.e.*, the giver and the recipient of the kickback). The

statute provides, in pertinent part:

(b) Illegal remunerations**

(2) Whoever knowingly and willfully offers or pays any remuneration (including any
kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind
to any person to induce such person –

a.   To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal health care program, or

b.   To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

83.   Claims for reimbursement for services that result from kickbacks are rendered false under the False Claims Act.  42 U.S.C. § 1320a-7b(g).  Recent amendments to the Anti-Kickback Statute in the Patient Protection and Affordable Care Act of 2010 ("PPACA") make plain that "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]."  *See* Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, 759 (2010), *codified at* 42 U.S.C. § 1320a-7b(g).

84.   In September 2008, the Office of Inspector General ("OIG") of the Department of Health & Human Services ("HHS") published formal guidance for nursing facilities, identifying several practices that constitute unlawful kickbacks.  *See OIG Supplemental Compliance Program Guidance for Nursing Facilities*, 73 Fed. Reg. 56832-48 (September 30, 2008).  With regard to the practice of nursing facilities paying doctors to provide medical director and other services, the Guidance states:

(b) Physician Services

Nursing facilities also arrange for physicians to provide medical director, quality assurance, and other services. . . .These physicians, however, may also be in a position to generate Federal health care program business for the nursing facility.  For instance, these physicians may refer patients for admission. . . . **Physician arrangements need to be closely monitored to ensure that they are not vehicles to pay physicians for referrals. As with other services contracts, nursing facilities should periodically**

**review these arrangements to ensure that: (i) There is a legitimate need for the services; (ii) the services are provided; (iii) the compensation is at fair-market value in an arm's-length transaction; and (iv) the arrangement is not related in any manner to the volume or value of Federal health care program business.** In addition, prudent nursing facilities will maintain contemporaneous documentation of the arrangement, including, for example, the compensation terms, time logs or other accounts of services rendered, and the basis for determining compensation. Prudent facilities will also take steps to ensure that they have not engaged more medical directors or other physicians than necessary for legitimate business purposes. They will also ensure that compensation is commensurate with the skill level and experience reasonably necessary to perform the contracted services. . . .

*Id.* at 56843-44 (emphasis added).

85.    The Anti-Kickback Statute's exceptions -- also known as Safe Harbors – identify specific transactions that will not trigger its prohibitions. Thus, for example, the safe harbor for personal services – the safe harbor that would typically apply when a nursing facility hires a physician to serve as a medical director or otherwise as a consultant – requires that:

> (1) The agreement must be reduced to a written contract, signed by the parties;
>
> (2) The contract must specify the services to be performed by the physician;
>
> (3) The contract must covers all of the services to be provided by the physician to the facility;
>
> (5) The aggregate services contracted for may not exceed those that are reasonable and necessary for the legitimate business purposes of the facility; and
>
> (6) The term of the arrangement must be for at least 1 year;

42 C.F.R. § 1001.952(d) (1)-(4).  Further, the compensation to be paid to the physician consultant:

> (1) Must be paid over the term of the arrangement and set in advance;
>
> (2) May not exceed the fair market value for the services; and
>
> (3) May not be determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties

(unless the agreement falls within the narrowly defined physician incentive plan).

*Id.* § (d)(5). Finally, the services may not involve promoting any activity that violates State or Federal law. *Id.* § (d)(6). Once the Government has demonstrated each element of a violation of the Anti-Kickback Statute, the burden shifts to the defendant to establish that defendant's conduct at issue was protected by a safe harbor or exception. The Government need not prove as part of its affirmative case that defendant's conduct at issue does not fit within a safe harbor.

86.    The State of California also has an Anti-Kickback law similar to the AKS, which applies to medical providers and entities participating in the California Medicaid programs. *See* Cal. Welf. & Inst. Code § 14107.2.

87.    Violations of the federal or California AKS laws can subject the perpetrator to liability under the federal and California FCAs, for example, for causing the submission of false or fraudulent claims or for making a false or fraudulent statement or record material to a false or fraudulent claim. *See* PPACA, *supra*, amending the federal AKS, 42 U.S.C. §1320a-7b, to add new subsections (g) and (h) (items or services resulting from a violation of the AKS constitute false or fraudulent claims for purposes of the federal FCA and no actual knowledge of this section or specific intent to commit a violation of this section is required). Accordingly, claims for reimbursement for services that result from kickbacks are rendered false under the False Claims Act. 42 U.S.C. § 1320a-7b(g).

88.    Violation of the federal Anti-Kickback Statute also subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).

89.    Compliance with Anti-Kickback laws is also a precondition to participation as a health care provider and receipt of payment under the Medicare, Medicaid, and other

Federal Health Care Programs. *See generally United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377 (1st Cir. 2011) (Medicare); *State of New York, et al. v. Amgen Inc.*, 652 F.3d 103 (1st Cir. 2011) (California Medicaid).

90.    Either pursuant to provider agreements, claim forms, or other appropriate manner, hospitals and physicians who participate in a Federal Health Care Program must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback Statute.

91.    Any party criminally convicted under the Anti-Kickback Statute must be excluded (*i.e.*, not allowed to bill for services rendered) from federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1). Even without a criminal conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agencies to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

**E.    The Stark Statute**

92.    42 U.S.C. § 1395nn, a section of the Social Security Act commonly known as the "Stark Statute," prohibits a healthcare provider from submitting claims to Medicare or Medicaid for certain items or services rendered to patients referred by physicians who have improper financial relationships with the providers. 42 U.S.C. §§ 1395nn(a)(1), 1396b(s). In enacting the statute, Congress found that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality. Further, Congress relied on various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of those

providers' services than similarly situated physicians who did not have such relationships. The statute was designed specifically to reduce the loss suffered by the Medicare Program due to such increased questionable utilization of services, but Stark also applies to Medicaid claims. *See generally. United States v. Rogan*, 459 F. Supp. 2d 692, 722-23 (N.D. Ill. 2006); *Fresenius Medical Care Holdings, Inc. v. Tucker*, 704 F.3d 935 (11th Cir. 2013).

93.    Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical laboratory provider. *See* Omnibus Budget Reconciliation Act of 1989, Pub. Law 101-239, § 6204.

94.    In 1993, Congress amended the Stark Statute (Stark II) to cover referrals for additional health services. *See* Omnibus Budget Reconciliation Act of 1993, Pub. Law 103-66, § 13562, Social Security Act Amendments of 1994, Pub. Law 103-432, § 152.

95.    The Stark Statute currently applies to the following twelve "designated health services": (1) clinical laboratory services; (2) physical therapy services; (3) occupational therapy services; (4) radiology services (including MRIs, CTs, and ultrasounds); (5) radiation therapy services and supplies; (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) home health services; (10) outpatient prescription drugs; (11) inpatient and outpatient hospital services; and (12) outpatient speech language pathology services. *See* 42 U.S.C. § 1395nn(h)(6).

96.    In pertinent part, the Stark Statute provides:

(a)    Prohibition of certain referrals

(1)    In general. Except as provided in subsection (b), if a physician (or an immediate family member of such physician) has a financial relationship with an

1   entity specified in paragraph (2), then – (A) the physician may not make a referral to

2   the entity for the furnishing of designated health services for which payment otherwise

3   may be made [by Medicare or Medicaid]; and (B) the entity may not present or cause

4   to be presented a claim under this title or bill to any individual, third party payor, or

5   other entity for designated health services furnished pursuant to a referral prohibited

6   under (A).

7

8   42 U.S.C. § 1395nn(a)(1).

9   97.    Therefore, a physician is prohibited from making referrals to an entity with

10  which s/he has a financial relationship for designated health services payable by Medicare or

11  Medicaid.  In addition, providers may not bill Medicare or Medicaid for designated health

12  services furnished as a result of a prohibited referral.  Further, no payment may be made by

13  the Medicare or Medicaid programs for designated health services provided in violation of 42

14  U.S.C. § 1395nn(a)(1).  *See* 42 U.S.C. §§ 1395nn(g)(1); 1396b(s).  Finally, if a person

15  collects payments billed in violation of 42 U.S.C. § 1395nn(a)(1), that person must refund

16  those payments on a "timely basis," defined by regulation not to exceed 60 days.  *See* 42

17  U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(d); 42 C.F.R. § 1003.101.

18  98.    The Stark Statute broadly defines prohibited financial relationships to include

19  any "compensation" paid directly or indirectly to a referring physician.  The statute's

20  exceptions --also known as Safe Harbors – then identify specific transactions that will not

21  trigger its referral and billing prohibitions. *See* 42 U.S.C. § 1395nn(e). The Safe Harbors for

22  personal services and employment agreements are largely the same under the Anti-Kickback

23  Statute and the Stark Statute.  Like the Anti-Kickback Statute, once the Government has

24  demonstrated each element of a violation of the Stark Statute, the burden shifts to the

25  defendant to establish that defendant's conduct at issue was protected by a Safe

26

Harbor/exception. The Government need not prove as part of its affirmative case that

defendant's conduct at issue does not fit within a safe harbor.

99.     Violations of the Stark Statute may subject the physician and the billing entity

to exclusion from participation in Federal Health Care Programs and various financial

penalties, including: (a) a civil money penalty of up to $15,000 for each service included in a

claim for which the entity knew or should have known that the payment should not be made;

and (b) an assessment of three times the amount claimed for a service rendered pursuant to a

referral the entity knows or should have known was prohibited. *See* 42 U.S.C. §§

1395nn(g)(3), 1320a-7a(a).

## V.     ALLEGATIONS

### A.     Summary of Ensign Defendants' Unlawful Conduct

100.     Ensign, established in 1999, has grown to a chain of over 140 SNFs through an

aggressive strategy of facility acquisition and transformation. Since its inception, whenever it

has taken over new facilities, Ensign has replaced the facility's administration with

individuals approved by and trained by Ensign's corporate office.

101.     By and through the officers it has put in charge of its SNFs, Ensign's pattern

and practice has been to contract with physicians, most often those with private practices in

specialties from which the SNF wishes to draw referrals, to serve as "medical directors" or

"associate medical directors" (collectively referred to herein a "Medical Directors"), or

otherwise to serve as "consultants" in various capacities to the SNF. [1]  Defendants pay their

Medical Directors and consultants substantially above fair market value ("FMV"), often for

little or no work, in part or in whole as an inducement to refer patients to their SNFs.

---

[1] As used in this complaint, the term "physician" is intended to refer to any medical professional that
makes referrals to an Ensign facility. This would include nurse practitioners and other non-
physician medical professionals who make referrals.

102.    Defendants' payments to physicians in a position to, and who in fact do, refer patients to the SNFs violate the federal and California Anti-Kickback Statutes, the Stark Statute, and Defendant Ensign's Corporate Integrity Agreement entered into on October 1, 2013, between Defendant Ensign and the Office of Inspector General of the United States Department of Health and Human Services arising out of the conduct alleged in *United States ex rel. Patterson v. Ensign Group, Inc., et al.*, Civil Action No. 06-6956 (Carney, J.).

103.    Ensign's corporate office puts tremendous pressure on the management of individual SNFs to maximize profits, which requires filling beds, ideally with Medicare and Medicaid patients whose bills are reliably paid by the Government and State Government.

104.    Each facility administrator is required to set a goal for Medicare census, as well as other profit-related metrics. These goals are referred to as "Big Hairy Audacious Goals" ("BHAGs"). The rewards for reaching these goals include bonuses and elaborate all-expense paid vacations for the senior managers of the facility plus their guests, to places like Hawaii. The BHAGs and the annual review place significant pressure on the administrators to maintain a high Medicare census and generate "big," "audacious" profits.

105.    Facility administrators who do not reach profit goals are frequently fired, along with their senior staff. To keep their jobs, and receive lucrative bonuses, these individuals resort to various means to keep up their patient census, including using Medical Director and consultant payments as a way to induce referrals.

106.    As explained more fully below, Defendants' payments to physicians in exchange for referrals constitute improper financial inducements that violate federal and California Anti-Kickback Statutes and the Stark Statute and are not subject to any Safe Harbor.

**B.      Ensign Defendants Pay Physicians Above Fair Market Value for Medical
Director and Other Types of Consultant Services, which Are Often
Unnecessary and/or Not Actually Performed**

107.    As discussed in the "Applicable Law" section above, when a SNF pays a

physician either as a consultant or as an employee, to qualify for protection under both the

Anti-Kickback and Stark Statutes, the agreement must meet certain essential standards.  Most

importantly: (1) the contract must pay no more than fair market value for the services

performed; (2) the services to be performed by the physician must be legitimately needed at

the facility and must be specified in the contract; and (3) the physician must actually perform

the required services to get paid.  Ensign's SNFs routinely ignore each of these requirements

in their dealings with referring physicians.

**1.      Ensign Defendants Routinely Pay More than Fair Market Value
for Physician "Medical Director" and "Consulting" Services.**

108.    At Defendant Ensign's direction and under its control, Defendant SNFs

routinely pay their physician "Medical Directors" and "consultants" large monthly payments

with little or no accountability for the amount worked.

109.    In Relator's experience, the standard industry practice among SNFs is to

consult data from national surveys and reports on physician compensation to determine an

hourly FMV rate for physician medical director and consulting services based on the

geographic area, physician specialty, type of services and other factors.  The FMV is typically

expressed as a per-hour rate, and the medical directors and consultants are paid that rate on a

per-hour basis in accordance with the number of hours actually worked per month.

110.    Defendants do not follow this practice.  Instead, the facility Administrators set

the compensation for Medical Directors and consultants at a lump sum monthly payment,

without reference to any standard FMV for the services and without reference to any actual

hours worked.

111.    For example, Defendant Ensign's records show that Defendant Carmel Mountain Rehabilitation & Healthcare ("Carmel Mountain") in San Diego pays "Medical Director" monthly payments of $7,000 to Dr. Daniel Pinney, $5,000 to Dr. Michael Kalafer, $3,000 to Dr. Mohinderpal Thaper, and $1,500 to Dr. Jason Keri, for an aggregate sum of $16,500 per month (or approximately $200,000 per year). This is far in excess of the FMV for Medical Director services for a single facility.

112.    Relator is informed and believes that Carmel Mountain's $16,500 in monthly payments to Medical Directors were set without any FMV analysis, without reference to whether a single individual could perform the overlapping services at a much lower cost, and without reference to how much time any individual would have to spend performing his or her duties. Relator alleges that the payments are not commercially reasonable and would not be made but for the benefits Carmel Mountain receives in the form of patient referrals in exchange for the payments.

113.    Defendant Ensign's records show many other examples of Ensign's SNFs paying Medical Directors and other consultants lump sum payments well above FMV and with no accountability for hours actually worked.

114.    For example, Ensign's records show that Defendant Lemon Grove Care Center ("Lemon Grove") in Lemon Grove, California, has six Medical Director or Associate Medical Director Agreements paying six physicians a total of $15,000 per month. These payments are for work that could be performed by a single physician at a much lower cost.

115.    Another representative example is Defendant Vista Knoll Specialized Care ("Vista Knoll") in Vista, California. Ensign's records show that Vista Knoll has or had Medical Director Agreements with four doctors (paid $3,000 per month, $2,000 per month, $1,500 per month, and $1,500 per month, respectively), as well as at least ten consulting agreements with ten additional doctors, most of which pay over $2,000 per month and one of

which pays $4,000 per month. The total payments to doctors, both Medical Directors and consultants, at Vista Knoll exceed $25,000 per month. This is so far in excess of the medical needs of the facility that it can only logically be attributed to the practice of paying doctors for referrals.

116.   Ensign's records show many other examples, such as:

(a)     Defendant Brookfield Healthcare Center in Downey, California, has or had Medical Director Agreements with six doctors, one paid $4,000 per month, another $3,300 per month, another $3,000 per month, another $2,000 per month, and two at $1,500 per month – for a grand total of $15,300 per month.

(b)     Defendant Cambridge Health & Rehabilitation Center in Richmond, Texas, has or had Medical Director Agreements with four doctors (paying an average of $1,500 per month), plus Quality Review Physician Agreements with three other doctors paying $3,000 per month, $1,000 per month, and $500 per month, respectively.

(c)     Defendant St. Joseph Villa in Salt Lake City, Utah, has or had Medical Director or Associate Medical Director Agreements with five doctors -- paying $6,000 per month, $3,500 per month, $3,000 per month; $225/hour, and $175 per hour, respectively – in addition to having consulting agreements with five more physicians, four of whom are paid $2,000 or more per month.

(d)     Defendant Rose Villa Health Care Center in Bellflower, California, has or had agreements with eight doctors to act either as Medical Director, Associate Medical Director, or consultants of various types, with aggregate payments of more than $9,000 per month.

(e)     Defendant Panorama Gardens Nursing and Rehab Center in Panorama City, California, has or had Medical Director or Associate Medical Director Agreements

31

with five doctors (paying amounts ranging from $800 to $1,900 per month), as well as consulting agreements with five other doctors paying monthly amounts up to $2,500 per month.

117. Relator is informed and believes and therefore alleges that each SNF named as a Defendant in this Complaint hired multiple Medical Directors and/or consultants and paid them a lump sum, without any FMV analysis or accountability for work actually performed.

### 2. Ensign Defendants Hire "Medical Directors" and other "Consultants" to Perform Services without Establishing What Those Services Are or Whether They Are Necessary.

118. A second key component of the analysis to determine if payments to physicians for "medical director" or "consulting" services are lawful is an analysis of the nature and amount of services that the physician is required to perform. *See, e.g.*, 42 C.F.R. § 411.357(d)(iii). This is so because the Anti-Kickback and Stark laws recognize that "make work" or "no show" consulting arrangements could easily be used to funnel improper payments to referring physicians.

119. Accordingly, in Relator's experience, law-abiding SNFs that plan to hire a new medical director, or renew an existing contract, perform an in-depth analysis of the SNF's needs. Based on this review, the SNF drafts a contract that sets forth the specific tasks to be performed, hours that the medical director or consultant will be expected to work to perform those tasks, and specific "timekeeping" requirements to establish that the work was done. Each of these requirements is essential to allow the facility to ensure that: (1) the facility contracts only for the services it needs; and (2) there are measurable standards by which the physician medical director's performance and compensation can be judged. Under Defendant Ensign's direction and control, however, Defendant SNFs routinely fail to provide even basic frameworks to establish that the services they are purportedly paying physicians for are needed.

1       120.    The amount that Defendants' Medical Directors and consultants are paid is not

2  tied to any analysis of how much time the duties assigned should require of a reasonably

3  efficient and qualified physician.  For example, Defendant Lemon Grove pays six Medical

4  Directors varying amounts:  one is paid $5,000 per month, one is paid $3,000 per month,

5  three are paid $2,000 per month, and one is paid $1,000 per month, for a total of $15,000 per

6  month.  Relator is informed and believes that this facility has no documentation explaining or

7  justifying the different payments.

8       121.    Typically, Defendants' Medical Director agreements contain only boilerplate

9  language setting forth the duties to be performed, without concrete or measurable

10  responsibilities.  In many cases, the duties are so broad as to make it difficult to determine

11  what exactly is required of the Medical Director.  Without specific detail in the Medical

12  Director agreement itself or some associated job description, the purported duties in these

13  contracts are almost impossible to assess, and the Administrators typically are not able to

14  provide the necessary detail.  Beyond the question of what duties are expected, it is also

15  important, for purposes of the Anti-Kickback and Stark Safe Harbors, to assess whether the

16  services to be performed are actually required – as opposed to simply being "make work"

17  used as a means to funnel compensation to the physician.  Even if a physician is being paid

18  what would otherwise be fair market value for his or her services, a SNF's payments to him

19  or her will constitute a kickback and improper financial relationship if the SNF does not have

20  a legitimate need for those services.

21       122.    Accordingly, before hiring a Medical Director or other consultant, a SNF must

22  first establish what *bona fide* need justifies the position.  Under Ensign's direction and

23  control, Defendant SNFs routinely fail to perform such a needs assessment, and/or hire

24  multiple medical directors for the same or similar positions without justification.  *See, e.g.,*

25  the examples provided in ¶ 116 above.

1

### 3.    Ensign Defendants Pay Medical Directors and Consultants for Services Without Evidence that the Services Were Actually Performed.

123.    Under Ensign's direction and control, Defendant SNFs routinely structure their agreements in ways that make it difficult if not impossible to monitor whether the Medical Director or consultant services were actually performed. Further, even where certain evidence of work is required, Defendants routinely pay the physicians despite a lack of documentation that work was performed.

124.    In Relator's experience, it is standard industry practice among SNFs to include in their Medical Director and consultant agreements a requirement that before a payment is made, the physician must turn in monthly time logs with details about the work performed. Defendant SNFs, however, do not require their Medical Directors and other consultants to submit such time records. Instead, the Medical Directors and consultants are routinely paid lump sums under the terms of their contracts, regardless of the amount of time they actually worked and without even requiring basic time keeping by the physician.

125.    The vast majority of all Medical Director and physician consulting agreements entered into by the Defendant SNFs provide lump sum monthly payments above FMV, with no requirement to keep time records, and a substantial portion of the compensation that Defendants have paid to physicians in the form of Medical Director and consulting contracts are inducements for referrals.

126.    All claims submitted to federal and state-funded health care programs by Defendants for reimbursement relating to such tainted patient referrals are thus false or fraudulent claims within the meaning of the FCA and California FCA.

### C.    Defendants Ensign and Axiom Mobile Imaging Engaged in an Unlawful Kickback Scheme Known as "Swapping"

127.    Over the past several years, the SNF Defendants participated with Defendant Axiom Mobile Imaging ("Axiom") in an illegal kickback scheme known as "swapping" that

defrauded the Medicare and Medicaid programs.  The swapping scheme consisted of Axiom providing the SNF Defendants with below-cost rates on mobile X-rays provided to their Medicare Part A patients, in exchange for the SNF Defendants referring Medicare Part B patients to Axiom.  This scheme is profitable for Axiom and the SNF Defendants because of the different ways in which Medicare Part A and Part B reimbursements are made.

128.    Broadly speaking, Medicare Part A covers inpatient care, including stays in SNFs.  Medicare Part A does not cover preventive or screening services.  Medicare Part B, in contrast, covers outpatient care and preventive and screening services, including X-rays, laboratory tests, and other diagnostic tests.

129.    Services furnished to beneficiaries under Part A are reimbursed at a flat, per diem rate, or "capitated" rate, under the Medicare prospective payment system ("PPS").  Companies like Axiom that provide SNFs with mobile X-ray services to Medicare Part A beneficiaries bill the SNFs for those services, and the SNFs pay Axiom out of the per diem rate the SNFs receive from Medicare.

130.    In the case of X-ray services covered by Medicare Part B, Axiom bills Medicare directly.  In contrast to the "capitated" payment system of Medicare Part A, Medicare Part B billing is based on a "fee for service" ("FFS") model.  In practice, mobile X-ray companies such as Axiom charge the Government the maximum amount the Government fee schedule will allow.  These differing payment methods provided Axiom and the SNF Defendants with the motivation and tools for their kickback scheme.

131.    Defendant Axiom offered Ensign's SNFs steep discountsper X-ray, for X-rays provided to the SNF's Part A patients.  These discounted rates did not come close to covering the cost of the X-rays.  In return for these discounts, the SNFs referred all of their Part B patients in need of X-ray services to Axiom.  This practice was profitable for the Defendant SNFs since they receive the Part A services at such a heavy discount, and was profitable for

1   Axiom since it billed the Government the maximum that the Government will pay for Part B

2   services (making up for the profit lost due to offering steep discounts on Part A patients).

3   This "swapping" scheme violated the federal and California Anti-Kickback Statutes, which

4   prohibit offering or accepting remuneration (including below-cost discounts) in exchange for

5   
6   referring business reimbursed by Federal Health Care Programs.

7          132.   In 2013, because of negative publicity surrounding other swapping schemes,

8   Defendant Axiom became concerned that its practice of offering below-cost X-ray services to

9   Ensign for Part A patients in exchange for referral of Ensign's Part B business would subject

10  Axiom to liability under the Anti-Kickback Statute.  Consequently, Axiom purported to make

11  a full disclosure to Ensign of the degree to which Axiom undercharged Ensign for Part A X-

12  
13  rays.

14         133.   Axiom provided Ensign with a spreadsheet showing how much it

15  undercharged 10 Ensign SNFs for Part A services. The 10 SNFs were:  Atlantic Memorial

16  Healthcare Center; The Orchard Post Acute Care Center; Palm Terrace Healthcare &

17  Rehabilitation Center; Palomar Vista Healthcare Center; Shoreline Healthcare Center;

18  Summerfield Health Care Center; Ukiah Convalescent Hospital; Sonoma Convalescent

19  Hospital; Cloverdale Convalescent Hospital; and Park View Gardens.  The spreadsheet

20  showed that Axiom undercharged these SNFs thousands of dollars per year for X-rays

21  
22  provided to Part A patients.  This was tantamount to an admission by Axiom that the

23  discounts were an unlawful inducement for referrals, in violation of the federal and California

24  Anti-Kickback Statutes.

25         134.   Relator is informed and believes that Ensign and the SNFs that did business

26  with Axiom did not pay back Axiom the amount of the undercharges, and never informed the

27  Government of any aspect of the swapping scheme.

28

135.    All claims submitted or caused to be submitted to the Government and State Government for Axiom's mobile X-ray services tainted by this kickback scheme constituted false or fraudulent claims in violation of the FCA and California FCA.

136.    Ensign and the involved SNFs also violated the "reverse false claims" provisions of the FCA and California FCA by failing to disclose the swapping scheme to the Government despite being under an obligation to do so pursuant to Ensign's Corporate Integrity Agreement (discussed in more detail *infra*), thereby knowingly avoiding repayment and penalties owed to the United States under the Corporate Integrity Agreement.

**D.    Defendants Ensign and its Subsidiaries Knowingly Failed to Report Violations of Their Corporate Integrity Agreement in an Effort to Avoid Paying Penalties Owed to the United States.**

137.    Defendant The Ensign Group, Inc., the parent company of the SNFs identified in this Complaint, entered into a Corporate Integrity Agreement ("CIA") with the Office of the Inspector General of the Department of Health and Human Services on October 1, 2013. The CIA expressly covers Ensign as well as its subsidiaries.

138.    All of the management employees of Ensign and its SNFs were aware of the CIA as the CIA requires a written Code of Conduct be distributed to all Covered Persons.  Per the CIA, a Covered Person is any officer, director, and employee of The Ensign Group (including its subsidiaries) and any, contractor, sub-contractor, agent or any other person who provides patient care items or services or who performs billing or coding functions.

139.    Under the CIA, each Covered Person is required to certify, in writing, that he or she has received, read, understood, and will abide by Ensign's Code of Conduct.  Pursuant to the CIA, the Code of Conduct must specify that all Covered Persons shall be expected to comply with the requirements of the CIA.

140.    In addition, the CIA contains an express contract agreement that requires Ensign to report any Reportable Events within thirty (30) days after making the determination that a Reportable Event exists. The CIA defines a Reportable Event as follows:

> *Definition of Reportable Event.* For purposes of this CIA, a "Reportable Event" means anything that involves:
>
>       \*    \*    \*    \*
>
>     b.  a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized;
>
>       \*    \*    \*    \*
>
> A Reportable Event may be the result of an isolated event or a series of occurrences.

141.    Indeed, the CIA contains a specific provision regarding Ensign's violation of the Stark Law.  The CIA provides that Ensign will report all probable violations of the Stark Law to CMS through the self-referral disclosure protocol ("SDRP"), with a copy to HHS-OIG.

142.    Pursuant to the CIA, the Compliance Officer must certify as follows:

> C. Certifications.
>
> The Implementation Report and Annual. Reports shall include a certification by the Compliance Officer that:
>
>     1.    to the best of his or her knowledge, except as otherwise described in the report, Ensign Group is in compliance with all of the requirements of this CIA;
>
>     2.    he or she has reviewed the report and has made reasonable inquiry regarding its content and believes that the information in the report is accurate and truthful . . . .

143.    Debbie Miller, as Compliance Officer of Ensign, was aware of the CIA as she was the person who signed and attested to the truthfulness of the required annual certifications.

144.    Relator is informed and believes that one or more certifications signed by the Compliance Officer were materially false in that Ensign certified that it complied with the reporting requirements  under the CIA when in fact it did not report the violations of the law alleged in this Complaint.

145.    In violation of 31 U.S.C. § 3729(a)(1)(G), Ensign submitted one or more false certifications to the OIG falsely attesting that Ensign and its subsidiaries were in compliance with all of the requirements of the CIA,  including compliance with the CIA's reporting requirements.  Such false certification constituted a false record or statement made, used, or caused to be used which was material to Ensign's obligation to pay or transmit money to the United States.  Further, through such false certifications, Ensign knowingly concealed and/or improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

## VI.    CLAIMS FOR RELIEF

### Count I

**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1) (1986)**
**31 U.S.C. § 3729(a)(1)(A) (2009)**
**(As to all Defendants)**

148.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

149.    This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.* as amended.

150.    With respect to acts occurring prior to the effective date of the 2009 FCA amendments, by and through the acts described above, Defendants have knowingly presented or caused to be presented, false or fraudulent claims to the United States for payment or approval.

151.    With respect to acts occurring on or after the effective date of the 2009 FCA amendments, by and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval.

152.    The Government, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

153.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

154.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count II

### Federal False Claims Act
### 31 U.S.C. § 3729(a)(2) (1986)
### 31 U.S.C. § 3729(a)(1)(B) (2009)
### (As to all Defendants)

155.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

156.    This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.* as amended.

157.    With respect to acts occurring or claims for payment pending prior to the June 7, 2008 effective date of the 2009 FCA amendment to 31 U.S.C. § 3729(a)(2) (1986), now codified as 31 U.S.C. § 3729(a)(1)(B) (2009), Defendants, knowingly made, used, or caused

1   to be made or used, false records or statements to get false or fraudulent claims paid or

2   approved by the Government.

3       158.    With respect to acts occurring, or claims for payment pending on or after the

4   June 7, 2008 effective date of that amendment, by and through the acts described above,

5

6   Defendants knowingly made, used, or caused to be made or used false records or statements

7   material to false or fraudulent claims.

8       159.    The Government, unaware of the falsity of the records, statements, and claims

9   made or caused to be made by Defendants, has paid and continues to pay claims that would

10  not be paid but for Defendants' illegal conduct.

11      160.    By reason of Defendants' acts, the United States has been damaged, and

12  continues to be damaged, in a substantial amount to be determined at trial.

13

14      161.    Additionally, the United States is entitled to the maximum penalty of up to

15  $11,000 for each and every violation alleged herein.

16                                  **Count III**

17                            **Federal False Claims Act**
                         **31 U.S.C. § 3729(a)(1)(G) (2009)**
18                            **(As to all Defendants)**

19      162.    Relator realleges and incorporates by reference the allegations contained in the

20  foregoing paragraphs as though fully set forth herein.

21

22      163.    This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§

23  3729, *et seq.* as amended.

24      164.    By and through the acts described above, Defendants have knowingly made,

25  used, or caused to be made or used a false record or statement material to an obligation to pay

26  money to the Government and they have concealed and improperly avoided an obligation to

27  pay money to the Government, including specifically Defendants' obligation to report and

28

repay past overpayments of Medicare and Medicaid claims for which Defendants knew they were not entitled, and therefore refunds were properly due and owing to the United States.

165. The Government, unaware of the concealment by the Defendants, has not made demand for or collected the years of overpayments due from the Defendants.

166. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

167. Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count IV

### Federal False Claims Act
### 31 U.S.C. § 3729(a)(3) (1986)
### U.S.C. § 3729(a)(1)(C) (2009)
### (As to all Defendants)

168. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

169. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.* as amended.

170. With respect to acts occurring prior to the effective date of the 2009 FCA amendments, by and through the acts described above, Defendants conspired to defraud the Government by getting false or fraudulent claims allowed or paid.

171. With respect to acts occurring on or after the effective date of the 2009 FCA amendments, by and through the acts described above, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A), (B), and (G).

172. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

173.    By reason of Defendants' acts, the United States has been damaged, and continues to
be damaged, in a substantial amount to be determined at trial.

174.    Additionally, the United States is entitled to the maximum penalty of up to $11,000
for each and every violation alleged herein.

## Count V

### California False Claims Act
### Cal. Gov't Code § 12651(a)(1)
**(As to Defendants The Ensign Group, Inc. ; Ensign Facility Services, Inc.; Axiom
Mobile Imaging; and SNF Defendants That are Located in California)**

175.    Relator realleges and incorporates by reference the allegations contained in the
foregoing paragraphs as though fully set forth herein.

176.    This is a claim for treble damages and penalties under the California FCA, Cal.
Gov't Code § 12651(a)(1).

177.    By and through the acts described above, one or more of the Defendants
knowingly presented or caused to be presented, false or fraudulent claims to the State of
California in order to obtain reimbursement to which Defendants were not entitled for health
care services provided under Medicaid and other state-funded health care programs.

178.    The State of California, unaware of the falsity of all such claims made or
caused to be made by Defendants has paid and continues to pay such false or fraudulent
claims that would not be paid but for Defendants' illegal conduct.

179.    By reason of Defendants' acts, the State of California has been damaged, and
continues to be damaged, in a substantial amount to be determined at trial.

180.    Additionally, the State of California is entitled to the maximum penalty of up
to $11,000 for each and every violation alleged herein.

1

## Count VI

2

3   **California False Claims Act**
    **Cal. Gov't Code § 12651(a)(2)**
4   **(As to Defendants The Ensign Group, Inc.; Ensign Facility Services, Inc.; Axiom Mobile Imaging; and SNF Defendants That are Located in California)**

5

6       181.    Relator realleges and incorporates by reference the allegations contained in the

7   foregoing paragraphs as though fully set forth herein.

8       182.    This is a claim for treble damages and penalties under the California FCA, Cal.

9   Gov't Code § 12651(a)(2).

10

11      183.    By and through the acts described above, one or more of the Defendants

12  knowingly made, used, or caused to be made or used false records or statements material to

13  false or fraudulent claims.

14      184.    The State of California, unaware of the falsity of all such claims made or

15  caused to be made by Defendants has paid and continues to pay such false or fraudulent

16  claims that would not be paid but for Defendants' illegal conduct.

17      185.    By reason of Defendants' acts, the State of California has been damaged, and

18  continues to be damaged, in a substantial amount to be determined at trial.

19
    186.    Additionally, the State of California is entitled to the maximum penalty of up
20
    to $11,000 for each and every violation alleged herein.
21

22

## Count VII

23

24  **California False Claims Act**
    **Cal. Gov't Code § 12651(a)(7)**
    **(As to Defendants The Ensign Group, Inc.; Ensign Facility Services, Inc.; Axiom Mobile Imaging; and SNF Defendants That are Located in California)**
25

26

27      187.    Relator realleges and incorporates by reference the allegations contained in the

28  foregoing paragraphs as though fully set forth herein.

188.    This is a claim for treble damages and penalties under the California FCA, Cal. Gov't Code § 12651(a)(7).

189.    By and through the acts described above, one or more of the Defendants has knowingly concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past overpayments of Medicaid claims for which Defendants knew refunds were properly due and owing to the State of California.

190.    The State of California, unaware of the falsity of all such claims made or caused to be made by Defendants has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

191.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

192.    Additionally, the State of California is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count VIII

### California False Claims Act
### Cal. Gov't Code § 12651(a)(8)
**(As to Defendants The Ensign Group, Inc.; Ensign Facility Services, Inc.; Axiom Mobile Imaging; and SNF Defendants That are Located in California)**

193.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

194.    This is a claim for treble damages and penalties under the California FCA, Cal. Gov't Code §12651(a)(8).

195.    By and through the acts described above, one or more of the Defendants was a beneficiary of an inadvertent submission of a false claim, subsequently discovered the falsity

of the claim, and failed to disclose the false claim to the state within a reasonable period of time.

196.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

197.    Additionally, the State of California is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count IX

### California False Claims Act
### Cal. Gov't Code § 12651(a)(3)
### (As to Defendants The Ensign Group, Inc.; Ensign Facility Services, Inc.; Axiom Mobile Imaging; and SNF DefendantsTthat are Located in California)

198.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

199.    This is a claim for treble damages and penalties under the California FCA, Cal. Gov't Code § 12651(a)(3).

200.    By and through the acts described above, one or more of the conspired to commit violations of Cal. Gov't Code §§ 12651(a)(1), (2), (7), and (8).

201.    The State of California, unaware of such conspiracy and the falsity of all such claims made or caused to be made by Defendants, and receipt of wrongful payments failed to be disclosed, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

202.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, the State of California is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

1

## VII.    PRAYERS FOR RELIEF

WHEREFORE, Plaintiff-Relator prays for judgment against Defendants as follows:

a.    that Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and the State of California False Claims Act;

b.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of the California False Claims Act;

d.    that Plaintiff-Relator be awarded the maximum amount allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d), and California False Claims Act, Cal. Gov't Code §§ 12652(g);

e.    that Plaintiff-Relator be awarded all attorneys' fees, costs, and expenses; and

f.    that the Plaintiffs United States and the State of California, and Plaintiff-Relator recover such other and further relief as the Court deems just and proper.

1

## DEMAND FOR JURY TRIAL

2

3          Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

4    a trial by jury.

5          Respectfully submitted this 4th day of March, 2015 by:

6
                                    HIRST LAW GROUP, P.C.
7
8                                   By: _____
9                                       Michael A. Hirst (CA Bar No. 131034)
                                        HIRST LAW GROUP, P.C.
10                                      200 B Street, Suite A
                                        Davis, California 95616
11                                      (530) 756-7700
                                        Fax: (530) 756-7707
12                                      Email: michael.hirst@hirstlawgroup.com

13                                  Suzanne E. Durrell (Mass. BBO #139280)
                                    DURRELL LAW OFFICE
14                                  180 Williams Avenue
15                                  Milton, Massachusetts 02186
                                    (617) 371-1072
16                                  Fax: (888) 676-7420
                                    Email: suzanne.durrell@verizon.net
17
18                                  Robert M. Thomas, Jr. (Mass. BBO #645600)
                                    THOMAS & ASSOCIATES
19                                  20 Park Plaza, Suite 833
                                    Boston, MA 02116-4322
20                                  (617) 371-1072
                                    Fax: (888) 676-7420
21                                  Email: rmt@thomasandassoc.net
22
23                                  ATTORNEYS FOR PLAINTIFF-
                                    RELATOR
24
25
26
27
28

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

| **I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ ) | **DEFENDANTS** ( Check box if you are representing yourself ☐ ) |
|---|---|
| [under seal] United States and States of California, ex rel. Jane Doe | The Ensign Group, Inc.; Ensign Facility Servics, Inc.; City Heights Health Associates, LLC, d/b/a Arroyo Vista Nursing Center; et al. |

| **(b) County of Residence of First Listed Plaintiff** _(EXCEPT IN U.S. PLAINTIFF CASES)_ | **County of Residence of First Listed Defendant**   Orange _(IN U.S. PLAINTIFF CASES ONLY)_ |
|---|---|
| **(c) Attorneys** _(Firm Name, Address and Telephone Number)_ If you are representing yourself, provide the same information. Michael A. Hirst; Hirst Law Group, P.C.; 200 B Street, Suite A; Davis, CA 95616; (530) 756-7700 | **Attorneys** _(Firm Name, Address and Telephone Number)_ If you are representing yourself, provide the same information. |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- ☒ 1. U.S. Government Plaintiff
- ☐ 2. U.S. Government Defendant
- ☐ 3. Federal Question (U.S. Government Not a Party)
- ☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

- ☒ 1. Original Proceeding
- ☐ 2. Removed from State Court
- ☐ 3. Remanded from Appellate Court
- ☐ 4. Reinstated or Reopened
- ☐ 5. Transferred from Another District (Specify)
- ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes  ☒ No      ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Violations of 31 U.S.C. secs. 3729-33 and the California False Claims Act resulting from fraud against Medicare, Medicaid, and other government healthcare programs.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☒ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

SACV15-00389 DOC (JCGx)

**FOR OFFICE USE ONLY:**   Case Number:

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned.  This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes   ☒ No<br><br>If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B:  Is the United States, or one of its agencies or employees, a PLAINTIFF in this action?<br><br>☒ Yes   ☐ No<br><br>If "no," skip to Question C. If "yes," answer Question B.1, at right. | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.<br><br>☒ NO. Continue to Question B.2. |
| | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.<br><br>☒ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C:  Is the United States, or one of its agencies or employees, a DEFENDANT in this action?<br><br>☐ Yes   ☒ No<br><br>If "no," skip to Question D. If "yes," answer Question C.1, at right. | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.<br><br>☐ NO. Continue to Question C.2. |
| | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.<br><br>☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | **A.**<br>Orange County | **B.**<br>Riverside or San Bernardino County | **C.**<br>Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside.  (Check up to two boxes, or leave blank if none of these choices apply.) | ☒ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside.  (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |

| **D.1.  Is there at least one answer in Column A?** | **D.2.  Is there at least one answer in Column B?** |
|---|---|
| ☒ Yes   ☐ No<br><br>If "yes," your case will initially be assigned to the<br>SOUTHERN DIVISION.<br><br>Enter "Southern" in response to Question E,  below, and continue from there.<br><br>If "no," go to question D2 to the right. ➡ | ☐ Yes   ☐ No<br><br>If "yes," your case will initially be assigned to the<br>EASTERN DIVISION.<br><br>Enter "Eastern" in response to Question E,  below.<br><br>If "no," your case will be assigned to the WESTERN DIVISION.<br><br>Enter "Western" in response to Question E, below. ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | SOUTHERN ▾ |

| QUESTION F: Northern Counties? | |
|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes   ☒ No |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court**?      ☐ NO      ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court**?
☐ NO      ☒ YES

If yes, list case number(s):      C.A. No. 06-6956 _____

**Civil cases** are related when they (check all that apply):

☒  A. Arise from the same or a closely related transaction, happening, or event;

☐  B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐  C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note:  That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐  A. Arise from the same or a closely related transaction, happening, or event;

☐  B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐  C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**  _Michael A. Hirst / by SED_      DATE: 3/4/15

**Notice to Counsel/Parties:**  The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended.  Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

Insert shipping document here. ►

Extremely Urgent



3/4/2015

FedEx Ship Manager - Print Your Label(s)

Origin ID: EMTA

From:  (213) 894-3535
Ms. Terry Nafisi
U.S. District Court
312 North Spring Street
ATTN: Civil Intake Section
Los Angeles, CA 90012

Ship Date: 04MAR15
ActWgt: 0.5 LB
CAD: 1927029/INET3610

Delivery Address Bar Code

Ref #

BILL SENDER

SHIP TO: (617) 371-1072
Melissa T. McCloskey
THOMAS & ASSOCIATES
20 Park Plaza
Suite 833
BOSTON, MA 02116

RMA #:
Return Reason:

RETURNS MON-FRI
STANDARD OVERNIGHT

02116
MA-US

TRK# 7901 4267 9030
0221







Envelope

envelope shipping

Express

FedEx