1  Michael A. Hirst (CA Bar No. 131034)
   Marisela Bernal (SBN 329589)
2  HIRST LAW GROUP, P.C.
   200 B Street, Suite A
3  Davis, California 95616
   Telephone:  (530) 756-7700
4  Facsimile: (530) 756-7707
   Email: michael.hirst@hirstlawgroup.com
5          marisela.bernal@hirstlawgroup.com

6  James E. Miller (SBN 262553)
   Chiharu G. Sekino (SBN 306589)
7  Casey T. Yamasaki (SBN 335445)
   MILLER SHAH LLP
8  1230 Columbia St., Ste. 1140
   San Diego, CA 92101
9  Telephone: (866) 540-5505
   Facsimile: (866) 300-7367
10 Email: jemiller@millershah.com
         cgsekino@millershah.com
11       ctyamasaki@millershah.com

12 [Additional Counsel Listed On Signature Page]

13 Attorneys for Qui Tam Plaintiff Sharon Ginger

14              UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF CALIFORNIA
15

16 UNITED STATES OF AMERICA and        NO. 8:15-cv-00389-JWH-DFM
   STATE of CALIFORNIA, ex rel.,
17 SHARON GINGER,
                                       **SECOND AMENDED**
18                                      **COMPLAINT FOR VIOLATION**
                                        **OF FEDERAL FALSE CLAIMS**
19          PLAINTIFFS,                  **ACT [31 U.S.C. §§ 3729 *et/ seq.* and**
                                        **the CALIFORNIA FALSE CLAIMS**
20 v.                                    **ACT [Cal. Gov't. Code §§ 12650 *et***
                                        ***seq.*]**
21 THE ENSIGN GROUP, INC. and
   ENSIGN FACILITY SERVICES,
22 INC.,                                **JURY TRIAL DEMANDED**

23
            DEFENDANTS.
24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................1

    A.    Defendants' Fraudulent Schemes..............................................1

        1.    Ensign's Scheme To Pay Improper Compensation And Remuneration To Physicians To Induce Patient Referrals To Ensign's SNFs.......................................................................5

        2.    Ensign's Illegal "Swapping" Scheme with Axiom Mobile Imaging ................................................................................8

        3.    Ensign's Violations of Its CIA With the Government ...............9

        4.    Damage to the United States and California ............................10

    B.    The Federal and California False Claims Acts ...................................10

    C.    The Instant Action ............................................................................12

II.    PARTIES ..........................................................................................12

    A.    Plaintiffs ...........................................................................................12

    B.    Defendants.........................................................................................13

    C.    Defendants Operate as Alter Egos of Each Other, as an Integrated Enterprise and as a Single or Joint Employer............................14

III.    JURISDICTION AND VENUE..................................................................23

IV.    APPLICABLE FEDERAL AND STATE LAWS AND REGULATIONS .23

    A.    Medicare and Medicaid....................................................................23

    B.    Other Federal and State-Funded Health Care Programs....................28

    C.    Federal and California False Claims Acts .........................................29

    D.    The Federal and California Anti-Kickback Statutes..........................31

    E.    The Stark Statute ..............................................................................36

V.    FACTS AND ALLEGATIONS ..................................................................39

    A.    Summary of Ensign's Unlawful Conduct and Relator's Role............39

    B.    Ensign's Scheme to Pay Illegal Compensation to Physicians to Induce Referrals to Ensign SNFs....................................................40

        1.    Ensign Paid More than Fair Market Value for Physician "Medical Director" and "Consulting" Services................................................44

        2.    Ensign Hired "Medical Directors" and other "Consultants" to Perform Services without Establishing What Those Services Were

or Whether They Were Necessary ...................................................47

    3.  Ensign Paid Medical Directors and Consultants for Services Without Evidence that the Services Were Actually Performed ....49

    4.  Ensign Engaged in This Misconduct (and Failed to Report it) Despite its Obligations under the October 2013 CIA with HHS-OIG..............................................................................................50

    5.  Chronology of Relator's Experience With Problematic Physician Payment Arrangements at Ensign................................................51

    6.  The Physicians Ensign Paid Were Incentivized and in a Position to Refer Government Health Care Program Patients to Ensign Facilities.........................................................................................69

    7.  Damages and Penalties Attributable to Ensign's Illegal Physician Compensation Scheme....................................................................71

C.  Ensign Engaged in an Unlawful Kickback Scheme Known as "Swapping" With Axiom Mobile Imaging .........................................72

D.  Ensign Knowingly Failed to Report Violations of Its Corporate Integrity Agreement in an Effort to Avoid Paying Penalties Owed to the United States. ....................................................................................77

VI.    CLAIMS FOR RELIEF..............................................................................80

Count I, Federal False Claims Act ...............................................................80

Count II, Federal False Claims Act ..............................................................81

Count III, Federal False Claims Act..............................................................82

Count IV, Federal False Claims Act ..............................................................83

Count V, California False Claims Act ...........................................................83

Count VI, California False Claims Act ..........................................................84

Count VII, California False Claims Act .........................................................85

Count VIII, California False Claims Act........................................................85

Count IX, California False Claims Act ..........................................................86

VII.   PRAYERS FOR RELIEF...........................................................................87

## I.    INTRODUCTION

1.    This is a *qui tam* action brought by Plaintiff-Relator Sharon Ginger ("Relator" or "Ms. Ginger") to recover damages and civil penalties on behalf of the United States of America (the "United States") and the State of California ("California") (unless otherwise specified, the United States and California are jointly referred to as the "Government"), arising from false and/or fraudulent statements, records, and claims made and/or caused to be made by the Defendants and/or their agents and employees in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA"), and the California False Claims Act, Cal. Gov't Code §§ 12650, *et seq.* (the "California FCA" or the "State FCA").

2.    The FCA violations arise from misconduct that contravenes the federal and state Anti-Kickback laws, the federal Stark law, and a Corporate Integrity Agreement ("CIA") entered into with the Office of Inspector General of the Department of Health and Human Services of the United States ("HHS-OIG") on October 1, 2013 (https://oig.hhs.gov/fraud/cia/agreements/ Ensign_Group_10012013.pdf) as part of the settlement of a different False Claims Act *qui tam* case then pending in this Court, *United States ex rel. Patterson v. Ensign Group, Inc., et al.,* Civil Action No. 06-6956 (Carney, J.).

3.    Through their misconduct, Ensign (defined below) has knowingly defrauded the federal and state Government in connection with Medicare, Medicaid, and other federal and/or state-funded health care programs, causing the Government to pay millions of dollars in claims the Government otherwise would not have paid. Under the federal and California FCAs, Defendants are thus liable for three times the damages sustained by the Government, plus civil penalties.

### A.    Defendants' Fraudulent Schemes

4.    Ensign was established in or about 1999, and has grown to a chain of over 140 skilled nursing and assisted living facilities (collectively referred to herein as "SNFs" or "Facilities"), mostly in the Western and Southwestern United

States.

5.     Since Ensign's inception, whenever it has taken over new Facilities, it has replaced the Facility's administration with individuals approved by and trained by Ensign's corporate office.

6.     Despite being subject to a CIA arising from a previous False Claims Act settlement, Ensign has fostered a corporate climate that tolerates and encourages illegal behavior to increase Ensign's profits.

7.     This Complaint alleges three illegal schemes engaged in by Ensign. Plaintiff-Relator learned of these schemes while working as Contracts Manager at Ensign from October 2013 through June 2015. In that role, she was responsible for reviewing, tracking, and monitoring contracts entered into by Ensign's Facilities. Ms. Ginger also served on the Company's Compliance Committee where one of her responsibilities was to ensure that payment provisions in Ensign's contracts were in accordance with the law.

8.     The first unlawful scheme alleged herein involves Ensign paying improper compensation and remuneration to physicians to induce the physicians to refer patients (including Medicare and Medicaid patients) to Ensign's SNFs. These illegal arrangements include inflated monthly payments to physicians in a position to refer patients to Ensign Facilities, purportedly to work as "Medical Directors" or in other "consulting" capacities at the Ensign SNFs, Advisory Board payments to physicians, and payment for entertainment such as golf outings and fancy dinners.

9.     This Complaint identifies numerous examples where SNF Directors made explicit connections between payments to doctors and referrals to the SNF. For example, in a conversation with three Facility Administrators in the San Diego "cluster" of SNFs (Ensign's "clusters" are discussed in detail below), the directors discussed how they used to pay the hospital admission coordinators for patient referrals with "donuts," but now they were paying doctors with "dollars" (in the form of Medical Director payments and consulting fees) for such patient referrals.

10.     In another example, the Administrator of the Palomar Vista Healthcare Center SNF advised Relator that he had performed a return on investment calculation in order to determine the minimum number of referrals he would need from each doctor in order to break even on the monthly payment amounts provided to those doctors. He also advised Relator that he would raise or lower the monthly payments in accordance with the number of referrals that he actually received from each physician.

11.     Similarly, Charlie Jenkins, the Administrator at Premier Care Center in Palm Springs, CA ("Premier Care"), emailed Relator about a partnership between Premier Care and UCR [University of California at Riverside] Health in which the expectation of patient referrals was clear:

> "They would like to begin the following partnerships.
> 1)      To have one of their physicians *refer and follow patients at Premier Care* immediately
>
> 2)      To have one of their physicians become the co-medical director at Premier Care immediately…
> "Dr. Streletz … would be following / referring."
>
> *"The contract would need to stipulate the co-medical director agreement and the ability for their physicians to follow patients at Premier Care."*

12.     In addition, this Complaint identifies numerous examples of single Ensign SNFs paying multiple physicians thousands of dollars each month for the purpose of inducing referrals. For example, Ensign's records show Vista Knoll Specialized Care ("Vista Knoll") in Vista, California, had Medical Director Agreements with four doctors (paid $3,000 per month, $2,000 per month, $1,500 per month, and $1,500 per month, respectively), as well as at least ten consulting agreements with ten additional doctors, most of which paid over $2,000 per month and one of which paid $4,000 per month. The total payments to doctors at Vista Knoll, both Medical Directors and consultants, exceeded $25,000 per month.

13.     Moreover, this Complaint details the unsuccessful attempts by Relator (and others) to institute hourly rates tied to fair market value (instead of inflated

monthly lump sums) and to limit the number of physicians at a given Facility. For example, upon learning in April 2014 of Relator's concerns about the monthly compensation, Ensign's General Counsel in a meeting with Relator stated that she thought "we [Ensign] were already doing an hourly rate" for Medical Directors because that was "something she said was instituted a few years ago." Based on that meeting, Relator changed the language in the form templates to an hourly rate and understood that would be enforced going forward. However, her attempts to do so were overridden by Barry R. Port, then the Chief Operating Officer of Defendant Ensign Facility Services, Inc.'s and now the Chief Executive Officer of Defendant The Ensign Group, Inc., after he received a complaint from a SNF Administrator.

14.     The second unlawful scheme alleged herein involves Ensign engaging in an illegal kickback scheme known as "swapping" with, among others, Axiom Mobile Imaging, a provider of mobile/portable X-rays. The "swap" consisted of the Ensign SNFs receiving steep discounts on what they had to pay for X-rays provided to their Medicare Part A patients in exchange for referring lucrative Medicare Part B services to Axiom.  Ensign and Axiom knew that such "swapping" schemes were being targeted by HHS-OIG under the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, because such arrangements result in facial and indefensible violations of the AKS. Indeed, Axiom itself calculated and communicated to Ensign that it had undercharged Ensign close to $100,000/year to effectuate the scheme, which had been ongoing for a number of years. When the parties negotiated a new, compliant arrangement at Axiom's insistence, Ensign never disclosed the misconduct or repaid the United States—despite its contractual agreement to do so under the CIA, as discussed below.

15.     The third unlawful scheme alleged herein involves Ensign's failure to timely disclose the above illegal schemes to the United States, in direct violation of the CIA entered into between Ensign and the United States. By failing to disclose

4

the illegal schemes, Ensign avoided the $1,000/day penalty that it agreed to pay for every day it was in violation of its obligations under the CIA, and ensured its continued participation in the Medicare and Medicaid programs. The CIA took effect on October 1, 2013 and lasted for five years.

16.     Through these unlawful fraudulent schemes, Ensign has caused millions of dollars of damage to the United States and the State of California.

**1.     Ensign's Scheme To Pay Improper Compensation And Remuneration To Physicians To Induce Patient Referrals To Ensign's SNFs**

17.     Ensign has engaged in a scheme to pay improper compensation and remuneration to physicians (including inflated monthly compensation to work as "Medical Directors" or in other "consulting" capacities), to induce the physicians to refer patients (including Medicare and Medicaid patients), to Ensign's SNFs so Facility Administrators could fill beds and meet the patient census goals set by management. This conduct violates the federal and state False Claims Acts, the federal and state Anti-Kickback laws, the federal Stark law, and Ensign's CIA entered into with HHS-OIG on October 1, 2013.

18.     By and through the managers it has put in charge of its SNFs, Ensign's pattern and practice has been to contract with physicians, most often those with private practices in specialties from which the SNF wishes to draw referrals, to serve as "Medical Directors" or "Associate Medical Directors" (unless otherwise indicated, collectively referred to herein a "Medical Directors"), or otherwise to serve as "consultants" in various capacities to the SNF.[1]  Defendants pay their Medical Directors and consultants substantially above fair market value ("FMV"), often for little or no work, in part or in whole as an inducement to refer patients to Ensign's SNFs.

---

[1] As used in this Complaint, the term "physician" is intended to refer to any medical professional in a position to make or arrange to make referrals to an Ensign Facility. This includes, without limitation, nurse practitioners, physician assistants, and other non-physician medical professionals who make referrals.

19.     Ensign's corporate office puts tremendous pressure on the managers of individual SNFs to maximize profits, which requires filling beds, ideally with Medicare and Medicaid patients whose bills are reliably paid by the Government.

20.     Each Facility Administrator is required to set a goal for Medicare census, as well as other profit-related metrics, which is reviewed and approved by management at Ensign. These goals are referred to as "Big Hairy Audacious Goals" ("BHAGs").  The rewards for reaching these goals include bonuses and elaborate all-expense paid vacations for the senior managers of the Facility, plus their guests, to places like Hawaii.

21.     The BHAGs and the annual review place significant pressure on the Administrators to maintain a high Medicare census and generate "big," "audacious" profits.  Moreover, Facilities (i.e., SNFs) are organized into groups known as "clusters" and Ensign's corporate office administered and evaluated the performance of clusters as a whole. This meant that the profitability (or lack thereof) of one or more Facilities in a cluster impacted the success or failure of the other Facilities in the cluster.

22.     Facility Administrators who do not reach profit goals are frequently fired, along with their senior staff.  To keep their jobs, and receive lucrative bonuses, these individuals resort to various means to maintain their patient census, including using Medical Director and consultant payments as a way to induce referrals.

23.     The most common form of illegal remuneration (i.e., kickbacks) paid by the SNFs to physicians was inflated monthly compensation to work as "Medical Directors," "Associate Medical Directors," or in other "consulting" capacities. These payments were made to physicians based on a set monthly rate agreed to between the Facility director and the physician that was substantially above market rate for their services, without a fair market value analysis, and with little or no accountability for whether the services were actually performed.

24.     In some cases, payments were made without any written agreement. In some cases, a physician was receiving payments from multiple SNFs.  In some cases, physicians at the same SNF were paid differing amounts for the same purported services. In many cases, a SNF had more physicians than could be justified by the Facility's legitimate needs.

25.     As detailed below, there are instances where Facility Administrators expressly stated that the payments were related to referral of patients to the Facility, and other instances where the connection between payments and referrals was strongly implied.  Additional examples below demonstrate that payments were reduced or increased depending not on fair market value, but rather on the level of referrals the physician made (or did not make) to the SNF.

26.     Other inducements provided to physicians included, without limitation, Advisory Board payments, and payment for entertainment such as golf outings and fancy dinners.

27.     The payments made to physicians were untethered from legal requirements and instead were tethered to inducing referrals so the SNFs and Ensign could reach their profit goals. Such payments are not commercially reasonable and would not be made but for the benefits Defendants received, or hoped to receive, in the form of patient referrals in exchange for the excessive payments.

28.     Providing remuneration to physicians to induce referrals violates the federal and California Anti-Kickback laws, the federal Stark Statute, and various state laws and ethical canons of the medical profession. All claims submitted or caused to be submitted by Defendants and/or physician practices for services performed pursuant to such illegal remuneration by these Stark and kickback-tainted arrangements are not lawfully eligible for reimbursement through Medicare, Medicaid, and other federal and state-funded health insurance programs, and thus are false or fraudulent claims within the meaning of the FCA and

California FCA.

**2.     Ensign's Illegal "Swapping" Scheme with Axiom Mobile Imaging**

29.     Several of the Ensign SNFs also engaged in an illegal kickback scheme known as "swapping with Axiom." Pursuant to this scheme, Axiom offered Ensign's SNFs steep discounts per X-ray, for X-rays provided to the SNF's Medicare Part A patients. These discounted rates did not come close to covering Axiom's cost of performing the X-rays. In return for the discounts, the SNFs referred all of their Medicare Part B patients in need of X-ray services to Axiom, who then billed Medicare Part B.

30.     This "swapping" scheme was profitable for the Ensign SNFs because the heavily discounted Axiom mobile x-ray services to the Part A patients reduced the SNFs' costs and increased their profitability. This is because the SNFs are reimbursed by Medicare Part A at a flat, per diem rate for each patient (often referred to as a "capitated" rate), intended to cover the routine, ancillary, and capital-related costs associated with the patient's stay, including physical therapy services, occupational therapy services, medications, and diagnostic radiology services. By reducing their costs without reducing their revenue, the SNFs become more profitable.

31.     This "swapping" scheme was also profitable for Axiom, since it was able to bill the Government the maximum that the Government would pay for Part B services (more than making up for the profit lost due to offering steep discounts on Part A patients), and ensured a steady pool of SNF patients available for the Part B charges.

32.     Upon information and belief, additional Ensign SNFs engaged in similar behavior with other providers of mobile/portable X-ray services.

33.     All claims to federal and state-funded health insurance programs for reimbursement relating to such kickback-tainted X-ray services are false or fraudulent claims within the meaning of the FCA and California FCA.

8

### 3.    Ensign's Violations of its CIA With the Government

34.    The conduct alleged in this Complaint also violated the 5-year CIA entered into on October 1, 2013, between Defendant Ensign Group and HHS-OIG.

35.    The CIA contains an express contractual agreement requiring Ensign to notify the United States of any "Reportable Events" within thirty (30) days after making the determination that a "Reportable Event" exists. Under the CIA, a "Reportable Event" means an isolated event or a series of occurrences that "a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any federal health care program for which penalties or exclusion may be authorized." In addition to this general provision, the CIA contains a specific requirement that Ensign report all probable violations of the Stark Law to the United States.

36.    Pursuant to the CIA, Ensign must certify in annual and other filings with the United States that Ensign is in compliance with all of the requirements of the CIA. Deborah Miller, Chief Compliance Officer of Defendant Ensign Group, Inc., was a signatory to the CIA and was also the person who signed and attested to the truthfulness of the required annual certifications. She reported to Christopher Christensen who at all relevant times was the President and Chief Executive Officer of Defendant Ensign Group, Inc. The CIA provides a $1,000/day penalty for failure to report misconduct.

37.    Relator is informed and believes that one or more certifications signed by the Chief Compliance Officer on behalf of Ensign were materially false in that Ensign certified that it complied with the reporting requirements under the CIA when, in fact, it did not report the violations of the law alleged in this Complaint, including violations of the Stark Statute and the Anti-Kickback Statute.

38.    Ensign violated the CIA by, *inter alia*, failing to report to the Government violations of the law described in this Complaint, as required by the CIA, and by filing false certifications of compliance. By doing so, Ensign avoided

9

repayments and penalties owed to the United States, in violation of the "reverse false claim" provisions of the FCA.

### 4.    Damage to the United States and California

39.    As explained more fully below, Ensign's illegal schemes violate the federal and California Anti-Kickback Statutes, the Stark Statute, and Ensign's 2013 CIA, and thus ultimately the federal and California FCAs.

40.    All claims submitted or caused to be submitted as a result of the Defendants' illegal schemes are not lawfully eligible for reimbursement through Medicare, Medicaid, and other federal and state-funded health insurance programs, and thus are false or fraudulent claims within the meaning of the FCA and California FCA.

41.    Through these actions, Defendants have defrauded the United States and the State of California of millions of dollars.

### B.    The Federal and California False Claims Acts

42.    The federal FCA was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and again in 2009 and 2010—to enhance the ability of the United States to recover losses sustained as a result of fraud against it. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

43.    The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the Government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the

Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to violate any of these sections of the FCA. *See* 31 U.S.C. §§ 3729(a)(1)(A)–(C), and (G).

44.     Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States. *Id*. § 3729(a)(1). The civil penalty shall be not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the misconduct. 31 U.S.C. § 3729(a)(1). When adjusted for inflation as required, for violations occurring between September 28, 1999, and November 1, 2015, the civil penalty amounts range from a minimum of $5,500 to a maximum of $11,000. *See* 28 C.F.R. § 85.3; 64 Fed. Reg. 47099, *47103 (1999). For violations occurring on or after November 2, 2015, the civil penalty amounts now range from a minimum of $11,665 to a maximum of $23,331. *See* 85 Fed. Reg. 37004 (June 20, 2020); *see* generally 28 C.F.R. § 85.5.

45.     For purposes of the FCA, to act "knowingly" means that a defendant: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The FCA does not require proof that defendants specifically intended to commit fraud. *Id*. Unless otherwise indicated, whenever the word "know" and similar words indicating knowledge are used in this Complaint, they mean "knowing" or "knowingly" as defined in the FCA.

46.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The person bringing the action is known under the FCA as the "Relator." The FCA requires that the Complaint be filed under seal for a minimum of 60 days

(without service on the defendant during that time) to allow the government time to conduct its own investigation. In this action, the Government has investigated the case and allowed the Relator to go forward, with the Government remaining as the real party in interest.

47.      Defendants' actions alleged in this Complaint also constitute violations of the California FCA, Cal. Gov't Code §§ 12650, *et seq.* The California FCA prohibits conduct similar to that prohibited by the federal FCA, similarly allows a private plaintiff to bring an action on the State's behalf, and provides analogous remedies to those provided in the federal FCA.

### C.      The Instant Action

48.      Based on the foregoing FCA and California FCA provisions, *qui tam* Plaintiff-Relator Sharon Ginger seeks through this action to recover all available damages, civil penalties, and other relief for the federal and state FCA violations alleged in this Complaint in every jurisdiction in which Defendants' misconduct has occurred.

49.      The allegations set forth in this Complaint have not been publicly disclosed within the meaning of the FCA, as amended, 31 U.S.C. § 3730(e)(4), or analogous provisions of the California FCA. Even if such a disclosure could have occurred, Relator is an "original source" as that term is used in the federal and California FCAs. *Id.*

## II.      PARTIES

### A.      Plaintiffs

50.      Plaintiff-Relator SHARON GINGER ("Plaintiff-Relator"," or "Relator" or "Ms. Ginger") is a citizen of the United States and a resident of California. She was employed as Contracts Manager at Ensign's Headquarters in Orange County, California from October 2013 through June 5, 2015, and also served on the Company's Compliance Committee.

51.      The governmental Plaintiffs in this lawsuit are the United States and

the State of California. They are the real parties in interest in this action, and through their stipulation with Relator, Dkt. 82, have authorized Relator to go forward independently on their behalf. Relator thus pursues these claims on their behalf pursuant to the federal FCA, 31 U.S.C. § 3730(c)(3), and the analogous provision of the California FCA.

**B.    Defendants**

52.    Defendant THE ENSIGN GROUP, INC. (Nasdaq: ENSG) is a Delaware corporation with its principal office and place of business at 29222 Rancho Viejo Road, San Juan Capistrano, CA 92675, in Orange County, California. The Ensign Group, Inc. is the parent holding company that, at all times relevant to this Complaint, owned over 140 skilled nursing and assisted living Facilities mostly in California and other parts of the Western and Southwestern United States. The Ensign Group, Inc., including all of its SNF and other subsidiaries, were subject to the 5-year CIA entered into on October 1, 2013.

53.    Defendant ENSIGN FACILITY SERVICES, INC. (also known as Ensign Services, Inc.) is a Delaware corporation with its principal office and place of business at 29222 Rancho Viejo Road, San Juan Capistrano, CA  92675, in Orange County, California. Defendant Ensign Facility Services, Inc. provides management and other services to Defendant The Ensign Group, Inc. and to the Ensign SNFs and assisted living facilities.

54.    As used herein, the term "Ensign" or "Company" refers collectively to The Ensign Group, Inc. ("Ensign Group") and Ensign Facility Services, Inc. ("Ensign Services"), as well as all of their operating subsidiaries, including the SNFs.  This is the manner that Defendants commonly refer to themselves in public filings and otherwise in recognition of the fact that they function as one essential business enterprise.

**C.** **Defendants Operate As Alter Egos Of Each Other, As An Integrated Enterprise And As A Single Or Joint Employer.**

55.     Ensign Group, Ensign Services, and the SNFs, as well as the other operating subsidiaries of Ensign Group and Ensign Services, operate as alter egos of each other, as an integrated enterprise and function as a single or joint employer. As Relator's employment experience detailed below establishes, Ensign is, in fact, one company.

56.     Ensign Group is simply a holding company to which the profits of the Ensign enterprise all flow up.  Ensign Group is publicly traded and includes all of the revenues, expenses, and profit of all SNFs and other operating subsidiaries, including Ensign Services, in its consolidated financial statements.  Ensign Group itself acknowledges in its public filings with the Securities Exchange Commission ("SEC") that it is a holding company with no direct operating assets, employees or revenues.  Ensign derives 95.2% of its revenues from the Facilities and over 77% of the revenue generated by the Facilities is paid by Medicare and Medicaid.

57.     Each Facility is required to pay Ensign Services a monthly management fee and Ensign Group, which owns the real estate at a number of locations at which the Facilities are located through other operating subsidiaries, collects rent from these Facilities.  In addition, each Facility is required to share a percentage of its monthly profits with the regional subsidiary company overseeing the "cluster" for the Facility (discussed below), which profits ultimately flow up to Ensign Group.  Due to the monthly management fee and rental payments collected by Ensign, the Facilities themselves operate in an undercapitalized manner that would prevent them from satisfying any significant judgment either individually or collectively as a result of this action or any lawsuit of consequence.  In other words, the profits earned from the false claims at issue in this case reside within Ensign Group and Ensign Services.

58.     Ensign Services a/k/a Ensign Facility Services was headquartered in

14

Mission Viejo, California, is now is headquartered in San Juan Capistrano, and shares the same address and location as the headquarters of Ensign Group. Facility Administrators and other employees in the SNFs are discouraged from referring to the location then in Mission Viejo (and now San Juan Capistrano) as "headquarters" and, instead, are encouraged to refer to the location as the "Service Center." In recognition of the manner in which Ensign actually functions, however, the location in Mission Viejo/San Juan Capistrano from which Ensign Services and Ensign Group both operate is commonly referred to as headquarters (the "Headquarters") because the entire Ensign enterprise is managed in a consolidated and centralized manner from this Headquarters' location.

59.     Ensign advises the employees working at the Facilities and in its geographic operating subsidiaries that Ensign Group is a holding company with no employees and that Ensign Services is the employer of all management and other corporate personnel. Ensign Services' senior executives and key corporate employees in the areas of management, compliance, information technology, legal, accounting, billing, and human resources also occupy the same or similar positions in terms of title and position with Ensign Group, even though they technically are only employed by Ensign Services. In other words, Ensign Group and Ensign Services, along with the Facilities and the geographic subsidiary companies discussed below, operate and function as one company and have no unique identity.

60.     Recruitment, interviews, training, and hiring of Facility Administrators and other key Ensign employees regularly occurs at Ensign Headquarters and Ensign's management regularly provides training and supervision to the employees in the Facilities. In addition, Ensign maintains an in-house, on-line educational platform known as "Ensign University," which is used to educate and train employees throughout Ensign Services, the Facilities and Ensign's other operating subsidiaries so that business is conducted based upon

Ensign's corporate policies throughout the enterprise.

61.    Ensign also holds annual meetings for its employees at its Headquarters that are attended by all Facility Administrators, Nursing Directors and Market Leaders, as well as Ensign Services' employees and Ensign Group management.

62.    Facility Administrators a/k/a Directors at Ensign ostensibly oversee the daily operations of SNFs and supervise admissions, nursing, rehabilitation, marketing, billing, housekeeping, maintenance, and hiring of management of these departments but, in reality, the SNFs are both owned and operated by Ensign as part of a single enterprise.

63.    Each Ensign Facility functions as part of a "cluster" of approximately five SNFs in a geographic area. Depending on the size of the territory, multiple clusters formed "markets" which are overseen by a regional subsidiary company of Ensign Group.  For example, the Ensign Group subsidiary that oversaw all markets and clusters in Texas was named Keystone Healthcare, LLC and the Ensign Group subsidiary that oversaw all markets and clusters in California was named The Flagstone Group, Inc. a/k/a Flagstone Healthcare.  Upon information and belief, California Facilities now are overseen by two operating subsidiaries, Flagstone Healthcare South, LLC and Flagstone Healthcare North, LLC.  Facility Administrators report to a Cluster Leader (generally one of the Facility Administrators in the cluster) who, in turn, reports to the Market Leader, who also generally serves as the President of the territory subsidiary such as Keystone Healthcare or Flagstone Healthcare.  The President/Market Leader of each geographic operating subsidiary supervising the clusters reports directly to the President of Ensign Services who also serves as the Chief Operating Officer of Ensign Group who, in turn, reports directly to the Chief Executive Officer of Ensign Group.

64.    Under the cluster model, Facility Administrators are theoretically

SECOND AMENDED COMPLAINT

accountable to each other.  If a particular facility is performing poorly financially and/or clinically, the other Facility Administrators in the cluster are supposed to impose accountability.  In reality, however, the Cluster Leader ultimately dictates policy within the Facilities in the cluster and to the Facilities Administrators. Moreover, the senior management of Ensign Group itself, including the then CEO, Christopher Christensen, are involved in the daily operations of each Facility.

65.     Under the cluster model, Ensign Services is supposed to provide independent consulting services to each individual SNF, which includes IT, human resources, accounting, and compliance services. Facility Administrators are discouraged by Ensign Services' employees from referring to Ensign Services as "corporate." Instead, they are encouraged to call Ensign Services and its Headquarters as the "Service Center." Each Facility pays a monthly consulting fee to Ensign Services.  In theory, Ensign Services is an independent contractor that provided "non-binding" services and professional guidance to individual Facilities. In reality, in virtually all respects, the Facility Administrators are actually reporting to Ensign Services' executives and ultimately to the Ensign Group CEO (for most, if not all, of the pertinent period, Christopher Christensen).  Indeed, Facility Administrators are prohibited from contracting with vendors for laboratory and other services that are not approved by Ensign Services (and some of which vendors Ensign actually owns).  In addition, Facility Administrators are not permitted to make significant hiring or firing decisions without specific approval from management at Ensign.  As a result, Facility Administrators ultimately have no significant autonomy with respect to the operation of the Facilities.

66.     Ensign Services also employs a variety of regional employees— including nursing consultants and Minimum Data Set ("MDS") consultants—who frequently visit the Facilities to instruct the employees in the Facilities on their clinical practices and other matters, as well as providing orders on how the Facilities should be operated.  In addition, Ensign's compliance division regularly

17

audits the Facilities and provides clear instructions and mandates to Facility Administrators on an array of compliance issues.

67.     In 2013, in connection with entering into the CIA, Ensign Group signed a settlement agreement—none of the subsidiaries signed the agreement—requiring payment of $48 million and assuming compliance responsibilities on behalf of its subsidiary SNFs, following a fraud case that was brought against the company involving conduct by the subsidiaries.  In addition, Defendants were required to conduct internal investigations into the healthcare services, recordkeeping, and billing processes of their operating subsidiaries to identify instances of non-compliance with healthcare laws under that settlement agreement. Moreover, even aside from their central compliance role, Defendants train the management of their subsidiary SNFs, including with respect to the contracting issues set forth in this Complaint.

68.     Ensign Services' accountants also audited and reconciled the books of each Facility on a monthly basis.  In essence, Ensign's cluster model and corporate structure is designed as a cover to conceal the hierarchical control that Ensign Group and Ensign Services exercise over the daily operations of the Facilities. Unlike certain of its competitors, Ensign exercises pervasive control over the Facilities in a manner that is antithetical to any suggestion that the Facilities or Ensign Services or Ensign Group operate as separate business enterprises.

69.     The leadership of Ensign Group and Ensign Services regularly and pervasively disregarded the corporate formalities by directly managing the Facilities without regard for the management of any operating subsidiaries or clusters.  At all pertinent times, senior officers of both Ensign Group and Ensign Services were deeply involved in the operation of each of the SNFs and monitored the financial performance of each SNF.  For example, former Ensign Group CEO Christopher Christensen and Ensign Services COO Barry Port (now Ensign Group's CEO) both personally reviewed the financial health of each SNF on a

monthly basis and themselves berated SNF Administrators for poor monthly financial performance.  Facility Administrators described Christensen and Port as presiding over a cutthroat work culture at Ensign and confirmed that Ensign Group and Ensign Services each disregarded the corporate formalities by treating Ensign as one functioning business entity with neither Ensign Group, Ensign Services, nor the SNFs treating each other at arms' length or in any manner resembling independently functioning business enterprises.

70.     The attention of Messrs. Port and Christensen on individual Facilities was focused almost entirely on generating additional profits rather than any commitment to improving the treatment of skilled nursing facility residents.  When Facilities received high grades for compliance or clinical achievements, they received little or no praise but, when a Facility achieved financial success, Port and Christensen provided personal and public praise of the Facility Administrators.  In fact, Christensen himself received daily reports regarding the census in each Facility and the number of Medicare patients within the census—because Medicare reimburses at higher rates than most other insurance.

71.     Each Ensign Facility Administrator had goals for his or her Facility, which were often referred to as Big Hairy Audacious Goals, or BHAGs, as discussed above.  Facility Administrators were required to complete annual "budgets"—that is BHAGs—that included what the Facility was expected to spend and earn. These budgets were essentially profit goals.  The goals themselves were established at the cluster-level but were then disseminated to the Market Leader and/or regional subsidiary President and then reported up the chain to Ensign Services executives and Ensign Group CEO Christensen.  Upon information and belief, the BHAGs/goals for each Facility were reviewed and approved by Ensign Services executives and Ensign Group CEO Christensen.  When a Facility Administrator met or exceeded his or her BHAGs, which were tracked closely by executives at both Ensign Services and Ensign Group, these executives

(Christensen and Port) could and did authorize the payment of bonuses to the Facility Administrator.

72.     Port and Christensen not only knew what the goals were for each Facility but both regularly enforced compliance with the goals through direct communications with individual Facility Administrators.  Although the Facilities' goals were annual in nature, they were monitored on a monthly basis by both the cluster and Ensign Services and Ensign Group executives.  Both Port and Christensen themselves regularly chastised Facility Administrators—usually via email—for having poor financial performance in general or for failing to meet a monthly financial projection.  Indeed, at times, Port and Christensen emailed Facility Administrators mid-month if their financial numbers were trending poorly and it appeared as if a Facility would miss its goal. Port and Christensen generally copied every Ensign Facility Administrator, Cluster Leader, and Market Leader in a region on these emails, thereby again demonstrating that Ensign operates as one consolidated and fully integrated business enterprise.

73.     Although Ensign Services was purportedly an entity that provided services to the SNFs, in fact, Ensign Services dictated the business practices and operations of the SNFs.  For example, Ensign Services' Vice President of Business Development, Curtis Reese, specifically pressured Facility Administrators at the various SNFs to recruit Medical Directors who were shown through CMS data to have had the most Medicare reimbursements in the territory.

74.     Ensign also trains the Facility Administrators in a coordinated manner in recognition of the fact that it is, indeed, one Company.  Ensign conducts two-week long "bootcamps" at its Headquarters during which all participants receive training on compliance, human resources, budgets, and administrative duties, as well as Ensign's common policies and practices with respect to the same.  Ensign then assigns Facility Administrators to SNFs initially as "Administrator(s)-in-Training" and, once training is completed after a period of months, assigns them to

other SNFs, often in different states and clusters.  The training is conducted by Ensign employees, including by Relator (as discussed below).  As discussed above, Ensign also operates Ensign University for all of its employees, including all of the employees of the Facilities.

75.    The Facilities essentially function at the behest of Ensign Services and Ensign Group (which function as one and the same entity).  And, the very sales and marketing policies that resulted in the kickbacks and false claims at issue in this case, were orchestrated and controlled by Defendants.

76.    Defendants and the Facilities directly participated in the false claim violations described herein and were the alter egos of one another, there being a sufficient unity of interest and ownership among and between them that the acts of one were for the mutual benefit of and can be imputed to the others.  Specifically, the policies and practices that resulted in the Medical Director and Axiom kickbacks, as well as the failure to report the violations of the CIA, occurred at the Headquarters of Ensign Services/Ensign Group and were perpetrated and encouraged by their common management.  Indeed, Ensign Services effectively submitted the claims for payment on behalf of the Facilities and centrally controlled the claims and reimbursement process at each Facility, as part of the uniform billing and reimbursement system that Ensign operates at the Facilities.

77.    Defendants exerted pervasive and continual control over the SNFs such that the Facilities were mere agents, instrumentalities, and conduits through which Defendants did business.

78.    Ensign Group filed consolidated financial statements and consolidated statements of operations of its subsidiaries with the Securities and Exchange Commission.  Such consolidation was proper pursuant to Generally Accepted Accounting Standards because Ensign Group controlled Ensign Services and its other subsidiary entities, including the SNFs.  More specifically, each of the Facilities were mere instrumentalities or conduits through which Ensign group did

business.  It would be inequitable to treat Ensign as anything but one individual entity.

79.     At all pertinent times, Defendants treated the funds of one Facility as the funds of another.  Defendants collected, distributed, and shared the revenues, profits, and assets of its Facilities by and through its cluster model—which required the Facilities to both compete against each other and also share revenues and profits.  Without control of their revenues and with no significant assets, Ensign's Facilities were entirely dependent on Defendants for their continued existence and ongoing operations.

80.     Each of the Facilities was undercapitalized with essentially all profits generated by the Facilities' operations swept into accounts controlled by Defendants.  Defendants collected and managed all revenues created by operations of its Facilities and controlled all of their expenditures.

81.     Ensign and the Facilities portray themselves as a single entity, publicly promoting themselves as a unified nationwide operation through brochures, marketing materials, website, and communications with the media, as well as in correspondence to state licensing and certification agencies.

82.     There is and was sufficient unity of interest and ownership among and between each Defendant and the Facilities such that the acts of one were for  the benefit of and could be imputed to all others.  Further, at all times herein mentioned, each Defendant acted as the agent and partner of, conspired with, and participated in a joint venture with the remaining Defendants.  Moreover, in engaging in the conduct  described  below, Defendants all acted with the express or implied knowledge, consent, authorization, approval, and/or ratification of their co-defendants.

83.     To the extent that either of the Defendants was not considered the alter ego of the other for purposes of the claims asserted in this Complaint, they alternatively would be liable for engaging in conspiracy to violate applicable law, as set forth below.

### III.   JURISDICTION AND VENUE

84.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to U.S.C. §§ 3729 and 3730. In addition, this Court also has jurisdiction over the California FCA claims pursuant to 31 U.S.C. § 3732(b), because the California state claims arise from the same transactions and occurrence as the federal claims. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case and controversy under Article III of the United States Constitution.

85.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, venue is proper under 31 U.S.C. § 3732(a), because one or more Defendants can be found in, resides in, or has transacted business in this District, including business related to Defendants' concerted misconduct.

### IV.   APPLICABLE FEDERAL AND STATE LAWS AND REGULATIONS

#### A.   Medicare and Medicaid

86.    Medicare is a federally-funded health insurance program that provides health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426 & 426A. The Medicare program is administered through the United States Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS").

87.    Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted and has two parts that are particularly relevant to the instant lawsuit:  Medicare Part A ("Part A") and Medicare Part B ("Part B").

88.    Part A, the Basic Plan of Hospital Insurance, covers the costs of inpatient hospital services and post-hospital nursing facility care. *See* 42 U.S.C. §§

1   1395c–1395i-4.

2   89.    Part B, the Voluntary Supplemental Insurance Plan, providing

3   supplemental medical insurance benefits to aged and disabled enrollees, covers the

4   cost of physician services, regardless of where they are provided, and certain other

5   medical services not generally covered by Part A, including services and supplies

6   incidental to the care provided by physicians, diagnostic tests, X-rays, and

7   ambulance services. *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s).

8   90.    At all times relevant to this Complaint, Part A paid for up to 100 days

9   of care in a skilled nursing facility ("SNF") for a beneficiary who has been

10  hospitalized for at least three days. *See* 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R.

11  §409.61(b)–(c). Part A will pay a qualified patient's bills in full for the first 20

12  days.  After 20 days, Part A will provide coverage subject to a co-payment

13  obligation (billed separately to, and paid by, the resident, private insurance, or

14  Medicaid).

15  91.    Part A pays for skilled nursing services only when provided by a

16  skilled nursing facility ("SNF") and when a physician certifies that such intensive

17  nursing care is needed. *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare General

18  Information, Eligibility, and Entitlement Manual, Ch. 4, §§ 40-40.4.

19  92.    A healthcare facility is eligible to receive Medicare or Medicaid funds

20  as a SNF if the institution is primarily engaged in providing nursing care and

21  health related services (above the level of room and board) to residents who,

22  because of their mental or physical condition, require a level of care which can be

23  furnished only in an institutional facility. Institutions primarily for the treatment of

24  mental diseases are specifically excluded. 42 U.S.C.A. § 1396r(a).

25  93.    SNFs are reimbursed by Part A at a flat, per diem rate for each patient.

26  This is often referred to as a "capitated" rate and depends in part on the severity of

27  the patient's condition. The capitated payment is intended to cover the routine,

28  ancillary, and capital-related costs associated with the patient's stay, including

physical therapy services, occupational therapy services, medications, and diagnostic radiology services.

94.     If a beneficiary exhausts his or her Part A SNF coverage, Part B will provide coverage for some services provided by the SNF. 42 C.F.R. § 410.60(b); *see also* Medicare Benefits Manual, Ch. 15 § 220.14; Medicare Claims Processing Manual, Ch. 7, § 10. For example, once Part A benefits are exhausted, Part B may be billed for services such as physical therapy, occupational therapy, speech therapy, X-rays, and laboratory services, so long as they are certified and ordered by a physician as medically necessary. Unlike Part A, Medicare Part B reimburses nursing facilities and other service providers on a fee schedule basis for the specific items or services provided. 42 U.S.C. § 1395yy(e)(9); Medicare Claims Processing Manual, Ch. 23, § 30. They are not, unlike Part A payments, based on a daily rate.  Where a fee schedule exists for the type of service, the fee amount will be paid.  Where a fee does not exist on the Medicare Physician Fee Schedule (MPFS) the particular service is priced on cost. Medicare Claims Processing Manual, Ch. 7, § 10.1 & Ch. 23 § 30.

95.     At the end of each month, nursing facilities bill the Medicare program Part A by submitting an invoice known as Universal Bill 92 ("UB-92") to the appropriate Medicare Administrative Contractor ("MAC") (formerly known as a fiscal intermediary or carrier) who acts on behalf of CMS to process and pay both Part A and Part B claims. A UB-92 is submitted for each resident and contains the number of billing days, the per diem rate, and total amount. Part B SNF claims are submitted on forms CMS-1450 (UB-40) or their electronic equivalents using Healthcare Common Procedure Coding System (HCPCS) codes, which are based on CPT codes, to report the number of units for outpatient rehabilitation services. 42 C.F.R. § 424.32; Medicare Claims Processing Manual, Ch. 7, § 20, Id., Ch. 23 §§ 20.1-20.3, 30; id., Ch. 5, § 20.2.

96.     In order to submit reimbursement claims to Medicare, each SNF must

submit a Medicare Enrollment Application in which the SNF certifies, among other things, that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider…I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

*See* CMS Form 855A.

97.    Medicare claims that violate these certifications are false or fraudulent claims under the False Claims Act. Medicaid is a state and federal assistance program that covers medical expenses for low-income patients, including low-income residents of nursing facilities.  *See* 42 U.S.C. §§ 1390, *et seq*. Funding for Medicaid is shared between the federal government and those states that participate in the program. States directly pay providers, and then obtain the federal contribution from accounts drawn on the United States Treasury. 42 C.F.R. §§ 430.0, *et seq*. The federal government reimburses or pays approximately one-half of the Medicaid bill and the state pays the other half; the federal reimbursement is called the "federal financial participation" ("FFP"). Federal funding for the Medicaid Program includes support for Medicare Savings Programs which help qualifying Medicare beneficiaries pay Part A and B premiums, co-payments, co-insurance, and deductibles. The Medicare Savings Programs consist of the Qualified Medicare Beneficiary Program, 42 U.S.C. § 1396d(p)(1), the Specified Low-Income Medicare Beneficiary Program, 42 U.S.C. § 1396a(a)(10)(E)(iii), the Qualifying Individual Program, 42 U.S.C. § 1396a(a)(10)(E)(iv), and the Qualified Disabled and Working Individuals Program, 42 U.S.C. § 1396d(s). Medicaid may serve as the primary insurer, or in some instances as the secondary insurer (e.g., with Medicare or private insurance providing primary coverage). Medicaid sets forth minimum requirements for state Medicaid programs to meet to qualify for federal funding and each participating state adopts its own state plan and

regulations governing the administration of the state's Medicaid program.

98.     Primary regulatory control of state Medicaid programs is left to the states. Consequently, reimbursement procedures and amounts vary among the states. The California Department of Health Care Services is the state agency responsible for administration of the California State Medicaid Program (Medi-Cal).  FFP is calculated each fiscal year in accordance with a formula established under Title XIX, with FFP ranging from a low of 50% in federal funding to more than 75% in FFP, depending on a variety of factors including such things as the relative wealth of the State and its people and the total amount and kinds of Medicaid expenditures that are needed or expected. For example, for fiscal year 2012, the FFP for California was 50%.

99.     Medicaid programs also foot the bill for beneficiaries receiving care and treatment at a SNF. In general, if a beneficiary is enrolled in both Medicare and Medicaid (a "dual eligible") and admitted to a SNF for rehabilitation and skilled therapy services pursuant to Medicare Part A, the payments will be divided between Medicare and Medicaid as follows:

Days 1-20: Medicare pays the entire amount;

Days 21-100: Medicare and Medicaid each pay a portion; and

Days 101 and beyond: Medicaid pays the entire amount.

100.   In order to receive payment from the Government for providing health care services and supplies, pursuant to the Medicare and Medicaid statutes and regulations, Defendants prepared claims for payment or approval, billing records, invoices and medical records and presented or caused them to be presented to an agent, officer or employee of the Government.

101.     In order to receive payment from the State of California for providing health care services and supplies covered by the California Medicaid program, Defendants prepared claims for payment or approval, billing records, invoices, and medical records, and presented or caused them to be presented to an agent, officer

SECOND AMENDED COMPLAINT

or employee of the State Government.

102.   In making claims for payment to the federal Medicare program and to the federal and State Medicaid programs, and as a condition for receiving payment, Ensign's skilled nursing facilities represented, impliedly or directly, that they were in compliance with applicable laws and regulations, including the Anti-Kickback Statute and Stark Statute, as well as the terms of the CIA.

**B.   Other Federal and State-Funded Health Care Programs**

103.   In addition to Medicare and Medicaid, the Federal Government administers other health care programs including, but not limited to, TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program.

104.   TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces, including members of the Uniformed Services and the spouses and children of active duty, retired, and deceased members. *See* 10 U.S.C. §§ 1071–1106.

105.   CHAMPVA, administered by the United States Department of Veterans Affairs ("VA"), is a health care program for the families of veterans with 100-percent service-connected disability or who died from a VA-rated service connected disability.

106.   The Federal Employee Health Benefit Program ("FEHBP"), administered by the United States Office of Personnel Management, provides health insurance for qualified federal employees, retirees, and survivors.

107.   The Plaintiff State of California provides health care benefits to certain individuals, based either on the person's financial need, employment status or other factors. To the extent those programs are covered by the California FCA, those programs are referred to in this Complaint as "state funded health care programs."

108.   Together, all of the above-described federal and/or state funded health care programs shall be referred to as "Federal Health Care Programs" or

"Government Health Care Programs."

109.   When submitting a claim for payment to a Government Health Care Program, a provider does so subject to and under the terms of its certification to the United States that the services were delivered in accordance with federal law, including, for example, the relevant Government Health Care Program laws and regulations.

110.   Government Health Care Programs require compliance with these certifications as a material condition of payment, and claims that violate these certifications are false or fraudulent claims under the FCA. CMS, its fiscal agents, and relevant State health agencies will not pay claims for services provided in violation of relevant state or federal laws, including the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). Thus, reimbursement claims submitted to any of the above programs that were the result of the unlawful activities alleged in this Complaint constitute false or fraudulent claims for reimbursement.

## C.   Federal and California False Claims Acts

111.   The federal FCA, 31 U.S.C. § 3729, *et seq.*, provides, in relevant part:

> Liability for Certain Acts.(1) In General – Subject to paragraph (2), any person who –(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B)…or (G). . . or (G) knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1). The FCA further provides:

> Actions by Private Persons. (1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government.

31 U.S.C. § 3730(b)(1).

112.    The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property" that "is made to a contractor, grantee, or other recipient" if the Government provides "any portion of the money or property" which is "requested or demanded," or if the Government "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested." 31 U.S.C. § 3729(b)(2).

113.    The FCA, 31 U.S.C. § 3729(b)(1), provides that "(1) the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." The FCA, 31 U.S.C. § 3729(b)(4), also provides that "(4) the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." The FCA defines an "obligation" to pay as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor guarantee, or licensor licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). Moreover, in the health care context, such as Medicare and Medicaid, the term "obligation" is further defined as "[a]ny overpayment retained by a person after the deadline for reporting and returning the overpayment … is an obligation (as defined [in the FCA])", and an overpayment must be reported "[b]y the later of…60 days after the date on which the overpayment was identified…or the date any corresponding cost report is due, if applicable." Patient Protection and Affordable Care Act, March 23, 2010 ("PPACA"), Pub. L. 111-148 (Mar. 23, 2010), Section 6404(a), codified at 42 U.S.C. § 1128J9(d); *see also* 42 U.S.C. § 1320a-7k(d).

114.    The State of California has enacted an FCA which tracks closely the federal FCA. The California FCA applies, inter alia, to the state portion of

Medicaid losses caused by false or fraudulent Medicaid claims to the jointly federal-state funded Medicaid program or by a conspiracy to do so. Defendants' acts alleged herein also constitute violations of the California FCA, Cal. Gov't Code §§ 12650, *et seq*. As discussed above, the California FCA contains *qui tam* provisions authorizing a relator to bring an action on behalf of the State to recover damages and civil penalties.

115.   Pursuant to the federal and California FCAs, Relator seeks to recover damages and civil penalties in the name of the United States and the State of California arising from the false or fraudulent claims for payment Defendants submitted or caused other health care providers to submit to the United States and the State of California and to Government Health Care Programs, and from other violations of the FCA and California FCA. Defendants' liability arises from violations of Government Health Care Program laws described above, as well as from violations of the federal and California Anti-Kickback Statutes, the Stark Statute, and the CIA, as more fully described below.

## D.   The Federal and California Anti-Kickback Statutes

116.   The Medicare and Medicaid Fraud and Abuse Statute (also known as the "Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977. The Anti-Kickback Statute ("AKS") arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

117.   The Anti-Kickback Statute prohibits any person or entity from making or accepting any "remuneration" to induce or reward any person for referring,

recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b). The statute's prohibition applies to both sides of an impermissible kickback relationship (i.e., the giver and the recipient of the kickback). The statute provides, in pertinent part:

> (b) Illegal remunerations**
>
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
>
>> a. To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal healthcare program, or
>>
>> b. To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Underscoring the breadth of the statutory definition of "remuneration," the HHS Office of Inspector General ("HHS OIG" or "OIG") has defined the term "remuneration" as "anything of value in any form or manner whatsoever." HHS OIG, *OIG Anti-Kickback Provisions*, 56 Fed. Reg. 35952, 35958 (July 29, 1991). Moreover, a financial arrangement violates the AKS if "one purpose of the remuneration is to obtain money for the referral of services or to induce further referrals." *See, e.g.*, OIG Advisory Opinion No. 97-5, at 4 (Oct. 6, 1997), http://oig.hhs.gov/fraud/docs/advisoryopinions/1997/ao97_5.pdf (citing *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989) and *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985)) (emphasis in original). *See also United States v. Bay State Ambulance and Hospital Rental Service, Inc.*, 874 F.2d 20, 30 (1st Cir. 1989). One example of illegal remuneration is paying more than "fair market value" for an item or service. *See* 42 U.S.C. § 1320a-7a(i)(6) (defining

"remuneration" under the AKS as "transfers of items or services for free or for other than fair market value.").

118.   Claims for reimbursement for services that result from kickbacks are rendered false under the False Claims Act. 42 U.S.C. § 1320a-7b(g).  Amendments to the Anti-Kickback Statute in the Patient Protection and Affordable Care Act of 2010 ("PPACA") make plain that "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." See Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, 759 (2010), codified at 42 U.S.C. § 1320a-7b(g).

119.   In September 2008, the Office of Inspector General ("OIG") of the Department of Health & Human Services ("HHS") published formal guidance for nursing facilities (such as those owned and operated by Ensign). This guidance identifies several practices that constitute unlawful kickbacks. *See* OIG Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg. 56832-48 (September 30, 2008). With regard to the practice of nursing facilities paying doctors to provide medical director and other services, the Guidance states:

(b) Physician Services

Nursing facilities also arrange for physicians to provide medical director, quality assurance, and other services. . . .These physicians, however, may also be in a position to generate Federal health care program business for the nursing facility. For instance, these physicians may refer patients for admission. . . . *Physician arrangements need to be closely monitored to ensure that they are not vehicles to pay physicians for referrals. As with other services contracts, nursing facilities should periodically review these arrangements to ensure that: (i) There is a legitimate need for the services; (ii) the services are provided; (iii) the compensation is at fair-market value in an arm's-length transaction; and (iv) the arrangement is not related in any manner to the volume or value of Federal health care program business*. In addition, prudent nursing facilities will maintain contemporaneous documentation of the arrangement, including, for example, the compensation terms, time logs or other accounts of services rendered, and the basis for determining compensation. Prudent facilities will also take steps to ensure that they have not engaged more medical directors or other physicians than necessary for legitimate business purposes. They will also ensure that compensation is commensurate with the skill level and experience reasonably necessary to perform the contracted

services. . . .

*Id.* at 56843–44 (emphasis added).

120.   The Anti-Kickback Statute contains certain exceptions—also known as Safe Harbors—that exempt certain transactions from its prohibitions. Once the Government or Relator has demonstrated each element of a violation of the AKS, the burden shifts to the defendant to establish that defendant's conduct at issue was protected by such a safe harbor or exception. The Government or Relator need not prove as part of its affirmative case that defendant's conduct at issue does not fit within a safe harbor. *United States v. Rogan*, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006), aff'd, 517 F.3d 449 (7th Cir. 2008). Conduct must fit squarely within a safe harbor to qualify for protection.

121.   Relevant to this Complaint, the regulations provide a safe harbor for "personal services", such as those that a nursing facility uses when it hires a physician to serve as a medical director or otherwise as a consultant. 42 C.F.R. § 1001.952(d). However, to qualify for this safe harbor, all of the seven standards set forth in the regulation must be met between the nursing facility (*i.e.* the "principal") and the physician medical director/consultant (i.e. the "agent"), including that:

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a fulltime basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may

SECOND AMENDED COMPLAINT

34

be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

*Id*. at § 1001.952(d)(1)–(7). The State of California also has an Anti-Kickback law similar to the AKS, which applies to medical providers and entities participating in the California Medicaid programs. *See* Cal. Welf. & Inst. Code § 14107.2. Violations of the federal or California AKS laws can subject the perpetrator to liability under the federal and California FCAs, for example, for causing the submission of false or fraudulent claims or for making a false or fraudulent statement or record material to a false or fraudulent claim. *See* PPACA, supra, amending the federal AKS, 42 U.S.C. §1320a-7b, to add new subsections (g) and (h) (items or services resulting from a violation of the AKS constitute false or fraudulent claims for purposes of the federal FCA and no actual knowledge of this section or specific intent to commit a violation of this section is required). Accordingly, claims for reimbursement for services that result from kickbacks are false or fraudulent under the False Claims Act. 42 U.S.C. § 1320a-7b(g).

122.   Violation of the federal Anti-Kickback Statute also subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§ 1320a-7(b)(7) & 1320a-7a(a)(7).

123.   Compliance with Anti-Kickback laws is also a precondition to participation as a health care provider and receipt of payment under the Medicare, Medicaid, and other Government Health Care Programs. *See* generally *United States ex rel. Wilkins v. United Health Group, Inc*., 659 F.3d 295 (3d Cir. 2011) (Medicare); *United States ex rel. Hutcheson v. Blackstone Medical, Inc*., 647 F.3d 377 (1st Cir. 2011) (Medicare); *State of New York, et al. v. Amgen Inc.,* 652 F.3d

103 (1st Cir. 2011) (California Medicaid).

124.    Pursuant to provider agreements, claim forms, and/or other appropriate manners, entities, facilities, and physicians who participate in a Federal Health Care Program must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback Statute.

**E.    The Stark Statute**

125.    42 U.S.C. § 1395nn, a section of the Social Security Act also known as the physician self-referral law and commonly referred to as the "Stark Law" or the "Stark Statute," prohibits a healthcare provider from submitting claims to Medicare or Medicaid for certain items or services rendered to patients referred by physicians who have improper financial relationships with the providers. 42 U.S.C. §§ 1395nn(a)(1), 1396b(s). In enacting the statute, Congress found that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality. Further, Congress relied on various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of those providers' services than similarly situated physicians who did not have such relationships. The statute was designed specifically to reduce the loss suffered by the Medicare Program due to such increased questionable utilization of services, but Stark also applies to Medicaid claims. *See generally United States v. Rogan*, 459 F. Supp. 2d 692, 722-23 (N.D. Ill. 2006); *Fresenius Medical Care Holdings, Inc. v. Tucker,* 704 F.3d 935 (11th Cir. 2013).

126.    Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical laboratory provider. *See* Omnibus Budget Reconciliation Act of 1989, Pub. Law 101-239, §

6204.

127.    In 1993, Congress amended the Stark Statute (Stark II) to cover referrals for additional health services. *See* Omnibus Budget Reconciliation Act of 1993, Pub. Law 103-66, § 13562, Social Security Act Amendments of 1994, Pub. Law 103-432, § 152.

128.    The Stark Statute currently applies to the following twelve "designated health services": (1) clinical laboratory services; (2) physical therapy services; (3) occupational therapy services; (4) radiology services (including MRIs, CTs, and ultrasounds); (5) radiation therapy services and supplies; (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) home health services; (10) outpatient prescription drugs; (11) inpatient and outpatient hospital services; and (12) outpatient speech language pathology services. *See* 42 U.S.C. § 1395nn(h)(6).

129.    In pertinent part, the Stark Statute provides:

(a)     Prohibition of certain referrals

(1)     In general. Except as provided in subsection (b), if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then – (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made [by Medicare or Medicaid]; and (B) the entity may not present or cause to be presented a claim under this title or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under (A).

42.S.C. § 1395nn(a)(1).

130.    The Stark Statute broadly prohibits financial relationships that include any "compensation arrangement" with an entity that furnishes designated health services. *See generally* 42 C.F.R. § 411.354(a), (c) (all references to Stark regulations are to those in effect at all times relevant to this Complaint). A "compensation arrangement" is "any arrangement involving remuneration, direct or indirect, between a physician (or a member of a physician's immediate family)

and an entity." 42 C.F.R. § 411.354(c). The term "remuneration" is defined to
include "any payment or other benefit made directly or indirectly, overtly or
covertly, in cash or in kind" except where "The amount of payment is set in
advance, does not exceed fair market value, and is not determined in a manner that
takes into account directly or indirectly the volume or value of any referrals." 42
C.F.R. § 411.351; *see also id.* (definition of "fair market value").

131.   Generally speaking, a "direct" financial/compensation arrangement
exists where the remuneration passes between the referring physician (or a member
of his or her immediate family) and the entity furnishing DHS without any
intervening persons or entities (provided, however, that where the intervening
entity is a physician organization in which the physician has an ownership or
investment interest, then the physician "stands in the shoes" of that organization
and the compensation arrangement is still considered "direct"). 42 C.F.R.§411.354
(c)(1) (all references to regulations are to those as in effect at times relevant to this
Complaint).

132.   Thus, under Stark, a physician is prohibited from making referrals to
an entity with which s/he has a financial relationship/compensation arrangement
for designated health services payable by Medicare or Medicaid. 42 C.F.R. §
411.353 (a). In addition, an entity (as defined in 42 C.F.R. § 411.351) may not bill
Medicare or Medicaid for designated health services furnished as a result of a
prohibited referral, and no payment may be made by the Medicare or Medicaid
programs for designated health services provided in violation of 42 U.S.C. §
1395nn(a)(1). *See* 42 U.S.C. §§ 1395nn(g)(1) & 1396b(s); 42 C.F.R. § 411.353(b)
and (c). Finally, an entity that collects payments billed in violation of 42 U.S.C. §
1395nn(a)(1), must refund those payments on a "timely basis," defined by
regulation not to exceed 60 days. *See* 42 U.S.C. § 1395nn(g)(2); 42 C.F.R. §§
411.353(d) & 1003.101.

133.   The Stark Statute contains exceptions that identify specific

arrangements that are exempted from its referral and billing prohibitions. *See* 42 U.S.C. § 1395nn(e); *see also* generally 42 C.F.R. §§ 411.354-357 (exceptions and special rules). The Stark exceptions for personal services and employment agreements are largely the same as under the Anti-Kickback Statute (*see* discussion *supra*). Like the Anti-Kickback Statute, once the Government or Relator has demonstrated each element of a violation of the Stark Statute, the burden shifts to the defendant to establish that defendant's conduct at issue was protected by an exception. The Government or Relator need not prove as part of its affirmative case that defendant's conduct at issue does not fit within an exception.

134.   Violations of the Stark Statute may subject the physician and the billing entity to exclusion from participation in Federal Health Care Programs and various financial penalties, including: (a) a civil money penalty of up to $15,000 for each service included in a claim for which the entity knew or should have known that the payment should not be made; and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knows or should have known was prohibited. *See* 42 U.S.C. §§ 1395nn(g)(3) & 1320a-7a(a).

## V.   FACTS AND ALLEGATIONS

### A.   Summary of Ensign's Unlawful Conduct and Relator's Role

135.   As described in the Introduction, supra, and as discussed in detail, below, this Complaint alleges three illegal schemes by the Defendants, all of which Relator was aware of from her role as Contracts Manager at Ensign from October 2013 through June 5, 2015.

136.   While Relator was on Ensign's Compliance Committee and listed on the 2014 Compliance Workplan as being responsible for making sure payment provisions in Ensign's contracts were in accordance with regulatory guidelines, she did not in fact have that authority; indeed, as evidenced by the factual allegations below, her multiple efforts to carry out her responsibilities and ensure compliance were consistently thwarted and undermined.

137.    Relator's role on the Compliance Committee, her responsibilities under the Compliance Workplan, and her familiarity with the requirements of the CIA made her especially sensitive to her obligations to report and try to correct what she saw as conduct violating the CIA and applicable law. This knowledge combined with her unsuccessful efforts to correct the situation at Ensign led to her filing this action and feeling forced to leave Ensign in June 2015.

**B.      Ensign's Scheme to Pay Illegal Compensation to Physicians to Induce Referrals to Ensign SNFs**

138.    Prior to joining Ensign, Relator had several years of experience working on contracts for health care companies. She was familiar with the laws and regulatory requirements generally governing such contracts.

139.    As Contracts Manager at Ensign beginning in October 2013, Relator was responsible for reviewing contracts entered into by all of Ensign's Facilities, which at that time consisted of over 140 skilled nursing and assisted living facilities in California and several other states. Ms. Ginger's responsibilities varied depending on the type of contract involved, but generally included reviewing, tracking, and monitoring these contracts.

140.    While Relator's job description referred to "Internal Risk Management Policies," she did not perform any duties related to this part of the job description because the company did not have any such policies. Other than the Human Resources manual which applied to all employees, and some Compliance Department policies on which employees were trained annually, Relator does not recall seeing, let alone receiving any training on, any internal policies, standard operating procedures ("SOPs"), or risk management guidance relevant to her job duties.

141.    In Relator's experience as Contracts Manager at Ensign, for medical directors/medical contracts, the SNF selected a doctor or other medical professional, negotiated the rate, advised Relator of the terms, and advised her that

40

a contract was needed. A typical conversation with an SNF Administrator on this issue would have been: "I have this new medical director, here's the rate, please prepare our standard contract." Facilities Administrators often asked the Relator to just send them a template so the Administrator could handle it directly, but she generally refused to do so.

142.   As part of the process, Relator asked the SNF to send her a copy of the doctor's license (so she could have the correct name for her "compliance screen") and information on malpractice insurance (i.e., the declarations page of the policy). She then ran a "compliance screen" on the doctor: this involved checking a publicly available database(s) providing HHS-OIG exclusion information and also state exclusion lists. She did not verify the doctor's license status or insurance.

143.   Assuming the "compliance screen" was clear, Relator then uploaded the relevant information into Ensign's Contracts Logix system, which generated the contract. The information she uploaded was the doctor's name and address. Relator manually filled in the compensation rate she learned from the SNF. The duties, timekeeping requirements (if any), etc., were on the template. On occasion, Relator might manually populate the template regarding specific duties if they were provided by the SNF; for example, one time she added language about the doctor working in the cardiac unit because the SNF had a cardiac unit.

144.   Once completed, Relator sent the contract to the SNF Administrator for review and execution. The contracts were supposed to be returned to her so that she could maintain a complete database of contracts.

145.   Relator was not authorized and never signed any contracts on behalf of Ensign: only the SNF's Administrator or an authorized person at Ensign's Service Center could sign (only in the event the Service Center was a party to the contract) and the counter-party signed.

146.   Relator did not negotiate doctor rates; again, that was done by the

SNF. Indeed, Ensign never gave her any fair market value ("FMV") tools or guidelines for calculating rates.

147.   Relator viewed her role on the Medical Director contracts as being "a scrivener." Indeed, as explained below, once she received negative feedback, she steered clear of making any substantive suggestions on those agreements.

148.   By the time Relator joined Ensign in 2013, it had grown to a chain of over 140 SNFs through an aggressive strategy of facility acquisition and transformation. During her tenure, Ensign acquired additional facilities, including eight California facilities acquired by Ensign in late 2014 to early 2015.

149.   Since Ensign's inception in 1999, whenever it has taken over new facilities, Ensign has replaced the facility's administration with individuals approved by and trained by Ensign's corporate office. Facility administration generally consisted of a Facility Administrator, Director of Nursing, Assistant to the Facility Administrator, and management over each department within the SNF.

150.   By and through the personnel it put in charge of its SNFs, Ensign's pattern and practice has been to contract with physicians, most often those with private practices in specialties from which the SNF wishes to draw referrals, to serve as Medical Directors, Associate Medical Directors, or consultants in various capacities to the SNF.

151.   Based on Relator's experience, Defendants paid their Medical Directors and consultants substantially above fair market value ("FMV"), often for little or no work, and often without a written agreement, in part or in whole as an inducement to refer patients to their SNFs.

152.   Relator attempted to maintain a complete set of contracts in Ensign's "Contracts Logix" management database. Contracts Logix is the contracts management system that Ensign used to create, edit, and store all of Ensign's contracts. Every time an Ensign Facility signed a contract, the Facility was supposed to provide a copy to Ensign's Headquarters for inclusion in the Contracts

Logix database. However, the lists maintained in Contracts Logix were likely incomplete (*i.e.*, were only a partial list of all of the Medical Director agreements entered into by Ensign's SNFs as of any given time), as sometimes Facility Administrators did not return the fully executed contracts to Relator or her predecessor(s).

153.   Relator has numerous copies and examples of Ensign's SNF's "Medical Director" ("Medical Director" or "MD"), Associate Medical Director, and "Consulting" Agreements between various SNFs and medical professionals as well as at least one template for such an agreement (with 07-09-2014 updates). These Agreements are examples only and are not the universe of all such agreements.  Relator obtained these particular agreements in the central repository of contracts maintained by the Ensign Headquarters.

154.   Of note, the scope of duties in each of the Medical Director and Associate Medical Director Agreements is virtually identical. This is especially significant where a SNF has Medical Director Agreements with multiple physicians.  The fact that a SNF was paying several doctors thousands of dollars each per month supposedly to perform the identical work was, based on Relator's experience, evidence that the payments were not for legitimate services but as inducements or rewards for referrals.

155.   Relator is also aware of Advisory Board Agreements at various Ensign SNFs. Advisory Board payments are another way that the SNFs funneled money to referring physicians. Relator realized that in addition to MD contracts, Ensign used Advisory Board payments and other creative ways (including golf outings and fancy dinners) to induce referrals.

156.   Ensign exerted significant pressure on Facility Administrators to reach the "Big Hairy Audacious Goals" set by management for patient census and thereby maximize profits. Relator believes that Facility Administrators who did not reach profit goals were subject to being fired, along with their senior staff. This

"carrot" (bonuses) and "stick" (being fired) approach incentivized Facility Administrators to maintain their patient census, including by using Medical Director and consultant payments as a way to induce referrals. Not surprisingly, there was high turnover among Administrators.

157.    As discussed in the "Applicable Law" section above, when a SNF pays a physician, to qualify for protection under exceptions to both the Anti-Kickback and Stark Statutes, the agreement must meet certain essential standards. Most importantly: (1) the contract must pay no more than fair market value for the services performed; (2) the services to be performed by the physician must be legitimately needed at the facility and must be specified in the contract; and (3) the physician must actually perform the required services to get paid. Ensign's SNFs routinely ignore each of these requirements in their dealings with referring physicians. Moreover, in many instances, payments were made without any written agreement or contract at all.

### 1.    Ensign Paid More than Fair Market Value for Physician "Medical Director" and "Consulting" Services.

158.    Ensign paid physicians (as defined in fn. 1, *supra*) compensation to act as "Medical Directors" or "consultants". This was often done with large monthly payments with little or no accountability for the amount worked or fair market value analysis of the rate or consideration or the need for the services.

159.    In Relator's experience, the standard industry practice among SNFs is to consult data from national surveys and reports on physician compensation to determine an hourly FMV rate for physician Medical Director and consulting services based on the geographic area, physician specialty, type of services, and other factors. The FMV is typically expressed as a per-hour rate, and the Medical Directors and consultants are paid that rate on a per-hour basis in accordance with the number of hours actually worked per month.

160.    Ensign generally did not follow this practice. Instead, SNF Facility

Administrators often set the compensation for Medical Directors and consultants at a lump sum monthly payment, without reference to any standard FMV for the services and without reference to any actual hours worked.  Ensign employees also were instructed to recruit Medical Directors and other consultants, including Advisors and Advisory Board members, based on who could "fill beds" and generate the most referrals.

161.   For example, Ensign's records show that SNF Carmel Mountain Rehabilitation & Healthcare ("Carmel Mountain") in San Diego paid "Medical Director" monthly payments of $7,000 to Dr. Daniel Pinney, $5,000 to Dr. Michael Kalafer, $3,000 to Dr. Mohinderpal Thaper, and $1,500 to Dr. Jason Keri, for an aggregate sum of $16,500 per month (or approximately $200,000 per year) in 2014. *See* **Exhibit 1** attached (Email of 12/29/14 from Ensign Accounting Department). This is far in excess of the FMV for Medical Director services for a single facility.

162.   Relator is informed and believes that Carmel Mountain's $16,500 in monthly payments to Medical Directors were set without any FMV analysis, without reference to whether a single individual could perform the overlapping services at a much lower cost, and without reference to how much time any individual would have to spend performing his or her duties. Relator alleges that the payments are not commercially reasonable and would not be made but for the benefits Carmel Mountain receives in the form of patient referrals in exchange for the payments.

163.   Ensign's records show many other examples of Ensign's SNFs paying Medical Directors and other consultants lump sum payments well above FMV and with no accountability for hours actually worked.

164.   For example, Ensign's records show that SNF Lemon Grove Care Center ("Lemon Grove") in Lemon Grove, California, was paying six physicians a total of $15,000 per month. *See* **Exhibit 1** attached (Email of 12/29/14 from Ensign

Accounting Department). Based on Ms. Ginger's experience, these payments are for work that could be performed by a single physician at a much lower cost.

165.   Another representative example is SNF Vista Knoll Specialized Care ("Vista Knoll") in Vista, California. Ensign's records show that Vista Knoll was paying four doctors (at $3,000 per month, $2,000 per month, $1,500 per month, and $1,500 per month, respectively), as well as at least ten additional doctors, most of which pay over $2,000 per month and one of which pays $4,000 per month. The total payments to doctors at Vista Knoll, both Medical Directors and consultants, exceeded $25,000 per month. This is so far in excess of the medical needs of that facility that it can only logically be attributed to the practice of paying doctors for referrals.

166.   Ensign's records show many other examples of multiple doctors, multiple contracts, and lump sum payments by Ensign SNFs, such as:

(a)     Brookfield Healthcare Center in Downey, California, has or had Medical Director Agreements with six doctors, one paid $4,000 per month, another $3,300 per month, another $3,000 per month, another $2,000 per month, and two at $1,500 per month—for a total of $15,300 per month.

(b)     Cambridge Health & Rehabilitation Center in Richmond, Texas, has or had Medical Director Agreements with four doctors (paying an average of $1,500 per month), plus Quality Review Physician Agreements with three other doctors paying $3,000 per month, $1,000 per month, and $500 per month, respectively.

(c)     St. Joseph Villa in Salt Lake City, Utah, has or had Medical Director or Associate Medical Director Agreements with five doctors -- paying $6,000 per month, $3,500 per month, $3,000 per month, $225/hour, and $175 per hour – in addition to having consulting agreements with five more physicians, four of whom were paid $2,000 or more per month.

(d)     Rose Villa Health Care Center in Bellflower, California, has or had

SECOND AMENDED COMPLAINT

agreements with eight doctors to act either as Medical Director, Associate Medical Director, or consultants of various types, with aggregate payments of more than $9,000 per month.

(e)     Panorama Gardens Nursing and Rehab Center in Panorama City, California, has or had Medical Director or Associate Medical Director Agreements with five doctors (paying amounts ranging from $800 to $1,900 per month), as well as consulting agreements with five other doctors paying monthly amounts up to $2,500 per month.

167.   Ensign also hired physicians to work as Medical Directors at multiple Facilities, including Dr. Pouya Afshar, who was so engaged because of his ability to generate referrals.

168.   Each Facility also tracked referrals by Medical Directors and consultants and reported those referrals to Ensign.  Indeed, an Ensign marketing executive provided training to employees at the Facilities on how to so track physician referrals in a customer relationship management ("CRM") system.

169.   Relator is informed and believes and therefore alleges that Ensign hired multiple SNF Medical Directors and/or consultants and paid them without any credible FMV analysis or accountability for work actually performed.

**2.     Ensign Hired "Medical Directors" and other "Consultants" to Perform Services without Establishing What Those Services Were or Whether They Were Necessary.**

170.   A second key component of the analysis to determine if payments to physicians for "Medical Director" or "consulting" services are lawful is an analysis of the nature and amount of services that the physician is required to perform. *See, e.g.,* 42 C.F.R. § 411.357(d)(iii). This is so because the Anti-Kickback and Stark laws recognize that "make work" or "no show" consulting arrangements could easily be used to funnel improper payments to referring physicians.

171.   Accordingly, in Relator's experience, law-abiding SNFs that plan to hire a new Medical Director, or renew an existing contract, perform an in-depth

analysis of the SNF's needs. Based on this review, the SNF drafts a contract that sets forth the specific tasks to be performed, hours that the Medical Director or consultant will be expected to work to perform those tasks, and specific "timekeeping" requirements to establish that the work was done. Each of these requirements is essential to allow the facility to ensure that: (1) the facility contracts only for the services it needs; and (2) there are measurable standards by which the physician Medical Director's performance and compensation can be judged. Under Ensign's direction and control, however, its SNFs often failed to provide even basic frameworks to establish that the services they were purportedly paying physicians for were needed.

172.    In Relator's experience, the amount that Defendants' Medical Directors and consultants were paid was not tied to any analysis of how much time the duties assigned should require of a reasonably efficient and qualified physician. For example, SNF Lemon Grove was paying six Medical Directors varying amounts: one is paid $5,000 per month, one is paid $3,000 per month, three are paid $2,000 per month, and one is paid $1,000 per month, for a total of $15,000 per month. *See* **Exhibit 1** attached (Email of 12/29/14 from Ensign Accounting Department).  Relator is informed and believes that this facility has no documentation explaining or justifying the different payments.

173.    Typically, Defendants' Medical Director agreements contained only boilerplate language setting forth the duties to be performed, without concrete or measurable responsibilities. In many cases, the duties are so broad as to make it difficult to determine what exactly is required of the Medical Director. Without specific detail in the Medical Director agreement itself or some associated job description, the purported duties in these contracts are almost impossible to assess, and the Administrators typically are not able to provide the necessary detail.

174.    Beyond the question of what duties are expected, it is also important, for purposes of the Anti-Kickback Act Safe Harbors and Stark exceptions, to

48

assess whether the services to be performed are actually required—as opposed to simply "make work" being used as a means to funnel compensation to the physician. Even if a physician were being paid what would otherwise be fair market value for his or her services, a SNF's payments to him or her will constitute a kickback and improper financial relationship if the SNF does not have a legitimate need for those services.

175.   Accordingly, before hiring a Medical Director or other consultant, a SNF must first establish what bona fide need justifies the position. Under Ensign's direction and control, the SNFs routinely failed to perform such a needs assessment, and/or hired multiple Medical Directors for the same or similar positions without any justification.

### 3.   Ensign Paid Medical Directors and Consultants for Services Without Evidence that the Services Were Actually Performed.

176.   Under Ensign's direction and control, its SNFs routinely structured their agreements in ways that made it difficult if not impossible to monitor whether the Medical Director or consultant services were actually performed. Further, even where certain evidence of work is required, SNFs routinely paid the physicians despite a lack of documentation that the work was performed.

177.   In Relator's experience, it is standard industry practice among SNFs to include in their Medical Director and consultant agreements a requirement that before a payment is made, the physician must turn in monthly time logs with details about the work performed. Ensign SNFs, however, typically do not require their Medical Directors and other consultants to submit such time records. Instead, the Medical Directors and consultants are routinely paid lump sums under the terms of their contracts, regardless of the amount of time they actually worked and without even requiring basic time keeping by the physician.

178.   All claims submitted to federal and state-funded health care programs by Defendants for reimbursement relating to such tainted patient referrals are thus

false or fraudulent claims within the meaning of the FCA and California FCA.

### 4. Ensign Engaged in This Misconduct (and Failed to Report it) Despite its Obligations under the October 2013 CIA with HHS-OIG.

179.   Relator was on Ensign's Compliance Committee and received copies of related materials, including an Excel Spreadsheet Entitled: "2014 Compliance Workplan," updates thereto, and emails outlining goals.

180.   The Compliance Workplan was created by or under the direction of Ensign's Chief Compliance Officer, Deborah M. Miller (with input from various departments) in connection with the company's Compliance Program and the 2013 CIA. Ms. Miller, an attorney, was a member of senior management who reported directly to Christopher Christensen, the then CEO and President of Defendant The Ensign Group, Inc., and was not subordinate to the General Counsel.

181.   While Relator is listed on this Compliance Workplan as being responsible for making sure payment provisions in Ensign's contracts were in accordance with regulatory guidelines, she did not in fact have that authority.

182.   This became abundantly clear to her through a series of key events surrounding her direct experience with Medical Director contracts and compensation, from the time she joined Ensign in the first week of October 2013 (when the CIA was signed) until she departed effective June 5, 2015. To her knowledge, and on information and belief, Ensign's problematic conduct continued after her departure.

### 5.    Chronology of Relator's Experience With Problematic Physician Payment Arrangements at Ensign

183.    Relator started working at Ensign during the first week of October 2013. Prior to joining Ensign, Relator had several years of experience working on contracts for health care companies.

184.    During her first week, Ensign signed the CIA and announced the DOJ False Claims Act settlement noted above, all of which was a surprise to her.

185.    Also surprising to her was Ensign's reaction internally to the settlement: from her discussions with non-attorney co-workers and statements by Defendant Ensign Facility Services, Inc.'s then Chief Operating Officer Barry R. Port, Relator's impression was that compliance training was not taken seriously. Rather, the compliance training was something they had to "get through," but it would be business as usual because the company had, in fact, done nothing wrong and the government forced them into it.

186.    Ensign's attitude towards compliance was very different from her experience at Medicis Pharmaceuticals ("Medicis," where Relator worked from January 2009 to August 2011); there, the Compliance team was highly regarded and held numerous company meetings that were fully supported by upper management after that company's 2007 DOJ settlement and CIA with HHS-OIG.[2] At Medicis, all day compliance trainings were held for various departments, including the Legal team, where out of state personnel were flown in to personally attend.

187.    At Ensign, Relator had one day of contracts training by Tanner Ainge, who trained her on the mechanics of the Contracts Manager job and generally outlined how the Contracts Manager position operated. There were no written

---

[2]    *See* DOJ press release at https://www.justice.gov/archive/opa/pr/2007/May/07_civ_336.html. While the DOJ press release does not reference a CIA, the Law360 article reported the company entered into a five year CIA, *see* https://www.law360.com/articles/24309/medicis-settles-off-label-marketing-charges.

guidelines for her to follow on contracts. There were, however, some templates including a Medical Director contract template. The training included showing her how to run the "contract" system (Contracts Logix). Soon she was doing 20–30 new agreements per day.

188.   Relator's work included Medical Director contracts and related issues such as those discussed below. In addition, she was responsible for inquiries and contracts for many other purposes, including pharmacy services/rebate agreements, leases, labs, ambulances, and x-rays.

189.   In November 2013, Relator discovered that Ensign and its 140-plus facilities were using a template for Medical Director contracts that included a flat monthly rate provision instead of a fair market value rate for actual work performed.  Indeed, the Medical Directors were not even required to keep time records. Relator also discovered that Ensign did not use any fair market valuation tools for physician compensation. This flat monthly rate provision and the absence of fair market valuation tools troubled her because, based on her prior experience, training, and knowledge, such flat monthly rates could be used to disguise payments to doctors in exchange for patient referrals.

190.   Relator advised Mr. Ainge of her concern that there were no fair market valuation tools and that the template contained the flat monthly rate provision. Other companies for which Relator had worked had people who utilized tools to develop FMV rates or they contracted with outside companies that compiled FMV rates; for example, Allergan had two full-time employees who performed FMV calculations for Allergan's contracts.

191.   In or about late December 2013, Relator was invited to participate with Ensign Service Center staff in a facility visit at SNF Lemon Grove Rehabilitation Center in the San Diego area. She understood at the time that the visit was scheduled because the facility had received unsatisfactory scores from a California State survey, experienced a lot of turnovers, including several

administrators, and had low employee morale.

192.   Many months later, Relator received a request for a new Medical Director agreement for Lemon Grove Rehabilitation Center. When she pulled up the contract records for this facility, she noticed that there were several pre-existing Medical Director agreements providing monthly payments of about $15,000 total. When, shortly thereafter, she questioned the Administrator, Matt Combe, about these other agreements, he stated that they were in fact using those physicians. In Relator's experience, however, it was unusual for a facility of this size (about 158 beds) to have so many physician agreements and to pay such large monthly amounts. Relator thus became concerned that these Lemon Grove Rehabilitation Center Medical Director payments were disguised payments for patient referrals.

193.   Relator's work goals for 2014 included those assigned to her on the 2014 Compliance Work Plan. These consisted of: "100% Government Exclusion Checklist Screening for all contracted entities; Screening of vendor payment structures for ***anti-kickback*** and CMS pricing guidelines; and Continued review of policies and regulations regarding government reimbursed healthcare programs as it relates to contracting." (emphasis added). A document entitled "2014 Goals from Emails" also contained these three goals and added a fourth one: Reporting all acquisitions in a timely manner per the CIA.

194.   In early 2014, Relator made a Contracts presentation at the Ensign Annual Meeting. This meeting was held once per year between the Ensign Service Center and its Facilities, with the Administrators, Directors of Nursing, and key staff attending. Her presentation was well received by certain members of management.  In addition to the annual meeting, Ensign held a "boot camp" training about once every 3 months or so for new Facility Administrators/ managers; it was also known as Administrator in Training ("AIT"). Relator also did AIT/"boot camp" trainings on contracting. A copy of her Contracts Training Module from an AIT Training is attached hereto as **Exhibit 2**. Among other things,

**Exhibit 2** discussed business terms, the contract submission and review process, risk management and compliance, relevant laws including the Anti-Kickback Act, prohibitions on "swapping arrangements", and references Ensign's CIA, Code of Conduct, and Compliance Programs.

195.   By April 2014, Relator was sufficiently concerned about Medical Director and physician compensation and contract issues that she reached out for a meeting with Beverly Wittekind, General Counsel at Ensign. The screenshot taken by Relator for a calendar reminder for a meeting invitation with Ms. Wittekind re: FMV for Medical Directors and Utilization Review members is attached as **Exhibit 3**. The meeting location was in Ms. Wittekind's office. The invitation was sent on April 21, accepted on April 22, and the meeting took place on April 23, 2014.

196.   During the meeting, as noted by Relator in an email attached as **Exhibit 3**, Ms. Wittekind said that *she thought "we [Ensign] were already doing an hourly rate [for medical directors] because that was something she said was instituted a few years ago."* (emphasis added). Yet, at the time of the meeting, Ensign was not routinely using hourly rates.

197.   After the meeting with Ms. Wittekind, Relator emailed her co-worker Tanner Ainge. *See* **Exhibit 3** attached. In that email, Relator told him that she met with "Bev" [Wittekind] to discuss "FMV and medical director and UR Committee agreements". The meeting went "really well," and based on the meeting: *"I have now changed the language in our form templates to an hourly rate and we will be enforcing that from here on out. We were both on the same page on what the ranges should be* and it was good to get her feedback, guidance and some history on this issue." (emphasis added). Mr. Ainge replied with "Nice, awesome thanks".

198.   Upon receipt of a subsequent Medical Director agreement request, Relator attempted to implement the "new" hourly rate. The Facility Administrator requesting the agreement expressed his displeasure with the provision to Relator

54

and, apparently, he complained to Barry Port, then Chief Operating Officer of Defendant Ensign Facility Services, Inc. Mr. Port was very hands on with the facilities: he travelled to them constantly; he knew all the Facility Administrators; he knew who was performing and who was not; and he would put pressure on them to perform. Mr. Port overruled the change to the template that Ms. Wittekind had agreed to adopt.

199.    Relator later approached Mr. Port in his office—which at the time was next door to hers—to discuss his decision. Mr. Port indicated that he had received a complaint about the hourly rate provision from one of the Administrators for one of the 140-plus Facilities, and that he had decided to continue to use the flat monthly rate provision. Relator explained to Mr. Port her concern that certain Facilities had numerous Medical Director agreements with these flat monthly rate provisions, and that this fact suggested that certain Facilities may be making improper payments to doctors for patient referrals in the guise of Medical Director payments. Mr. Port raised his voice and stated that just because a single Facility had multiple Medical Director agreements containing flat monthly rate provisions with multiple physicians did not necessarily mean that such payments are for patient referrals. At that point, Mr. Port told Relator that the issue was "closed." He appeared to be very angry and did not want to hear any further concerns from Ms. Ginger on this topic.

200.    Following this meeting, Relator noticed that Mr. Port's behavior toward her changed. He no longer made friendly small-talk and seemed to avoid her in the office. Subsequently, and without explanation, she was moved into a different office further away from Mr. Port. She felt isolated and feared for her job in the wake of her interaction with him.

201.    On August 14, 2014, Charlie Jenkins (Facility Administrator at SNF Premier Care Center in Palm Springs, CA) emailed Relator to discuss his plan to start a partnership between Premier Care and UCR (University of California at

Riverside) Health. Relator pointed out that Ensign/Premier Care requires a doctor (not an institution like UCR) to be a co-Medical Director. Mr. Jenkins responded that Dr. Deborah Streletz planned to be co-Medical Director; in that email, he made the expectation (and benefit) of patient referrals clear:

> "They would like to begin the following partnerships.
>
> 1) To have one of their physicians *refer and follow patients* at Premier Care immediately
>
> 2) To have one of their physicians become the co-medical director at Premier Care immediately…
>
> "Dr. Streletz … would be *following/referring*."
>
> *"The contract would need to stipulate the co-medical director agreement and the ability for their physicians to follow patients at Premier Care."*

*Id.* (emphasis added). The lengthy email (attached as **Exhibit 4**) notes, among other things, that UCR would like to receive a $2500 monthly stipend for Dr. Streletz, and that:

> UCR Health runs a family practice here in Palm Springs. They are currently in negotiations to manage all of the IEHP patients for our main feeder hospital, Desert Regional Medical Center. IEHP is one of the two health plans that will be managing dual eligible in our county, so this could be a great opportunity to capture those patients in the future as well.

*Id.* (emphasis added).

202.   While Relator did prepare a Medical Director agreement in August 2014 for Dr. Streletz for $2,500 (discussed below), subsequent emails from August 14, 2014 to September 16, 2014, primarily between Mr. Jenkins and Relator (but also between Mr. Jenkins and UCR), were of concern to Relator because they discussed referrals as part of the arrangement for the agreement.

203.   Then, Mr. Jenkins approached Relator on September 4, 2014 about yet more Medical Director contracts for his same Facility (Premier Care). In that email chain, Mr. Jenkins requested new contracts for Associate MDs and MDs at the following pay rates (without providing or suggesting any FMV analysis):

Associate MDs:

- Dr. Dimple Agarwal - $3,000/month

- Dr. Eric Presser - $1,000/month

- Dr. Hyman Sacks – $750/month

- Dr. Himmelman - $1000/month

- Dr. Gary Levinson - $500/month

MD: Dr. Clifton Cole – as of April 1, 2014, $3,000/month

204.   Relator was troubled that Mr. Jenkins was attempting to sign new Medical Director contracts with *six different doctors* for the same Facility without any explanation why that Facility supposedly required so many Medical Directors – all of which occurred after she had drafted a Medical Director agreement for Dr. Streletz less than one month earlier. Relator was concerned that Premier Care was paying these multiple doctors for patient referrals in the guise of Medical Director payments.

205.   Relator considered Mr. Jenkins' actions disturbing enough that she shared her concerns with Owen Hammond, then President of the holding company Ensign Signum Healthcare, Inc. ("Signum"). Signum owned Premier Care and, in turn, was owned by Ensign. Specifically, on September 5, 2014, Relator forwarded Mr. Jenkins' email to Mr. Hammond to ask him how to proceed, given that Mr. Jenkins was drafting the contracts "without any compliance screens or legal reviews." *See* **Exhibit 5** attached. In a follow up email that same day, Relator also noted that she had just drafted at Mr. Jenkins' request an MD Agreement during the prior month [August] for Dr. Streletz for $2,500. *See id.* Relator did not regularly communicate with Mr. Hammond, but she did so at this time because she was very concerned about Mr. Jenkins' request and his prior actions. Ms. Ginger also forwarded to Chad Keetch, Ensign's Deputy General Counsel, her email correspondence with Mr. Hammond and Mr. Jenkins, along with a copy of the Medical Director contract for Dr. Cole that Jenkins had drafted himself. *See*

57

**Exhibit 5** attached.

206.   On September 15, 2014, Mr. Jenkins emailed Relator requesting that she draft a contract for Dr. Levinson (above) so he can get "PCC [Premier Care Center] Access" to "consult" with patients there. He also noted that he attached Dr. Levinson's "Letter of Agreement." In the ensuing email thread, it became apparent that there was already a Medical Director agreement, to which Relator responded that the Letter of Agreement (Contract) was "not drafted by the Contracts Department, nor was the physician compliance screened." Mr. Jenkins responded, apologizing for modifying the contract, and explaining that he "took the contract template from the other physician contracts drafted by the contracts department and changed the name to Dr. Levinson. I was unaware of the additional screening you conducted."

207.   Mr. Hammond never informed Relator about his subsequent communications with Mr. Jenkins, if any. Several months later, however, Relator approached Brett Arnold in Ensign's Accounting Department. At her request for Medical Director payment information for Premier Care, Mr. Arnold informed her that all of the doctors for whom Mr. Jenkins had requested Medical Director agreements were receiving Medical Director payments even though she had never prepared any Medical Director agreements for them. Mr. Jenkins' willingness to break protocol and draft the contracts without Relator showed how eager he was to get the deals done.

208.   On September 22, 2014, Relator met with three Ensign Facility Administrators of SNFs in San Diego: Clay Gardner, Matt Rutter, and Glenn Matthews. Mr. Gardner was the Executive Director at Vista Knoll Specialized Care ("Vista Knoll"); Mr. Rutter was the Executive Director at The Springs at Pacific Regent ("The Springs"); and Mr. Matthews was the Executive Director at Carmel Mountain. The San Diego "cluster" of Facilities included at that time, among others, Arroyo Vista, Carmel Mountain Rehabilitation, Lemon Grove

Rehabilitation Center, The Springs, Vista Knoll, and Palomar Vista Healthcare Center. At the time, Ensign rewarded its Facility leaders with bonus payments based on the success of other Ensign Facilities within the same cluster. Such success was predicated in large part on maintaining a high patient census.

209.   Relator and the three Administrators gathered to discuss the large number of contracts that would be coming in as a result of an upcoming multi-Facility acquisition.[3] During this meeting, while discussing how the Facilities could maintain a high patient census, Mr. Gardner stated that they used to obtain patient referrals from hospital admission coordinators. However, as Mr. Gardner explained, due to certain rule changes, the doctors now made referral decisions. *Then, chuckling among themselves, Messrs. Gardner, Rutter and Matthews discussed how, whereas they used to pay the hospital admission coordinators for patient referrals with "donuts," they now were paying doctors with "dollars"* (in the form of Medical Director payments and consulting fees) for such patient referrals.

210.   Relator was disturbed by the comments she heard at the meeting. As the meeting was concluding, Mr. Matthews offered to take her on a tour of one of his Facilities. Relator agreed but, before doing so, she went back to her car and took notes about the meeting on a pad that she had purchased with her own money.

211.   Troubled by what she had been learning about MD payments, Relator later approached Mr. Arnold and requested that he provide her a list of the Medical Directors (including payments received by each of them) for the San Diego Facilities operated by Messrs. Gardner, Rutter, and Matthews. Mr. Arnold provided Relator by email the list that she had requested with each named Medical

---

[3] The facilities that were ultimately acquired later in 2014-early 2015 and became part of the San Diego "cluster" include SNFs : Mission Trails Healthcare, Inc., d/b/a Grossmont Post Acute Care; Nautilus Healthcare, Inc., d/b/a The Cove At La Jolla; Portside Healthcare, Inc., d/b/a Mission Hills Post Acute Care; Bayside Healthcare, Inc., d/b/a South Bay Post Acute Care; and Claydelle Healthcare, Inc., d/b/a Somerset Subacute and Care. Others in the San Diego cluster included SNFs Parkside Health and Wellness Center, and Magnolia Post Acute Care.

Director and the amount each MD received each month. This list confirmed that the Facilities had multiple Medical Directors who were all paid flat monthly amounts with no apparent FMV analysis. A copy of this email is attached as **Exhibit 1**. Specifically, Mr. Arnold's information showed the following regarding "MDs at Springs, Lemon Grove, & Carmel Mtn":

> **The Springs / La Jolla** – *"They've used three recently"*
> *- Daniel Pinney, MD (last used in July)- $2,000/mo.*
> *- Pouya Afshar MD, Inc. - $2,500/mo.*
> *- Robert W. DeMonte Jr. MD - $200/hr ("crazy high - provides detailed invoices that detail the scope of his work and his hours")*
>
> **Lemon Grove** – *"They have a lot, but seem to use them all every month"*
> *- John Gaidry MD - $3,000/mo.*
> *- Bernard Michlin, MD - $2,000/mo.*
> *- Dan [sic---should be Dat] Nguyen, MD - $5,000/mo.*
> *- Salam Yatooma, MD - $2,000/mo.*
> *- David Riker, MC Inc. - $1,000/mo.*
> *- Francisco S. Pardo $2,000/mo. ("Doesn't say MD but he is coded to the medical director account. He was last used in May but it just got paid earlier this month which is why I'm including it")*
>
> **Carmel Mountain** – *"They appear to have four"*
> *Dr. Daniel Pinney (probably same MD as at The Springs?)- $7,000/mo.*
> *Dr. Jason Keri - $1,500/mo.*
> *Dr. Michael Kalafer - $5,000/mo.*
> *Dr. Mohinderpal Thaper - $3,000/mo.*

Relator was upset with this information. For example, Lemon Grove, which had a patient nurse ratio that was not "up to par" and was a "'substandard" Facility, was paying 6 Medical Directors a total of $15,000 per month; in Relator's experience, Facilities of this size (about 158 beds) have only one or two MDs who are generally not paid close to these rates and should be paid hourly, not a monthly flat rate.

212.   On October 20, 2014, Brian Squires, Marketing Director of SNF Sea Cliff Health Care, emailed Relator informing her that Dr. Salem would be joining the Sea Cliff Health Care Board as a 30-day readmission director with compensation at $1,500. From the email it is not clear whether this compensation was a monthly or a one-time payment for this contract. The email is consistent with the overall scheme to pay MDs a flat monthly rate without taking into account

FMV.

213.   Later that month, in an email on October 27, 2014, Michael
Leinweber, executive director of Village Healthcare and Rehabilitation, instructed
Relator to use a vendor's template for a new MD Contract. In the email thread,
Relator pointed out that the vendor's template requires that the "facility maintain
time records." Mr. Leinweber told her to delete the contract's requirement that the
Facility maintain time records in their agreement. To Relator, this email showed
that Ensign Facility directors didn't want to have time records required for the
contracts and demonstrated once again that MDs were paid a flat monthly rate,
without any requirement on maintaining time records reflecting the hours worked.

214.   Also in October 2014, Relator and Doug Haney, CEO of SNF Bella
Vita Health and Rehabilitation Center, were involved in efforts to have Lana
Peterson, a nurse practitioner with Pride Behavioral Health LLC, sign a "new"
contract for services at Bella Vita. Ms. Peterson was not a physician, but a
Psychiatric Physician Assistant paid as a Medical Director since the Facility was
required to have a Psychiatric Physician (or PA) on call in order to admit
psychiatric patients. Apparently, Ms. Peterson kept demanding more and more
money even though she was not visiting the Facility as required.

215.   From Relator's notes, Ms. Peterson had been providing (some)
services and being paid without a "fully executed contract since May 2013." Also
from Relator's handwritten notes, the Facility Medical Director who came in
regularly was Dr. Clark with IPC (a vendor who provides physician services), and
who was compensated at about $2,000/month. Ms. Peterson apparently was paid
$76,950 in just one year "plus patient billing." Relator's notes also indicate that the
"facility does not have a lot of Med [Medicare Part] A patients, and that Medicare
pays $151 for psychiatric evaluations." Mr. Haney's email notes that "She [Ms.
Peterson] came in last Thursday but only stayed 4 hours. …Our plan is for her to
do the 2 behavioral units for $6k and ask her if she wants to do psych evals on

patients outside our 2 units which she can bill insurance or bill us if they're [sic] insurance won't pay for that. In the meantime, we're looking for someone else but that may take a couple months." Relator replied to Mr. Haney: "Wow, she is really giving us a hard time. When I last spoke with her, she said as long as we made all of her requested contract changes, she would sign. I made them, but now she is coming back with more. Does she have a lot of patients in your building? When she was last in, was she mostly just doing patient follow up?"

216.    Then, on November 11, 2014, Relator had a conversation with Scott Meppen that stunned her. Mr. Meppen was, at least in name, the Operations Manager for SNF Palomar Vista Healthcare Center, even though Mr. Matthews was the licensed Administrator. Mr. Meppen had recently taken over from David Mayo. Mr. Meppen was at Ensign Service Center for a boot camp/AIT training, during which Ms. Ginger had made a presentation on contracting. *See* **Exhibit 2** attached (copy of the Contracts Training Module from AIT Training)]. After that presentation, Mr. Meppen approached Relator in her office and specifically asked her to prepare Medical Director agreements for several doctors for his single Facility. Mr. Meppen advised that he had performed a return on investment calculation in order to determine the minimum number of referrals he would need from each doctor in order to break even on the monthly payment amount. He also advised Relator that he would raise or lower the monthly payments in accordance with the number of referrals that he actually received from each physician. In other words, Mr. Meppen bluntly admitted that the purported Medical Director payments were actually payments made to doctors in exchange for patient referrals.

217.    During the meeting, Relator wrote some rough notes on the back of Mr. Meppen's business card. To protect herself after he left her office, she typed a memo of their conversation on her computer. A copy of her notes, Mr. Meppen's business card, and her memo are attached as **Exhibit 6.**

218.    According to Relator's memo, with respect to the existing doctors -

Drs. Mallo, Dashi and Navahandi – Scott Meppen made explicit the tie between referrals and level of payment, stating the following:

> Scott indicated that he wanted to reduce Dr. Navahandi (currently compensated at $1200 per month). He stated that Dr. Navahandi is not providing any referral business and only shows up for one hour per month for the Quality Review Committee Meeting. Otherwise, Dr. Navahandi is not providing any other services to the facility. He stated that he wanted to change Dr. Navahandi to a QA Committee Agreement at an hourly rate of $300 per hour, but added he didn't think Dr. Navahandi would show up for that amount of money. He was concerned about angering Dr. Navahandi with the possible reduction.
>
> With regard to **Dr. Dashi**, he would like to increase his compensationto $3500 per month from the current $1500 per month and said that Dr. Dashi has agreed to start following his patients to the facility. He indicated that Dr. Dashi will also start referring more of his patients to the facility. Scott said that he wanted the increased compensation to be effective for a 90 day period so that they could track if the facility actually experienced increased patient census as a result. If, after 90 days, they are not seeing additional patients from Dr. Dashi, then he wanted the flexibility to reduce the amount back down.
>
> In addition, Dr. Dashi has a partner in his medical group, **Dr. Rapshitii (SP?)**[sic]**,** that would also like to become an associate medical director and would work with Dr. Dashi in referring patients to Palomar Vista. Scott stated that they needed to increase patient count by at least 15 per month because they are currently not breaking even on referrals versus payments to medical director(s).With regard to **Dr. Mallo**, Scott indicated that when the prior administrator was at Palomar Vista, there was a good relationship and Dr. Mallo referred a lot of patients. However, after some leadership and nursing changes, he has not been referring as many patients. Scott spoke with him about the drop in referrals and as a result, Dr. Mallo referred 5 new patients in the last week and will work on sending more patients to Palomar Vista. He doesn't want to change anything about Dr. Mallo's current compensation ($2500 per month) right now.

*See* **Exhibit 6** attached (emphasis added).

219.    Relator was very nervous after her conversation with Mr. Meppen. She had already complained about the lack of a fair market value analysis and the flat monthly fee provision in the Ensign contract template, as well as Mr. Jenkins' plan to sign multiple Medical Directors for a single facility (SNF Premier Care). She believed these facts were evidence of improper payments to doctors in exchange for patient referrals. However, her complaints were either ignored or

overruled by senior personnel within Ensign. Indeed, Mr. Port had become angry with Relator during their earlier meeting and had told her the issue was "closed." Also, before her meeting with Mr. Meppen (whose SNF was in the San Diego cluster), three of his fellow SNF Administrators in the San Diego cluster (i.e., Messrs. Gardner, Rutter, and Matthews) had said outright during a separate meeting that they had been paying doctors for patient referrals. Relator was in fear of losing her job if she further voiced her concerns and did not know what to do. As a result, Relator initially ignored Mr. Meppen's request for the Medical Director contracts and hoped that he would not follow up.

220.   But, by email on November 13-14, 2014, Mr. Meppen and Dr. Repishti corresponded about a contract at a $3500 monthly stipend and Dr. Repishti apparently provided Mr. Meppen with his address, full name, business license, and liability insurance information, as requested by Mr. Meppen.

221.   Mr. Meppen then followed up with Relator by email on November 19, 2014, wondering where his contracts were. In the email, he noted that he had been "swamped since I last saw you" and was not sure if she had sent him the contracts for the physicians to sign; he also "needed to get a new contract from one MD and append [sic, presumably 'amend'] another one". He wanted to know if there was a particular contract he should use and also to make sure he got her all the correct information. Relator, in light of her suspicions, was concerned about having Mr. Meppen involved in drafting any new contract.

222.   A couple of days later, by email on November 21, 2014, Mr. Meppen forwarded to Relator the information he had received from Dr. Repishti: "Sorry I did not get back with you sooner. This would be for $3,500 [monthly] as a stipend. Please feel free to call me with questions. Thanks." Relator does not have access to the attachments referenced in this and other emails. The final MD contract itself might include both Dr. Repishti and Dr. Dashi.

223.   Relator was afraid of getting fired. Although she was disturbed by her

interaction with Mr. Meppen and did not want to go along with preparing the agreements, she ended up doing so because she feared she would be fired otherwise.

224.   To Relator's knowledge, there was never a FMV analysis for any of the figures discussed by Mr. Meppen and reflected in **Exhibit 6** attached; rather, the compensation amounts were offered by Mr. Meppen as the amount he and SNF Palomar Vista were willing to pay to increase referrals.

225.   Another Facility Administrator, Brad Albrechtsen of St. Joseph Villa, emailed Relator on December 11, 2014, discussing a MD hourly rate and how to convert that rate to a monthly payment, given that MDs who are paid monthly are considered to be "on-call 24/7." In the email thread, Mr. Albrechtsen asked Relator about the appropriateness of monthly fees to MDs and how to calculate such fees given that they consider $250/hour appropriate and that MDs are considered "on-call 24/7." Relator replied that they cannot be compensated for being on-call unless services are actually being performed. Mr. Albrechtsen replied: "I know we don't compensate them by the hour for being on call, but I often hear mentioned by my peers that part of the justification for a monthly director fee in [sic] that they are on call 24/7." (emphasis added).

226.   As referenced above, on December 29, 2014, Mr. Arnold in Ensign accounting emailed Relator information on Medical Directors at SNFs Carmel Mountain, The Springs, and Lemon Grove, and their compensation. His email confirmed that the Facilities had multiple Medical Directors who were all paid flat monthly amounts (with no apparent FMV analysis). *See* **Exhibit 1** attached.

227.    During the first week in January 2015, Relator met with four lawyers in Ensign's Legal Department: Bev Wittekind (General Counsel), Tanner Ainge, Chad Keech (Deputy General Counsel), and Sapna Jain.

228.   At the time of this meeting, Christine Warner worked at Ensign as Co-Contracts Manager with Relator. Ms. Warner held the position for only a few

months, from approximately October 2014 to January 2015. While she was there, she shared with Relator an email Chad Keech (Deputy General Counsel) sent to Ms. Warner.

229.   In February 2015, Relator attended the Ensign annual meeting (as she had in 2014). After that meeting, Relator concluded that Ensign was purposely not addressing the issues of concern to her.

230.   Mr. Meppen surfaced again in March 2015, this time emailing Relator on March 9, 2015 (with a copy to Messrs. Rutter and Gardner) requesting that she update MD contracts for the three MDs at Palomar Vista discussed in November 2014:

> *I want to make changes to the attached contracts as of April first as follows:*
> *Dr. Dashi – I want to change that to $2,500/month*
> *Dr. Repishti – Change to $2,500/month*
> *Dr. Navahandi -I would like to bring him in at $1500/month (he has not been working with us and never signed the attached contract- wanted to see how it went with Dr. Dashi/ Repishti first)....*

231.   It certainly appeared that from the time of Relator's November 11, 2014 meeting with Mr. Meppen until the time of this email, Mr. Meppen had been evaluating referrals by Medical Directors to make adjustments in their compensation amounts.

232.   For example, Mr. Meppen's statement that Dr. Navahandi "has not been working with us and never signed the attached contract—wanted to see how it went with Dr. Dashi/ Repishti first" suggested that the monthly compensation received by Medical Directors depended on their referrals. To Relator's mind, it amounted to saying that Mr. Meppen/Ensign was compensating the Medical Directors for bringing patients to the Facility, and adjusted their compensation based on that, and that the physicians were aware of this. As discussed above, during his November 2014 meeting with Relator, Mr. Meppen wanted to reduce Dr. Navahandi from $1200/mo. to $300/hr. because he wasn't providing sufficient referrals.

233.   On March 24, 2015, Becky Jerke, Administrator at SNF Southland Rehabilitation and Healthcare (Ensign Group) in Lufkin, Texas, emailed Relator requesting that she update Dr. Jason Carter's MD Agreement from an hourly basis to a monthly rate as Co-MD (request for updated contract); the email did not discuss the monthly rate figure or reference a FMV analysis for a monthly rate.

234.   On March 26, 2015, Abe Oyler, Executive Director at SNF Heritage Gardens Rehabilitation & Healthcare in Carrollton, Texas, emailed Robin Wun, Relator's then assistant in Contracts, in response to Robin Wun's drafted MD Agreement for Dr. Leroy Kim. Mr. Oyler instead requested that Dr. Kim's compensation be changed to a monthly stipend of $1,000 for the first 3 months, then $2,000/month thereafter.

235.   During May 2015, Relator participated in two meetings at Ensign, each lasting between one and two hours. The first meeting occurred in or about mid-May 2015, when Deborah Miller (Chief Compliance Officer) and Chad Keech (Deputy General Counsel) came to Relator's office, closed her door, and had a discussion. The second meeting happened a week or less later, on May 20, 2015, and included Ms. Miller and Ms. Miller's assistant Shelley Johnson. Relator made and kept notes of the second meeting.

236.   On May 19, 2015, per an email thread, Joe Frustaci, the executive director at SNF Magnolia Post Acute Care, acquired the necessary information for a new contract and contacted Relator to draft an Associate MD contract for Dr. Dat Nguyen, calling for a $3,333 monthly stipend. The thread begins at 8:33 a.m. with Mr. Frustaci writing to Mason Hunter of Ensign requesting the malpractice insurance, license information, and contact information for Dr. Nguyen to begin the process of getting the Associate MD agreement drafted. Upon learning about Dr. Nguyen's monthly pay rate, he expresses the following sentiment: "*Also, $3,333 for 1 pt MTD is steep brotha. Hopefully he can help salvage the rest of this month.*" (emphasis added). By email on May 20, 2015, Frustaci asked Contracts to

67

draft an Associate Medical Director contract in the amount of $3,333/month for
Dr. Nguyen effective May 1, 2015.

237.    To Relator, this email was but another example of the connection
between payments to physicians and patient referrals. The language "hopefully he
can help salvage the rest of this month" strongly implies that Dr. Nguyen can make
up for the high pay rate by increased referrals. In the email thread, Mr. Hunter says
that the "the other buildings contracting with Dat would like his credentials. Do
you guys have them on hand? If so, can you pass them on to the new buildings he
is taking on?" In response, Kendra Vallone, Director of Business Development at
Lemon Grove (where Dr. Nguyen already had a contract for $5,000/month—*see*
above), forwarded Dr. Nguyen's credentials so the contracts could be prepared.

238.    On May 29, 2015, Cory Christensen, an Administrator at SNF
Victoria Healthcare and Rehabilitation located in Costa Mesa, CA (and son of
Christopher R. Christensen, founder of Ensign, and then President and CEO of
Defendant The Ensign Group, Inc.), emailed Relator, Steve Powell, Matt Heufner,
and Kirk Lindahl with the "long-coveted" agreement between Victoria [Healthcare
and Rehabilitation, a SNF in Costa Mesa, Orange County] and PHA [Relator
believes this is a physicians' group known as Pacific Hospitalists Associates in
Newport Beach] for their approval. According to the email, the stipend PHA was
requesting was about one-third of what Beachside was paying because PHA is "not
providing our Medical Director (even though technically they are because
Chatterjee has officially joined them)." Christensen strongly recommended a quick
approval because Chandler [this may be Dr. Weston Chandler at PHA] was giving
the option of a June 1 start date—the Monday after the email was sent on Friday
May 29. The Victoria SNF was one example of a SNF that Ensign acquired and
then promptly got rid of the longstanding physicians and instead made new
physician arrangements

239.    On June 4, 2015, Matt Oldroyd, Executive Director at SNF Parkside

Health and Wellness Center, emailed Relator discussing the need for "UR board" doctor contract for Dr. Dat Nguyen at Parkside, paying $2,000/month. This is the same Dr. Nguyen with a MD position and $3,333 monthly stipend at Magnolia Post Acute Care, discussed above, and a $5,000/month contract at Lemon Grove, also discussed above.

240.   Because Ensign had not shown any willingness to change its aggressive and illegal practices, Relator did not believe she could remain as an Ensign employee. She was forced to give notice to Ensign on May 27, 2015, and her last date of employment was June 5, 2015. During her time there she had received many positive comments and expressions of gratitude for her contract work and responsiveness. However, the situation surrounding the Medical Director contracts had not improved and was very upsetting to her.

### 6.   The Physicians Ensign Paid Were Incentivized and in a Position to Refer Government Health Care Program Patients to Ensign Facilities

241.   As detailed above, there are numerous examples of suspect Medical Director contracts and arrangements that Relator became aware of from documents, emails, and conversations during her tenure as Ensign's Contracts Manager. Also, as noted above, Facility Administrators expressly stated that the payments to at least certain of the Medical Directors were related to referral of patients to the Facility, and other instances where the connection between payments and referrals was strongly implied.

242.   While at Ensign, Relator had access to multiple documents, including, emails, contracts, accounting and payment records, and Facility lists, however, the documents she had access to after Ensign was more limited. Attached as **Exhibit 7** is an Excel spreadsheet created by Relator and her counsel based on some of the available documents showing approximately 130 physicians (and their area of practice/specialty) who had contracts with approximately 28 of Ensign's then approximately 140 Facilities. [There are 142 entries on the Exhibit, but that is

69

because some doctors, as detailed above, had more than one Medical Director contract].

243.   Of these 28 Facilities, several are in the San Diego "cluster" which, as demonstrated above, was one of the most suspect Ensign clusters with respect to Medical Director compensation. These Facilities are:

- Arroyo Vista Nursing Center (San Diego, CA)
- Lemon Grove Care and Rehabilitation Center (Lemon Grove, CA) (Executive Director Clay Gardner)
- Carmel Mountain Rehabilitation & Healthcare Center (San Diego, CA) (Executive Director Glenn Matthews)
- The Springs at Pacific Regent La Jolla (San Diego, CA) (Executive Director Matthew Rutter)
- Palomar Vista Healthcare Center (Escondido, CA) (Facility Administrator/Operations Manager Scott Meppen)
-  Vista Knoll Specialized Care (Vista, CA)
- Parkside Health and Wellness Center (El Cajon, CA) (Executive Director Matt Oldroyd)
-  Magnolia Post Acute Care (El Cajon, CA) (Executive Director Joe Frustaci)
- Somerset Subacute and Care (El Cajon, CA)

244.   Among the other Facilities that were not in the San Diego cluster, there are multiple examples of physician and Medical Director contracts that were the subject of conversation, discussion, and/or concern to Relator. This includes, for example, SNF Premier Care Center (Palm Springs, CA) (Facility Administrator/Executive Director Charlie Jenkins) and SNF Victoria Healthcare and Rehabilitation (Cosa Mesa, CA) (Executive Director Cory Christensen).

245.   The majority of the areas of practice/specialties listed on **Exhibit 7** are, on information and belief, of the type likely to be in a position to refer (or influence the referral) of Medicare, Medicaid, and other Government Health Care Program patients to an Ensign Facility. These include the following areas of

practice:

- Internal Medicine—and within these, at least two (#49 and 93) are hospitalists per the name of the practice and another (#48) refers to itself as Inpatient Consultants

- Family Medicine

- Geriatrics

- Orthopedics

- Cardiology

- Pulmonology

- Physical Medicine and Rehabilitation

- Neurology/Psychiatry

- Psychiatry/Geriatrics

- General or Specialized Surgery

### 7. Damages and Penalties Attributable to Ensign's Illegal Physician Compensation Scheme

246. All claims submitted or caused to be submitted to the Government and State Government for Medicare and other Government Health Care Program services related to or as a result of Ensign's unlawful Medical Director contracts scheme in violation of the Anti-Kickback laws, the Stark Statute, and Ensign's CIA constitute false or fraudulent claims in violation of the FCA and California FCA. As such, the United States and the State of California are entitled to recover three times their loss, in addition to penalties for each such claim. The damages are equivalent to payments made for services procured by these kickbacks and self-referral violations and not reported as required by the CIA.

247. Using, by way of example only, the 28 Facilities on the spreadsheet attached as **Exhibit 7**, and conservatively estimating an average number of beds at 100 per Facility (most of which will be patients covered by Government Health Care Programs), Relator conservatively estimates 100 claims per month per Facility (given turnover rates), which is 1,200 claims per year per Facility. That

amounts to 7,200 claims per Facility over an approximately 6-year time frame.

248.    Even if the above damages analysis of the claims paid by the Government for services following illegally induced referrals is not used to calculate damages and penalties, the damages are still significant when calculated solely based on the illegal payments made to, and received by, the Medical Directors. Thus, if one considers the amounts paid in violation of the Anti-Kickback laws and the Stark Statute as damages under the False Claims Act, then Relator estimates the government's damages as at least $16.8 million. This figure is derived, using by way of example only, the spreadsheet attached as **Exhibit 7**, which shows 28 Facilities and about 140 contracts. Some contracts provide as much as $5,000/month and some provide as little as $1,000/month. Even assuming a conservative $2,000 average monthly payment for the roughly 140 contracts at issue, and extrapolating this number over an approximately 6-year time frame, that amounts to $16.8 million ($2,000 x 60 months x 140 contracts = $16,800,000). The United States and the State of California are entitled to recover for three times their loss and penalties for each violation of their respective FCAs.

## C.    Ensign Engaged in an Unlawful Kickback Scheme Known as "Swapping" With Axiom Mobile Imaging

249.    As noted above, as part of her job duties as Contracts Manager at Ensign, Relator became aware of a troublesome relationship between Axiom Mobile Imaging and Ensign. In particular, over a several year period, several of the Ensign SNFs participated with Axiom in an illegal kickback scheme known as "swapping" that defrauded the Medicare and Medicaid programs. The swapping scheme consisted of Axiom providing the SNFs with below-cost rates on mobile X-rays provided to their Medicare Part A patients, in exchange for the SNFs referring Medicare Part B patients to Axiom. This scheme is profitable for Axiom and the SNFs because of the different ways in which Medicare Part A and Part B reimbursements are made.

250.   Broadly speaking, Medicare Part A covers inpatient care, including stays in SNFs. Medicare Part A does not cover preventive or screening services. Medicare Part B, in contrast, covers outpatient care and preventive and screening services, including X-rays, laboratory tests, and other diagnostic tests.

251.   Services furnished to beneficiaries under Part A are reimbursed at a flat per diem rate, or "capitated" rate, under the Medicare prospective payment system ("PPS"). Companies like Axiom that provide SNFs with mobile X-ray services to Medicare Part A beneficiaries bill the SNFs for those services, and the SNFs pay Axiom out of the per diem rate the SNFs receive from Medicare.

252.   In the case of X-ray services covered by Medicare Part B, Axiom bills Medicare directly. In contrast to the "capitated" payment system of Medicare Part A, Medicare Part B billing is based on a "fee for service" ("FFS") model. In practice, mobile X-ray companies such as Axiom charge the Government the maximum amount the Government fee schedule will allow. These differing payment methods provided Axiom and the Ensign SNFs with the motivation and tools for their kickback scheme.

253.   Axiom offered Ensign's SNFs steep discounts per X-ray, for X-rays provided to the SNF's Part A patients. These discounted rates did not come close to covering the cost of the X-rays. In return for these discounts, the SNFs referred all of their Part B patients in need of X-ray services to Axiom. This practice was profitable for the SNFs since they receive the Part A services at such a heavy discount, and was profitable for Axiom since it billed the Government the maximum that the Government would pay for Part B services (making up for the profit lost due to offering steep discounts on Part A patients).

254.   This "swapping" scheme violated the federal and California Anti-Kickback Statutes, which prohibit offering or accepting remuneration (including below-cost discounts) in exchange for referring business reimbursed by Federal Health Care Programs.

73

255.   In 2013, apparently because of negative publicity surrounding HHSOIG actions around the country related to X-ray swapping schemes, Axiom became concerned that its practice of offering below-cost X-ray services to Ensign for Part A patients in exchange for referral of Ensign's Part B business would subject Axiom to liability under the Anti-Kickback laws. Consequently, Axiom purported to make a full disclosure to Ensign of the degree to which Axiom undercharged Ensign for Part A X-rays.

256.   As early as June 2013, before Relator joined Ensign, her predecessor as Contracts Manager, Mr. Eisenberg, was in discussions with Dr. Ken Steele, CEO of Axiom, to revise the contracts for Ensign's Northern and Southern California Facilities. *See* **Exhibit 8** attached (email chain). By email on June 26, 2013, Mr. Eisenberg provided Mr. Steele with "what I believe to be, a suitable template for us to use when we engage your services on a go-forward basis and for remediation of legacy agreements. Please have a look and advise on your thoughts." *See id*. (as with many emails in her possession, Relator does not have the attachments to this email).

257.   The draft contracts were still outstanding when Relator started at Ensign in October 2013. Over the next few months, she and Ken Steele and Landon Steele (also of Axiom) finalized the contracts for the 10 SNFs at issue. *See* email chain attached as **Exhibit 8**. The 10 affected Ensign SNFs were: Atlantic Memorial Healthcare Center; The Orchard Post-Acute Care Center; Palm Terrace Healthcare & Rehabilitation Center; Palomar Vista Healthcare Center; Shoreline Healthcare Center; Summerfield Health Care Center; Ukiah Convalescent Hospital; Sonoma Convalescent Hospital; Cloverdale Convalescent Hospital; and Park View Gardens.

258.   During this time, Axiom purported to make a full disclosure to Ensign of the degree to which Axiom undercharged Ensign for Part A X-rays. Axiom prepared a chart and provided it to Ensign, showing how much it undercharged

74

these 10 Ensign SNFs for Part A services as well as showing how much more Axiom would have to charge these 10 Ensign SNFs going forward for mobile X-rays provided to Part A patients in order to charge Ensign a fair market rate. A copy of this chart, entitled Axiom Mobile Imaging Analysis of Impact of Pricing Change Moving Forward, is attached hereto as **Exhibit 9**. The chart also showed the "Average Monthly Delta," meaning the amount Axiom had undercharged these SNFs in the past for Part A services. *Id.* The spreadsheet showed that Axiom in total undercharged these SNFs close to $8,000 per month (or close to $100,000 per year) for X-rays provided to Part A patients, which conduct had continued for several years.

259.    In Relator's view, Axiom's chart and emails were tantamount to an admission by Axiom that the discounts were an unlawful inducement for referrals, in violation of the federal and California Anti-Kickback Statutes.

260.    Thereafter, Axiom and Relator worked together to revise Axiom's contract and pricing terms. Copies of the email exchange between Axiom, through Landon Steele and Kenneth Steele, and Ensign, through Relator and her predecessor Mr. Eisenberg, concerning changes to Axiom's contract with Ensign to provide mobile X-rays is attached at **Exhibit 8**. Ultimately, the parties entered into a revised contract.

261.    However, to Relator's knowledge, Ensign never timely informed HHSOIG (or any other relevant government official) of the swapping scheme with Axiom, despite the Ensign CIA and its obligations requiring Ensign to do so. Indeed, the CIA was signed by Ensign's Deborah Miller and Christopher Christensen on October 1, 2013, in the midst of the emails between Ensign and Axiom, exchanged between June 11, 2013 and February 24, 2014 and attached hereto as **Exhibit 8**.

262.    Relator is informed and believes that Ensign and the SNFs that did business with Axiom did not pay back Axiom the amount of the undercharges and

never informed the Government of any aspect of the swapping scheme. She also has no reason to believe that Axiom notified the Government or repaid any monies.

263.   All claims submitted or caused to be submitted to the Government and State Government for Medicare Part A and Part B related to Axiom's mobile X-ray services tainted by this kickback scheme constituted false or fraudulent claims in violation of the FCA and California FCA.

264.   Ensign and its involved SNFs also violated the "reverse false claims" provisions of the FCA and California FCA by failing to disclose the swapping scheme to the Government despite being under an obligation to do so pursuant to Ensign's CIA (discussed in more detail infra), thereby knowingly avoiding repayment and penalties owed to the United States under the CIA.

265.   Moreover, many Ensign SNFs, including those in Texas, handled their portable X-ray contracts directly (with companies other than Axiom who only did business in California), without going through Relator or Contracts at Ensign. For example, Relator believes that some Texas SNFs had contracts under which they were being charged as little as 50 cents per patient/day for Part A patients. On information and belief, Ensign has engaged in similar "swapping" arrangements with such other mobile imaging providers.

266.   In May 2014, Relator received a new agreement request from Mike Conrad, Facility Administrator at Salado Creek in San Antonio, Texas, for a provider other than Axiom that had "an x-ray ppd rate of $0.50." In an effort to avoid noncompliance, Relator informed Mr. Reese that "OIG has highlighted portable x-ray companies in their 2014 workplan as a target for enforcement actions this year." As such, for regulatory purposes she could not draft mobile x-ray contracts below the 80% Medicare fee schedule. Instead of "a new agreement request [for] an x-ray ppd rate of $0.50," Relator wrote: "We plan to proceed with drafting the agreement as 80% Medicare fee schedule. Please let me know if you have any concerns in this regard." *See* **Exhibit 10** attached (Email threads between

Relator and Mr. Reese and attaching OIG 2014 Workplan, National Association of Portable X-Ray Providers Letter to Industry [**Exhibit 11** hereto], and US DOJ Enforcement Action-Diagnostic Laboratories and Radiology). Mr. Conrad sent another email to Relator (copying Mr. Reese) on May 27, 2014 asking if there is "any way we can do a contract with Alamo Mobile using the same rates we have with our current provider?"; Relator replied as before that for regulatory purposes she could not draft mobile x-ray contracts below 80% Medicare." *See* **Exhibit 12** attached.

267.   Then, almost one year later, on March 23, 2015, Edward Dove, Facility Administrator at Victoria Post Acute Care, emailed Relator and others in Ensign asking for thoughts and feedback on using Axiom "for my Xray services." Mr. Rutter (who was at The Springs), responded "I have used them in the past. They are OK but one concern I have is the owner, Ken Steele is a slimy guy. I have never felt good about him."

**D.    Ensign Knowingly Failed to Report Violations of Its Corporate Integrity Agreement in an Effort to Avoid Paying Penalties Owed to the United States.**

268.   As noted above, Defendant The Ensign Group, Inc., the parent company of the SNFs identified in this Complaint, entered into a CIA with HHS-OIG on October 1, 2013. The CIA expressly covers Ensign as well as its subsidiaries and covered the individual officers and directors of Ensign.

269.   The CIA was part of the 2013 settlement of a False Claims Act qui tam case entitled *United States ex rel. Patterson v. Ensign Group, Inc., et al.*, Civil Action No. 06-6956 (C.D. Cal.) (Judge Cormack J. Carney) handled by the U.S. Attorney's Office for the Central District of California and the Department of Justice. *See* https://oig.hhs.gov/fraud/cia/agreements/Ensign_Group_10012013.pdf.

270.   The CIA was signed by Christensen, then President and Chief Executive Officer of Defendant The Ensign Group, Inc., and member of its Board of Directors, and Deborah Miller, the Chief Compliance Officer of Ensign.

271.   The term of the CIA was five years. As such, it was in effect during Relator's tenure at Ensign and for the conduct discussed above.

272.   All of the management employees of Ensign and its SNFs were aware of the CIA, as the CIA requires a written Code of Conduct be distributed to all Covered Persons.

273.   Per the CIA, a Covered Person is any officer, director, and employee of The Ensign Group (including its subsidiaries) and any, contractor, sub-contractor, agent or any other person who provides patient care items or services or who performs billing or coding functions. As such, this would include, for example, Deborah Miller, the Chief Compliance Officer of Ensign, as well as Mr. Port, Mr. Christopher Christensen, and the SNF Administrators.

274.   Under the CIA, each Covered Person is required to certify, in writing, that he or she has received, read, understood, and will abide by Ensign's Code of Conduct. Pursuant to the CIA, the Code of Conduct must specify that all Covered Persons shall be expected to comply with the requirements of the CIA.

275.   In addition, the CIA contains an express contractual agreement that requires Ensign to report any Reportable Events within thirty (30) days after making the determination that a Reportable Event exists. The CIA defines a Reportable Event as follows:

> Definition of Reportable Event. For purposes of this CIA, a "Reportable Event" means anything that involves:
>
> *   *   *   *
>
> b. a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized;
>
> *   *   *   *
>
> A Reportable Event may be the result of an isolated event or a series of occurrences.

276.   Indeed, the CIA contains a specific provision regarding Ensign's

violation of the Stark Statute. The CIA provides that Ensign will report all probable violations of the Stark Law to CMS through the self-referral disclosure protocol ("SDRP") with a copy to HHS-OIG.

277.   Pursuant to the CIA, the Compliance Officer must certify as follows:

C.   Certifications.

The Implementation Report and Annual. Reports shall include a certification by the Compliance Officer that:

1. to the best of his or her knowledge, except as otherwise described in the report, Ensign Group is in compliance with all of the requirements of this CIA;

2. he or she has reviewed the report and has made reasonable inquiry regarding its content and believes that the information in the report is accurate and truthful . . . .

278.   Deborah Miller, Chief Compliance Officer of Ensign, was a signatory to the CIA and was also the person who signed and attested to the truthfulness of the required annual certifications. She reported to Christopher Christensen who at all relevant times was the company's President and CEO. The CIA provides a $1,000/day penalty for failure to report misconduct.

279.   Relator is informed and believes that one or more certifications signed by the Chief Compliance Officer on behalf of Ensign were materially false in that Ensign certified that it complied with the reporting requirements under the CIA when, in fact, it did not report as required the violations of the law alleged in this Complaint, including violations of the Stark Statute and the Anti-Kickback Statute.

280.   In violation of the FCA, including 31 U.S.C. § 3729(a)(1)(G), Ensign submitted one or more false certifications to the OIG falsely attesting that Ensign and its subsidiaries were in compliance with all of the requirements of the CIA, including compliance with the CIA's reporting requirements. Such false certification constituted a false record or statement made, used, or caused to be used which was material to Ensign's obligation to pay or transmit money to the United States. Further, through such false certifications, Ensign knowingly

concealed and/or improperly avoided or decreased an obligation to pay or transmit money or property to the Government. Ensign's false certifications were material to the Government's payment decisions in that the Government would not have allowed Ensign to continue to receive Government funding had the Government known of the falsity.

281.   To Relator's knowledge, Ensign was in violation of the CIA every day from at least October 1, 2013, when the CIA took effect, until the day she left Ensign (June 5, 2015). That is approximately 612 days times $1,000/day penalty under the CIA for a total of $612,000 in unpaid penalties.

282.   Furthermore, on information and belief, Ensign's misconduct, and false certifications, statements, and records, continued after she left, resulting in additional penalties owed to the United States.

## VI.   CLAIMS FOR RELIEF

### Count I

**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1) (1986)**
**31 U.S.C. § 3729(a)(1)(A) (2009)**

283.   Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein. 257.

284.   This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq*. as amended.

285.   With respect to acts occurring prior to the effective date of the 2009 FCA amendments, by and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims to the United States for payment or approval.

286.   With respect to acts occurring on or after the effective date of the 2009 FCA amendments, by and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for

payment or approval.

287. The Government, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

288. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

289. Additionally, the United States is entitled to the maximum statutory penalty for each and every violation alleged herein.

## Count II

### Federal False Claims Act
### 31 U.S.C. § 3729(a)(2) (1986)
### 31 U.S.C. § 3729(a)(1)(B) (2009)

290. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

291. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.* as amended.

292. With respect to acts occurring or claims for payment pending prior to the June 7, 2008 effective date of the 2009 FCA amendment to 31 U.S.C. § 3729(a)(2) (1986), now codified as 31 U.S.C. § 3729(a)(1)(B) (2009), Defendants, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

293. With respect to acts occurring or claims for payment pending on or after the June 7, 2008 effective date of that amendment, by and through the acts described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

294. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

SECOND AMENDED COMPLAINT

295.   By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

296.   Additionally, the United States is entitled to the maximum statutory penalty for each and every violation alleged herein.

### Count III

**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(G) (2009)**

297.   Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

298.   This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.* as amended.

299.   By and through the acts described above, Defendants have knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to the Government and they have concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past overpayments of Medicare and Medicaid claims for which Defendants knew they were not entitled, and therefore refunds were properly due and owing to the United States.

300.   The Government, unaware of the concealment by the Defendants, has not made demand for or collected the years of overpayments due from the Defendants.

301.   By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

302.   Additionally, the United States is entitled to the maximum statutory penalty for each and every violation alleged herein.

## Count IV

### Federal False Claims Act
### 31 U.S.C. § 3729(a)(3) (1986)
### U.S.C. § 3729(a)(1)(C) (2009)

303.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

304.    This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.* as amended.

305.    With respect to acts occurring prior to the effective date of the 2009 FCA amendments, by and through the acts described above, Defendants conspired together and with others to defraud the Government by getting false or fraudulent claims allowed or paid.

306.    With respect to acts occurring on or after the effective date of the 2009 FCA amendments, by and through the acts described above, Defendants conspired together and with others to commit violations of 31 U.S.C. § 3729(a)(1)(A), (B), and (G).

307.    The Government, unaware of the conspiracies and of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

308.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

309.    Additionally, the United States is entitled to the maximum statutory penalty for each and every violation alleged herein.

## Count V

### California False Claims Act
### Cal. Gov't Code § 12651(a)(1)

310.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

311.   This is a claim for treble damages and penalties under the California FCA, Cal. Gov't Code § 12651(a)(1).

312.   By and through the acts described above, one or more of the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of California in order to obtain reimbursement to which Defendants were not entitled for health care services provided under Medicaid and other state-funded health care programs.

313.   The State of California, unaware of the falsity of all such claims made or caused to be made by Defendants has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

314.   By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

315.   Additionally, the State of California is entitled to the maximum statutory penalty for each and every violation alleged herein.

## Count VI

### California False Claims Act
### Cal. Gov't Code § 12651(a)(2)

316.   Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

317.   This is a claim for treble damages and penalties under the California FCA, Cal. Gov't Code § 12651(a)(2).

318.    By and through the acts described above, one or more of the Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

319.   The State of California, unaware of the falsity of all such claims made or caused to be made by Defendants has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

320.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

321.    Additionally, the State of California is entitled to the maximum statutory penalty for each and every violation alleged herein.

## Count VII

### California False Claims Act
### Cal. Gov't Code § 12651(a)(7)

322.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

323.    This is a claim for treble damages and penalties under the California FCA, Cal. Gov't Code § 12651(a)(7).

324.    By and through the acts described above, one or more of the Defendants has knowingly concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past overpayments of Medicaid claims for which Defendants knew refunds were properly due and owing to the State of California.

325.    The State of California, unaware of the falsity of all such claims made or caused to be made by Defendants has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

326.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

327.    Additionally, the State of California is entitled to the maximum statutory penalty for each and every violation alleged herein.

## Count VIII

### California False Claims Act
### Cal. Gov't Code § 12651(a)(8)

328.    Relator realleges and incorporates by reference the allegations

contained in the foregoing paragraphs as though fully set forth herein.

329.   This is a claim for treble damages and penalties under the California FCA, Cal. Gov't Code §12651(a)(8).

330.   By and through the acts described above, one or more of the Defendants was a beneficiary of an inadvertent submission of a false claim, subsequently discovered the falsity of the claim, and failed to disclose the false claim to the state within a reasonable period of time.

331.   By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

332.   Additionally, the State of California is entitled to the maximum statutory penalty for each and every violation alleged herein.

## **Count IX**

### **California False Claims Act**
### **Cal. Gov't Code § 12651(a)(3)**

333.   Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

334.   This is a claim for treble damages and penalties under the California FCA, Cal. Gov't Code § 12651(a)(3).

335.   By and through the acts described above, one or more of the Defendants conspired together or with others to commit violations of Cal. Gov't Code §§ 12651(a)(1), (2), (7), and (8).

336.   The State of California, unaware of such conspiracy and the falsity of all such claims made or caused to be made by Defendants, and receipt of wrongful payments failed to be disclosed, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

337.   By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at

SECOND AMENDED COMPLAINT

trial.

338.   Additionally, the State of California is entitled to the maximum statutory penalty for each and every violation alleged herein.

## VII.  PRAYERS FOR RELIEF

WHEREFORE, Plaintiff-Relator prays for judgment against Defendants as follows:

a.   That Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* and the State of California False Claims Act;

b.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus the maximum statutory civil penalty for each violation of 31 U.S.C. § 3729;

c.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus the maximum statutory civil penalty for each violation of the California False Claims Act;

d.   That Plaintiff-Relator be awarded the maximum amount allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d), and California False Claims Act, Cal. Gov't Code § 12652(g);

e.   That Plaintiff-Relator be awarded all attorneys' fees, costs, and expenses; and

f.   That the Plaintiffs United States and the State of California, and Plaintiff-Relator recover such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a trial by jury.

Dated: August 10, 2021                    Respectfully submitted,

                                          */s/ Chiharu G. Sekino*
                                          James E. Miller (SBN 262553)
                                          Chiharu G. Sekino (SBN 306589)
                                          Casey T. Yamasaki (SBN 335445)
                                          MILLER SHAH LLP
                                          1230 Columbia St., Ste 1140
                                          San Diego, CA 92101
                                          Telephone: (866) 540-5505
                                          Facsimile: (866) 300-7367
                                          Email: jemiller@millershah.com
                                                 cgsekino@millershah.com
                                                 ctyamasaki@millershah.com

                                          Heidi A. Wendel (Admitted *Pro Hac Vice*)
                                          MILLER SHAH LLP
                                          52 Duane Street, 7th Floor
                                          New York, NY 10007
                                          Telephone: (866) 540-5505
                                          Facsimile: (866) 300-7367
                                          Email: hawendel@millershah.com

                                          James C. Shah (SBN 260435)
                                          Kolin C. Tang (SBN 279834)
                                          MILLER SHAH LLP
                                          19712 MacArthur Boulevard
                                          Irvine, CA 92612
                                          Telephone: (866) 540-5505
                                          Facsimile: (866) 300-7367
                                          Email: jcshah@millershah.com
                                                 kctang@millershah.com

                                          Michael A. Hirst (SBN 131034)
                                          Marisela Bernal (SBN 329589)
                                          HIRST LAW GROUP, P.C.
                                          200 B Street, Suite A
                                          Davis, California 95616
                                          Telephone: (530) 756-7700
                                          Facsimile:  (530) 756-7707
                                          Email: michael.hirst@hirstlawgroup.com
                                                 marisela.bernal@hirstlawgroup.com

Suzanne E. Durrell
(Admitted *Pro Hac Vice*)
DURRELL LAW OFFICE
180 Williams Avenue
Milton, Massachusetts 02186
Telephone: (617) 333-9681
Facsimile: (888) 676-7420
Email: suzanne@thomasdurrell.com

Robert M. Thomas, Jr.
(Admitted *Pro Hac Vice*)
THOMAS & ASSOCIATES
20 Park Plaza, Suite 438
Boston, Massachusetts 02116
Telephone: (617) 366-2800
Facsimile: (888) 676-7420
Email: bob@thomasdurrell.com

David J. Caputo (Admitted *Pro Hac Vice*)
Zachary Arbitman (Admitted *Pro Hac Vice*)
YOUMAN & CAPUTO LLC
1635 Market Street, Suite 1600
Philadelphia, PA 19103
Telephone: (215) 302-1999
Facsimile: (610) 422-1999
Email: dcaputo@youmancaputo.com
        zarbitman@youmancaputo.com

*Attorneys for Plaintiff-Relator*

1

## **<u>CERTIFICATE OF SERVICE</u>**

2    I hereby certify that, on August 10, 2021, I caused the foregoing to be

3 electronically filed with the Clerk of Court using the CM/ECF system, which will

4 send notification to all counsel of record.

5

           */s/ Chiharu G. Sekino*

6            Chiharu G. Sekino
            Miller Shah LLP

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT