1
2
3
4
5
6
7
8        **UNITED STATES DISTRICT COURT**
9    **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA, *ex rel.* SHARON GINGER,<br><br>    Plaintiffs,<br><br>    v.<br><br>THE ENSIGN GROUP, INC. and ENSIGN FACILITY SERVICES, INC.,<br><br>    Defendants. | Case No. 8:15-cv-00389-JWH-DFMx<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [ECF No. 130]** |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Before the Court is the motion to dismiss[1] of Defendants The Ensign Group, Inc. and Ensign Facility Services, Inc.[2]  After considering the arguments of counsel at the hearing on the Motion, as well as the papers filed in support and in opposition,[3] the Court orders that the Motion is **GRANTED IN PART** and **DENIED IN PART**, as set forth herein.

## I.  BACKGROUND

### A.    Procedural Background

In March 2015, Plaintiff-Relator Sharon Ginger filed a complaint[4] in this *qui tam* action against Defendants and myriad additional entities.[5]  More than five years later, in April 2020, the United States of America and the State of California declined to intervene, and the Court unsealed portions of the record.[6]

In December 2020, Ginger amended her complaint, asserting nine claims for relief, but against only the instant two Defendants.[7]  Two months later, Defendants moved to dismiss.[8]  The Court granted that motion, concluding that

---

[1]    Defs.' Mot. to Dismiss the Second Am. Compl. (the "Motion") [ECF No. 130].

[2]    Plaintiff-Relator Sharon Ginger refers to Defendant The Ensign Group, Inc. as "Ensign." *See* Second Am. Compl. (the "SAC") [ECF No. 129] ¶ 4. However, later in her SAC, Ginger defines the term "Ensign" or "Company" to refer to Defendant The Ensign Group, Inc. and to Defendant Ensign Facility Services, Inc., as well as their operating subsidiaries, including the skilled nursing and assisted living facilities (the "SNFs"). *Id.* at ¶ 54.

[3]    The Court considered the following papers: (1) the SAC; (2) the Motion (including its attachments); (3) Pls.' Opp'n to the Motion (the "Opposition") [ECF No. 131]; and (4) Defs.' Reply in Supp. of the Motion (the "Reply") [ECF No. 132].

[4]    Compl. (the "Complaint") [ECF No. 1].

[5]    Ginger removed those additional defendants from her pleading when she filed her First Amended Complaint. *Compare* First Am. Compl. (the "FAC") [ECF No. 94] *with* Complaint.

[6]    Stip. Regarding Election by the United States and the State of California to Decline Intervention [ECF No. 82]; Order Regarding Election by the United States and the State of California to Decline Intervention and Unsealing Case [ECF No. 83].

[7]    *See generally* FAC.

[8]    Defs.' Mot. to Dismiss Relator's First Am. Compl. [ECF No. 95].

Rule 9(b) of the Federal Rules of Civil Procedure does not allow group pleading, but the Court afforded Ginger leave to amend.[9]

In August 2021,[10] Ginger filed her Second Amended Complaint,[11] in which she reasserts nine claims for relief.  Four of those claims relate to alleged violations of the federal False Claims Act (the "FCA"); specifically, 31 U.S.C. §§ 3729(a)(1)(A), (B), (C), & (G).[12]  The other five claims allege violations of California's False Claims Act (the "CFCA"); namely, Cal. Gov't Code §§ 12651(a)(1), (2), (3), (7), & (8).[13]

Defendants filed the instant Motion on August 24.[14]  Ginger opposed on September 10,[15] and Defendants replied a week later.[16]  The Court conducted a hearing on the Motion on October 4.

**B.    Factual Background**

Ginger alleges the following facts in her Second Amended Complaint, which the Court assumes to be true for the purposes of the instant Motion.  *See, e.g.*, *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996) (on motion to dismiss for failure to state a claim, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party").  The Second Amended Complaint is voluminous.  The Court summarizes only those facts germane to the instant Motion.

Defendant The Ensign Group, Inc. ("Ensign Group") is a parent holding company that owns a chain of more than 140 SNFs in the western and

---

[9]     Order Granting Defs.' Mot. to Dismiss (the "Order") [ECF No. 128].

[10]    All subsequent dates are in 2021 unless otherwise specified.

[11]    *See generally* SAC.

[12]    *Id*. at ¶¶ 283-309.

[13]    *Id*. at ¶¶ 310-338.

[14]    *See generally* Motion.

[15]    *See generally* Opposition.

[16]    *See generally* Reply.

southwestern United States.[17]  Each SNF is directly owned by a separate legal entity or entities.[18]  When Ensign Group acquires a SNF, it replaces the existing administrators with individuals approved and trained by Ensign Group's corporate office.[19]  Ensign Group entered into a Corporate Integrity Agreement (the "CIA") with the Office of Inspector General of the Department of Health and Human Services of the United States ("HHS-OIG") on October 1, 2013.[20]  Defendant Ensign Facility Services, Inc., also known as Ensign Services, Inc., ("Ensign Services") provides management services to Ensign Group and its SNFs.[21]

Ginger used to work for Ensign Group.  She was a Contracts Manager from October 2013 to June 2015; she also served on Ensign Group's Compliance Committee.[22]  During that time, Ginger observed that Ensign Group engaged in three potentially unlawful schemes.[23]

- First, Ensign Group compensated physicians for referrals to its SNFs.[24] Specifically, Ensign Group allegedly paid off physicians or bribed them with "golf outings and fancy dinners" to induce them to refer patients to Ensign Group's SNFs.[25]  Those illegal arrangements included inflated monthly payments to physicians to work in "consulting" capacities.[26]

---

[17]     SAC ¶¶ 4 & 52.

[18]     Ensign Group Form 10-K [ECF No. 95-2].

[19]     SAC ¶ 5.

[20]     *Id.* at ¶ 2.

[21]     *Id.* at ¶ 53.

[22]     *Id.* at ¶ 50.

[23]     *Id.* at ¶ 7.

[24]     *Id.* at ¶ 8.

[25]     *Id.*

[26]     *Id.* at ¶¶ 8-13.

- Second, Ensign Group received heavily discounted services for Medicare Part A patients from a provider of X-rays called Axiom Mobile Imaging.[27]  Ginger describes that business arrangement as an illegal kickback scheme known as "swapping," since Ensign Group benefitted from Axiom's discounted X-rays in exchange for referring its Medicare Part B patients to Axiom, which tends to be lucrative.[28]

- Third, Ensign Group failed to disclose those two schemes to the United States, which Ginger says violates the CIA.[29]

Together, those schemes defrauded the United States and the State of California out of millions of dollars.[30]

## II.  LEGAL STANDARD

Under Rule 12(b)(6), a party may make a motion to dismiss for failure to state a claim upon which relief can be granted.  When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and must construe them in the light most favorable to the non-moving party.  *See, e.g.*, *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  *Id.*

---

[27]     *Id.* at ¶ 14.
[28]     *Id.*
[29]     *Id.* at ¶ 15.
[30]     *Id.* at ¶ 16.

Normally, Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555; *see also Horosny v. Burlington Coat Factory, Inc.*, 2015 WL 12532178, at *3 (C.D. Cal. Oct. 26, 2015). Claims under the FCA, however, are subject to Rule 9(b). *See United States* ex rel. *Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016). Rule 9(b) requires that circumstances constituting a claim for fraud or mistake be pleaded with particularity. Fed. R. Civ. P. 9(b). That rule requires a plaintiff to "identify the 'who, what, when, where and how of the misconduct charged,'" as well as "what is false or misleading about [the purportedly fraudulent conduct], and why it is false." *Shimono v. Harbor Freight Tools USA, Inc.*, 2016 WL 6238483 at *5 (C.D. Cal. Oct. 24, 2016) (quoting *Cafasso,* ex rel. *United States v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)). Of course, the Federal Rules of Civil Procedure, including Rule 9(b), apply in federal court, "irrespective of the source of the subject matter jurisdiction, and irrespective of whether the substantive law at issue is state or federal." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).

Lastly, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (*en banc*) (internal quotation marks and citation omitted).

## III. DISCUSSION

Defendants level several attacks against Ginger's Second Amended Complaint. First, Defendants argue that all of Ginger's claims should be dismissed because Ginger engages in impermissible group pleading ***and*** her attempts to rescue her Second Amended Complaint through alter ego

-6-

allegations fall short.  Then Defendants proceed claim by claim, explaining why all of Ginger's claims for relief (except for the fifth and sixth) should be dismissed under Rule 9(b) or Rule 12(b)(6).  After careful review, the Court determines that Ginger's pleadings withstand most of those salvos, but it agrees with Defendants that Ginger's third claim for relief should be dismissed.

**A.     Group Pleading and Alter Ego Allegations**

As a threshold matter, Defendants move to dismiss the entire Second Amended Complaint because Ginger impermissibly "double[d] down" on group pleading, notwithstanding this Court's prior order.[31]  Ginger does not deny her use of group pleading.  Instead, she insists that it is proper because Ensign Group, Ensign Services, and the SNFs are all alter egos of one another.[32]

**1.     Group Pleading under Rule 9(b)**

Generally speaking, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *United States v. Corinthian Colleges*, 655 F.3d 984, 997–98 (9th Cir. 2011) (internal citation omitted).  "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum[,] identify the role of each defendant in the alleged fraudulent scheme." *Id.* at 998 (internal citation omitted). Collective pleading is appropriate only "where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *Swoben*, 848 F.3d at 1184.

But alter ego liability, if alleged, would circumvent this requirement, as it would imply that the two Defendants here are—for all intents and purposes—

---

[31]     Motion 5:17-22; *see also* Order 7:14-18; FAC ¶¶ 114-116.

[32]     Opposition 5:2-17.

the same Defendant.  *See United States v. TEVA Pharms. USA, Inc.*, 2016 WL 750720, at *12 (S.D.N.Y. Feb. 22, 2016) (finding that where a complaint alleges a legal relationship between fraud defendants that makes the acts of one attributable to each, Rule 9(b) does not require plaintiffs to allege specific connections between fraudulent representations and particular defendants); *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 453 (E.D. Pa. 2020) (in cases where the alleged fraud was "perpetrated by sophisticated corporate entities that are related to each other" and plaintiffs allege that defendants were alter egos of each other, courts have held that collective allegations are sufficient to put defendants on notice).  Therefore, if Ginger successfully alleges that Ensign Group and Ensign Services and their subsidiaries were alter egos of one another, then Rule 9(b)'s proscription on group pleading would not apply, but Ginger would still have to plead the "who, what, when, where, and how" of the alleged false claims with sufficient particularity.  *Gonzalez v. Planned Parenthood of Los Angeles*, 2011 WL 1481398, at *8 (C.D. Cal. Apr. 19, 2011).

### 2.    Pleading Standard for Alter Ego Allegations

With respect to allegations of alter ego liability, Ginger maintains that Rule 8, rather than Rule 9(b), applies.[33]  Defendants contend the exact opposite.[34]  During the hearing, the Court inquired about this point, and the parties conceded that courts in the Ninth Circuit have disagreed about whether Rule 9(b) applies to pleadings of alter ego liability.  *See also Wimbledon Fund, SPC v. Graybox, LLC*, 2016 WL 7444709, at *5 (C.D. Cal. Aug. 31, 2016) (collecting cases).

---

[33]    Opposition 5:20-6:1.
[34]    Reply 3:11-19.

Defendants point to *Wimbledon* as their best authority to support the proposition that Rule 9(b) should apply to alter ego allegations.[35] But *Wimbledon* is less persuasive than Defendants wish it to be, since it is not a FCA case[36] and the court there was interpreting Texas state veil-piercing law. *Id.* at 1, 5. Federal common law, rather than state law, governs the veil-piercing inquiry in cases where "some federal interest is implicated by [it]." *U.S.* ex rel. *Siewick v. Jamieson Sci. & Eng'g, Inc.*, 191 F. Supp. 2d 17, 20 (D.D.C. 2002), *aff'd*, 322 F.3d 738 (D.C. Cir. 2003) (quoting *U.S. Through Small Bus. Admin. v. Pena*, 731 F.2d 8, 12 (D.C. Cir. 1984)). "The government's interest in protecting itself from fraud, as embodied in the False Claims Act, makes it reasonable to apply the federal common law standard for piercing the corporate veil instead of the test set forth by the state courts . . . ." *Id.* at 20-21.

Ginger relies upon *Ardente, Inc. v. Shanley*, 2010 WL 546485 (N.D. Cal. Feb. 10, 2010), which the Court finds more persuasive for three reasons. First, as the court in *Ardente* noted, an allegation that one defendant has acted as an alter ego of another defendant is not necessarily an allegation "grounded in fraud" or "sounding in fraud" such that the heightened pleading standard of Rule 9(b) should apply. *Id.* at *4. Second, alter ego liability is not—in and of itself—a claim for relief; rather, it is a doctrine. *Id.* And third, the Supreme Court has construed Rule 9(b) to be an exception to the general rule set forth in Rule 8. *See Leatherman v. Tarrant Cty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993). For example, when addressing the question of whether Rule 9(b) applied to pleadings of municipal liability under 42 U.S.C. § 1983, the Supreme Court in *Leatherman* held that:

---

[35]   *Id.* at 3:16-19.

[36]   Nor is *Eversource Cap. LP v. Fimrite*, 2019 WL 11638377 (D. Ariz. May 21, 2019)—another case that Defendants cite and that itself cites to *Wimbledon*—a FCA case.  *See* Reply 3:14-16.

The Federal Rules do address in Rule 9(b) the question of the need for greater particularity in pleading certain actions, but do not include among the enumerated actions any reference to complaints alleging municipal liability under § 1983. *Expressio unius est exclusio alterius*.[37]

*Id.*; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions," such as Rule 9(b)). Those holdings signal that Rule 9(b)'s pleading standard should not be extended beyond its explicit language, which makes "no mention of alter-ego or agency theories." *Pac. Gas & Elec. Co. v. Jesse M. Lange Distrib., Inc.*, 2005 WL 3507968, at *3 (E.D. Cal. Dec. 21, 2005). Indeed, the Court sees no inconsistency in applying Rule 9(b) to the elements of the FCA claims themselves and Rule 8 to allegations that Defendants and their subsidiaries are alter egos of one another. *See, e.g.*, *United States* ex rel. *Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 61 (D.D.C. 2014), *on reconsideration in part*, 160 F. Supp. 3d 253 (D.D.C. 2016), *and clarified on denial of reconsideration*, 2016 WL 3197550 (D.D.C. June 8, 2016) (applying Rule 8's pleading standard to corporate veil-piercing allegations in an FCA case). Thus, the Court will apply Rule 8 to the Second Amended Complaint as it relates to Ginger's alter ego allegations.

### 3. Factual Support for Ginger's Alter Ego Allegations

To satisfy the alter ego test, Ginger must make out a *prima facie* case (a) that there is such a unity of interest and ownership between Defendants and their subsidiaries that the entities no longer exist; and (b) that the failure to disregard Defendants' separate identities would result in fraud or injustice. *Iconlab, Inc. v. Bausch Health Companies, Inc.*, 828 F. App'x 363, 364 (9th Cir.

---

[37] This Latin phrase means "when one or more things of a class are expressly mentioned, others of the same class are excluded."

2020); *Indus. Bank of Korea v. ASI Corp.*, 2018 WL 6164315, at *9 (C.D. Cal. Apr. 26, 2018).  Factors used to assess the first prong include the commingling of funds, inadequate capitalization, disregard for corporate formalities, the use of the same offices and employees, identical directors and officers, lack of segregation of corporate records, holding out one entity as liable for the other, identical equitable ownership of the entities, and the use of one entity as a mere shell or conduit for the affairs of the other.  *See Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1250 (9th Cir. 2017); *Delacruz v. Serv. Corp. Int'l*, 2018 WL 2287962, at *5 (E.D. Cal. May 18, 2018); *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 954 (N.D. Cal. 2015).  "This list is non-exclusive, and California courts have relied on a host of other factors in finding alter ego liability as well."  *Gerritsen v. Warner Bros. Ent. Inc.*, 116 F. Supp. 3d 1104, 1137 (C.D. Cal. 2015).

### a.  Unity of Interest or Ownership

Ginger makes numerous factual allegations in her Second Amended Complaint to suggest that Ensign Group, Ensign Services, and the SNF subsidiaries function as alter egos of one another.  First, she alleges that Ensign Group and Ensign Services share the same address and headquarters.[38]  While Ginger does not assert that the SNFs share the same office space as Ensign Group's headquarters,[39] the sharing of offices is still highly probative of an alter ego relationship—at least between Ensign Group and Ensign Services.  *City & Cty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 640 (N.D. Cal. 2020).

Second, Ginger alleges that Defendants shared many of the same employees.[40]  For example, she identifies by name two senior executives who

---

[38]     SAC ¶ 58.
[39]     Reply 5:6-13.
[40]     Opposition 11:1-21.

monitored and oversaw the various SNF subsidiaries, and she further alleges that all of the senior executive and key employees in the areas of management, compliance, information technology, legal, accounting, billing, and human resources are shared by Ensign Group and Ensign Services.[41]

Third, Ginger contends that Ensign Group siphons off and commingles funds of the SNFs.[42]  Specifically, she says that Ensign Group collected a monthly management fee from each SNF and that Ensign Group has "collected, distributed, and shared the revenues, profits, and assets of its [SNFs] by and through its cluster model—which required the [SNFs] to both compete against each other and also share revenues and profits."[43]  Those acts led to the SNFs' undercapitalization and made them dependent on Ensign Group, as each SNF lacked significant assets of its own and lacked sufficient control over its profits, revenues, and expenditures.[44]

Defendants urge the Court to consider *NetApp, Inc. v. Nimble Storage, Inc.*, 2015 WL 400251 (N.D. Cal. Jan. 29, 2015), for the proposition that the fact that revenues flow up to Ensign Group is not indicative of an alter ego.[45]  *NetApp* held that a parent corporation reporting the financial results of its subsidiaries in the parent's financial statements "is not proof of an alter ego relationship."  *Id.* at *6.  But the anodyne act of reporting subsidiary revenue is distinguishable from Ginger's allegations.  She alleges control and direction over both revenues and expenditures, such that the SNFs were undercapitalized and dependent upon Ensign Group—the umbrella holding company.[46]

---

[41]    SAC ¶¶ 59-69.

[42]    *Id.* at ¶¶ 78-80.

[43]    *Id.* at ¶¶ 57 & 79.

[44]    *Id.* at ¶¶ 79 & 80.

[45]    Reply 5:24-6:7

[46]    Opposition 13:5; SAC ¶¶ 79 & 80.

Fourth, Ginger makes myriad allegations to support the idea that Ensign Group ran the SNFs as a single joint venture, exerting control over day-to-day management and directing, *inter alia*, (1) the hiring, training, and setting of incentives and compensation of employees, medical directors, and consultants alike; (2) contracting decisions; (3) the management of the SNFs' finances and related audits; and (4) compliance with healthcare laws, including the Anti-Kickback Statute and the Stark Laws.[47]  Additionally, Ensign Group's executive leadership reviewed and approved the SNFs' corporate performance goals—colorfully known as Big Hairy Audacious Goals, or "BHAGs"—that had implications for the budgets of the SNFs and the bonuses of their administrators.[48]

And fifth, Ginger contends that Ensign Group holds itself and its SNFs out as a single entity, publicly promoting the image of "a unified nationwide operation through brochures, marketing materials, website, and communications with the media, as well as in correspondence to state licensing and certification agencies."[49]

In response, Defendants insist that those allegations would not establish alter ego liability, even if they were true.[50]  In multiple places, Defendants repeat the argument that those allegations, in total, amount to no more than a typical parent-subsidiary relationship.[51]  But the Court must remind Defendants that, at this stage in the litigation, the correct inquiry is not whether alter ego liability has been established, but whether it ***has been alleged*** with "sufficient factual

---

[47]     Opposition 14:3-12; SAC ¶¶ 60, 61, 65-72, 74-76, 156, 160, 168, & 256-258.

[48]     SAC ¶ 71.

[49]     *Id.* at ¶ 81.

[50]     Reply 5:27.

[51]     *See* Motion 1:19-25, 7:7-16, 9:1-4, & 12:16-17; Reply 6:22-26 (citing *United States v. Bestfoods*, 524 U.S. 51, 67-69 (1998)).

matter, accepted as true" to state a claim that is "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court concludes that Ginger has alleged numerous facts with sufficient particularity that speak to a unity of interest, such as the commingling of funds, inadequate capitalization, disregard for corporate formalities, the use of some of the same offices and employees, identical senior leadership, and the act of holding the various entities out as a single identity. Those allegations are sufficient at the pleading stage. *See Daewoo Elecs. Am. Inc.*, 2013 WL 3877596, at *5 (finding that unity of interest was sufficiently pleaded for Rule 12(b)(6) purposes with merely two factors); *see also Pac. Mar. Freight, Inc. v. Foster*, 2010 WL 3339432 (S.D. Cal. Aug. 24, 2010). Finding the first prong of the alter ego test met, the Court turns to the second prong.

### b.    Inequitable Result

The second prong of the alter ego test asks whether treating the actions of the SNFs as their own independent acts would lead to an inequitable result. Ginger says it would. In particular, she alleges that the SNFs' undercapitalization insulates Ensign Group and would allow Ensign Group to avoid liability for its fraudulent schemes.[52] Defendants contend that Ginger's factual allegations are insufficient to establish that such an inequitable result would occur.[53] However, if what Ginger alleges is true—*i.e.*, that Ensign Group "misdirected funds, exercised crippling control, and purposely siphoned profits from the [SNFs]"—then Ensign Group could minimize repayments owed to the federal government and the State of California as the result of orchestrating its fraudulent schemes through undercapitalized subsidiaries. *See Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 473 (D. Del. 2010). In short, Ensign Group

---

[52]    SAC ¶¶ 57, 79, 80, & 83.

[53]    Motion 13:3-13.

-14-

1  would have "perpetrated an element of fraud or injustice in [its] use of the

2  corporate form under . . . the federal alter ego standard." *Id.*

3       Because the Court must construe those factual allegations "in favor of the

4  nonmoving party" at the pleading stage, the Court finds that Ginger has made a

5  *prima facie* showing of a unity of interest between Ensign Group and its

6  subsidiaries. *Tinoco v. San Diego Gas & Elec. Co.*, 327 F.R.D. 651, 656 (S.D. Cal.

7  2018) (quoting *Cahill*, 80 F.3d at 337–38).  Furthermore, the Court is persuaded

8  that a failure to disregard Ensign Group's separate identities would cause an

9  inequitable result.  Accordingly, the Court cannot grant the Motion to dismiss

10 on the grounds that Ginger impermissibly used group pleading; she has

11 adequately alleged an alter ego relationship among Defendants.

12 **B.    First and Second Claims for Relief:  False Claims under 31 U.S.C.**

13 **§ 3729(a)(1)(A) & (B)**

14      Next, Defendants argue that Ginger fails to state a claim under the FCA.

15 Defendants make three arguments:  (1) Ginger does not allege any facts that

16 show that Ensign Group or Ensign Services is directly liable for any fraudulent

17 scheme;[54] (2) Ginger does not allege that Ensign Group or Ensign Services

18 received remuneration for referrals, thereby failing to plead violations of the

19 Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a–7b, or the Stark Laws,

20 42 U.S.C. § 1395nn;[55] and (3) Ginger fails to allege any reliable indicia

21 demonstrating that Ensign Group or Ensign Services submitted false claims.[56]

22      The FCA makes liable anyone "who knowingly presents, or causes to be

23 presented, a false or fraudulent claim for payment or approval" or "knowingly

24 makes, uses, or causes to be made or used, a false record or statement material

25 to a false or fraudulent claim." *United States* ex rel. *Campie v. Gilead Scis.*, 862

---

26

27  [54]    *Id.* at 13:17-21.

     [55]    *Id.* at 19:9-20:22.

28  [56]    *Id.* at 21:1-23:9.

F.3d 890, 898-99 (9th Cir. 2017) (quoting 31 U.S.C. § 3729(a)(1)(A) & (B)).
The Ninth Circuit has synthesized the elements of a FCA claim to be (1) a false
statement or fraudulent course of conduct, (2) made with scienter, (3) that was
material, causing (4) the government to pay out money or forfeit moneys due.
*See U.S.* ex rel. *Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006).

### 1.    Direct Liability

Defendants first argue that Ginger fails to allege that ***Defendants*** actually
submitted (or "presented") any fraudulent claims to any federal government
entity.[57]  Defendants characterize the Second Amended Complaint as pointing
the finger at only the SNFs, and not Defendants themselves.[58]

However, Defendants contradict that argument mere pages later, when
they attempt to explain away the decision of Ensign Service's former Chief
Operating Officer, Barry Port (who is now Ensign Group's CEO), to overrule
certain changes to medical director contracts.[59]  Ginger alleges that those
contracts were shams.[60]  Had the changes been made, they would have instituted
industry-standard hourly rates with time logs.[61]  If Ginger's allegations
concerning Port are true, then those facts alone would establish Defendants'
involvement and would open the door linking Defendants to those contracts and
any false presentment.

Additionally, Ginger's Second Amended Complaint includes allegations
that Defendants oversaw, enabled, and facilitated the SNFs' scheme of illegal
kickbacks and the payment of doctors via sham contracts in exchange for

---

[57]      *Id.* at 13:22-23; *see also id*. at 14:11-20.
[58]      *Id.* at 14:20-15:1.
[59]      *Id.* at 16:23-17:13.
[60]      SAC ¶¶ 169-175.
[61]      *Id.* at ¶¶ 177 & 198.

referrals.[62]  Even if Ensign Group or Ensign Services never submitted any false claims themselves, "the FCA holds a defendant liable if it pursues a scheme that ultimately results in the submission of a false claim, even if the defendant does not participate in the actual submission of the claim."  *United States* ex rel. *Kuzma v. N. Arizona Healthcare Corp.*, 2021 WL 120901, at *5 (D. Ariz. Jan. 13, 2021) (holding that defendant, a parent company, could be liable for an illegal physician kickback scheme where plaintiff-relator alleged that the defendant employed the individuals involved and that those individuals were governed by defendant's corporate policies).  Defendants reply that merely being a parent corporation of a subsidiary that commits a FCA violation—"without some degree of participation by the parent in the claims process"—is not enough to support a claim against the parent for the subsidiary's FCA violation.[63]  *United States* ex rel. *Martinez v. KPC Healthcare Inc.*, 2017 WL 10439030, at *6 (C.D. Cal. June 8, 2017).  But Ginger's Second Amended Complaint does more than that.  Indeed, Ginger describes how Defendants "institutionalized and enforced [their] fraudulent scheme" through the recruitment, hiring, and training of facility administrators and other key employees involved in the alleged schemes.[64]  *United States* ex rel. *Vatan v. QTC Med. Servs., Inc.*, 721 F. App'x 662, 664 (9th Cir. 2018).

Ginger even calls out several senior executives and other managers by name and describes their alleged involvement.[65]  Defendants attempt to disabuse the Court of the notion that those conversations establish Defendants' involvement,[66] but Defendants' instant Motion is not one for summary

---

[62]   *Id.* at ¶¶ 8-13 & 139-141.

[63]   Motion 14:12-15.

[64]   SAC ¶¶ 59-63, 151, & 153.

[65]   *See, e.g.*, *id.* at ¶¶ 69, 70, 72, 190, 197-210, & 213-226.

[66]   Motion 15:9-17:18.

judgment.  What Ginger has pleaded shows that it is ***plausible*** that Defendants
and members of their senior leadership had knowledge of, condoned, or were
involved with the alleged schemes.  Ginger's allegations satisfy the heightened
pleading standard under Rule 9(b).  *Vatan*, 721 F. App'x at 664.

### 2.    Violations of the AKS and the Stark Laws

Defendants' second argument is that Ginger fails to allege any violations
of the AKS or the Stark Laws.  The Court disagrees.

To allege a violation of the AKS, *see* 42 U.S.C. § 1320a–7b(b)(2), Ginger
must plead that Defendants knowingly and willfully offered or paid
remuneration to induce referrals of program-related business.  *Hanlester Network
v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995).  Generally, the AKS does not
require proof of a *quid pro quo* or proof that any payment or referral was made.
*Id.* at 1397.  However, at least one court in this district has used "fair market
value" as the metric to assess whether a discount (or payment) constituted
remuneration.  *See United States* ex rel. *Gough v. Eastwestproto, Inc.*, 2018 WL
6929332, at *8 (C.D. Cal. Oct. 24, 2018).

Similarly, the Stark Laws prohibit a healthcare provider from submitting
claims to Medicare or Medicaid for certain items or services rendered to
patients referred by physicians who have improper financial relationships with
the providers.  *See* 42 U.S.C. §§ 1395nn(a)(1) & 1396b(s).

Ginger spills copious ink describing how Defendants violated both of
those federal laws when their subsidiaries allegedly made monetary payments
through medical director and consulting contracts in exchange for referrals, as
well as payments received by Ensign companies from Axiom and other X-ray
providers in exchange for referring outpatient X-ray services to those

companies.[67]  Many of those referrals were "substantially above fair market
value," based upon Ginger's observations and experience in the industry.[68]

Defendants believe that the omission of Ensign Group or Ensign Services
from the allegations regarding those payments renders Ginger's claim invalid.[69]
But because Ginger has adequately pleaded alter ego liability, the Court must
presume that the actions of the SNFs are the actions of Defendants.  Indeed, in
one instance, Ginger states that Ensign Group's own accounting department's
records reflect some allegedly illegal payments made from SNF Carmel
Mountain Rehabilitation & Healthcare in San Diego to various doctors,
approximating $200,000 per year.[70]  Those payments were merely a sample of
many supposedly made to physicians as remuneration or inducement to increase
referrals to Ensign Group's SNFs.[71]  In another instance, Ginger alleges that
Defendants' employees were instructed to recruit medical directors and other
consultants based upon who could "fill beds" and generate the most referrals.[72]
In view of the impropriety of those alleged relationships, the Court finds that the
Second Amended Complaint adequately pleads that Defendants violated both
the AKS and the Stark Laws.

### 3.    Reliable Indicia

Defendants' third argument is that Ginger does not identify any false
claims submitted by any Ensign entity.[73]  Defendants maintain that, absent any
actual examples, Ginger must at a minimum allege "particular details of a
scheme to submit false claims *paired with* reliable indicia that lead to a strong

---

[67]    SAC ¶¶ 135-267.
[68]    *Id.* at ¶¶ 151, 158, & 159.
[69]    Motion 19:9-19.
[70]    SAC ¶ 161.
[71]    *Id.* at ¶ 9.
[72]    *Id.* at ¶¶ 17 & 160.
[73]    Motion 21:1-8.

inference that claims were actually submitted." *Ebeid* ex rel. *U.S. v. Lungwitz*, 616 F.3d 993, 998–99 (9th Cir. 2010) (citing *U.S.* ex rel. *Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009)) (emphasis added).  Reliable indicia may include "representative examples" of submitted claims, but such examples are not strictly necessary.  *United States v. United Parcel Serv., Inc.*, 2015 WL 13648581, at *3 (C.D. Cal. July 2, 2015), *aff'd sub nom. United States* ex rel. *DeFatta v. United Parcel Serv., Inc.*, 771 F. App'x 735 (9th Cir. 2019).  Other reliable indicia include information "such as dates that services were fraudulently provided or recorded, by whom, and evidence of the department's standard billing procedure," *see Grubbs*, 565 F.3d at 189–90.  There does not appear to be a single recipe, though, for what qualifies as reliable indicia.

By now, it is well-established that Ginger has adequately pleaded details of a broader scheme to submit false claims.  But Defendants contend that Ginger falls short of the other side of the coin; *i.e.*, that she has not supplied reliable indicia that false claims were actually submitted.[74]  This issue is a close call.  Ginger asserts the following:

- Ensign Services effectively submitted the claims for payment on behalf of the SNFs since Ensign Services centrally controlled the claims and reimbursement process at each SNF.[75]

- "Defendants prepared claims for payment or approval, billing records, invoices and medical records and presented or caused them to be presented to an agent, officer or employee" of both the federal government and the State of California.[76]

- At the end of each month, the SNFs billed the Medicare program Part A by submitting an invoice known as Universal Bill 92 (the "UB-92") to the

---

[74]    *Id.* at 21:16-26.
[75]    SAC ¶ 76.
[76]    *Id.* at ¶¶ 100 & 101.

appropriate Medicare Administrative Contractor, who processed and paid Medicare claims.[77]

- A UB–92 was submitted for each resident, and it contained the number of billing days, the per diem rate, and total amount.[78]

- Ginger's Exhibit 7—a spreadsheet that Ginger created based upon her knowledge and access to documents that she had at the time—identifies approximately 130 physicians who had allegedly sham contracts with 28 of Ensign Group's SNFs.[79]

- On information and belief, those physicians' practice specialties were of the type likely to be in a position to refer of Medicare and Medicaid patients to an Ensign facility, including geriatrics, surgery, family medicine, internal medicine, orthopedics, pulmonology, and neurology/psychiatry.[80]

- Ginger estimates that each SNF submitted roughly 100 claims per month, or 1,200 claims per year over a six-year time frame, based upon the number of beds and patients—most of whom were covered by government health care programs.[81]

In response, Defendants argue that those alleged facts are too conclusory (or too threadbare) to serve as reliable indicia.[82]  Defendants' strongest case in support is *United States* ex rel. *Karp v. Ahaddian*, 2018 WL 6333670 (C.D. Cal. Aug. 3, 2018).  There, the plaintiff-relators were patients of the defendant physicians, who operated a psychiatric care practice.  *Id.* at *1.  The plaintiff-

---

[77]    *Id.* at ¶ 95.
[78]    *Id.*
[79]    *Id.* at ¶ 242; *see also* SAC, Ex. 7 [ECF No. 129-7].
[80]    SAC ¶ 245.
[81]    *Id.* at ¶ 247.
[82]    Motion 21:24 & 23:7-9.

1   relators alleged that the defendants submitted false claims to their private

2   insurers for services that were never rendered.  *Id.*  Although the plaintiff-

3   relators were not Medicare beneficiaries, they assumed that the defendants ***must***

4   have submitted some false claims to Medicare, in view of the defendants' high

5   volume of Medicare work.  *Id.*  The court in *Karp* was not persuaded; it

6   concluded that the plaintiff-relators did not successfully "allege *what* claims

7   were submitted to the federal government; *when* such claims were submitted to

8   the federal government; or *who* submitted such claims to the federal

9   government."  *Id.* at *4.

10          Here, the Court finds that Ginger succeeds in distinguishing the facts in

11  *Karp*.  Ginger, a former insider, identifies by name and location a sizeable

12  number of physicians who saw patients and submitted claims in a defined—

13  albeit broad—period of time.  The Court can reasonably infer that some of those

14  physicians' patients would have used Medicare and Medicaid, given the

15  description of Defendants' billing system and the use of forms designed

16  specifically for billing government health care programs, in conjunction with the

17  broad range of services and specialties afforded.  *See Loma Linda Univ. Med. Ctr.

18  v. Sebelius*, 684 F. Supp. 2d 42, 45 (D.D.C.), *aff'd*, 408 F. App'x 383 (D.C. Cir.

19  2010) (noting that Medicare Part A regulation 42 C.F.R. § 424.32 requires

20  hospitals to submit claims for payment via a specific form, the UB-92).  Those

21  factual allegations allow the Court, and Defendants, to determine "the who,

22  what, when, where, and how" of the alleged misconduct.  *United States* ex rel.

23  *Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1057 (N.D. Cal. 2020).

24  Furthermore, the gravamen of Ginger's Second Amended Complaint is that the

25  financial relationship of those 130 physicians with their respective SNFs was

26  suspect.  If true, that would mean that Defendants face penalties for any or all

27  "of the claims filed by [those physicians] during their respective medical

28  directorship[s]" to governmental health programs.  *U.S.* ex rel. *Kaczmarcyk v.*

*SCCI Health Servs. Corp.*, 2004 WL 7089810, at \*5 (S.D. Tex. Mar. 11, 2004). Therefore, the Second Amended Complaint meets the Rule 9(b) pleading standard.  The Court **DENIES** the Motion as it relates to the first and second claims for relief.

## C.   Third Claim for Relief:  Reverse FCA Provision under 31 U.S.C. § 3729(a)(1)(G)

The FCA's "reverse false claims" provision creates liability for anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  *United States* ex rel. *Kelly v. Serco, Inc.*, 846 F.3d 325, 335–36 (9th Cir. 2017) (quoting 31 U.S.C. § 3729(a)(1)(G)).  This provision "attempts to provide that fraudulently reducing the amount owed to the government constitutes a false claim."  *Cafasso*, 637 F.3d at 1056.

In their Motion, Defendants make four arguments regarding this claim: (1) there is no underlying violation, so there is no wrongfully withheld overpayment; (2) it is redundant of Ginger's presentment claim; (3) Ginger fails to plead that Defendants knew of any false claim or overpayment received; and (4) the fact that Ensign Group incurred penalties for violations of its CIA is immaterial, since those enforcement penalties are not an obligation for purposes of a private *qui tam* recovery.[83]

Defendants' first argument in unavailing, in view of the Court's finding that Ginger properly alleges an underlying false presentment violation, *see supra* Part III.B.  But that finding potentially renders her reverse false claim redundant, per Defendants' second argument.  *See e.g.*, *United States v. Kinetic*

---

[83]      *Id.* at 23:19-24:21.

*Concepts, Inc.*, 2017 WL 2713730, at *14 (C.D. Cal. Mar. 6, 2017) (dismissing a
redundant reverse false claim); *U.S.* ex rel. *Davern v. Hoovestol, Inc.*, 2015 WL
6872427 (W.D.N.Y. Nov. 9, 2015) (observing it is not the intent of the statute
that, whenever a defendant violated subparagraphs (a)(1)(A) or (B) and received
payment, the defendant would also necessarily violate subparagraph (G) if it
failed to repay the fraudulently obtained payments to the federal government);
*see also U.S.* ex rel. *Besancon v. Uchicago Argonne, LLC*, 2014 WL 4783056, at *4
(N.D. Ill. Sept. 24, 2014).

However, as part of the Fraud Enforcement and Recovery Act of 2009,
Congress amended the False Claims Act to define an "obligation" as "an
established duty, whether or not fixed, arising from an express or implied
contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based
or similar relationship, from statute or regulation, or from the retention of any
overpayment." *Martinez*, WL 10439030, at *5 (quoting 31 U.S.C. § 3729(b)(3)).
Furthermore, in 2010 Congress established an independent legal duty of
Medicare payment recipients to "report and return" an overpayment within 60
days "after the date on which the overpayment was identified." *Id.* at *6
(quoting 42 U.S.C. §§ 1320a-7k(d)(1), (2)).  A similar obligation was created for
Medicaid.  *See Ormsby*, 444 F. Supp. 3d at 1056.  In view of those legislative
amendments, courts have allowed reverse false claims to proceed when they
concern an obligation under Medicaid or Medicare, notwithstanding a
concurrent false presentment claim.  *Id.* at 1081; *see also Martinez*, 2017 WL
10439030, at *6; *United States v. Mount Sinai Hosp.*, 2015 WL 7076092, at *12
(S.D.N.Y. Nov. 9, 2015).

That exception applies here.  Because Ginger alleges that Defendants and
their subsidiaries "have concealed and improperly avoided an obligation to pay
money to the Government, including specifically Defendants' obligation to
report and repay past overpayments of Medicare and Medicaid claims for which

Defendants knew they were not entitled,"[84] the Court finds that Ginger's false presentment claim under 31 U.S.C. § 3729(a)(1)(A) does not preclude her reverse false claim under 31 U.S.C. § 3729(a)(1)(G).

However, the Court does agree with Defendants' third argument; *i.e.*, that Ginger fails to plead that Defendants knew of any false claim or overpayment received.  Although Ginger points to a $100,000 underpayment for inpatient X-ray services that Defendants received from Axiom in exchange for referring their outpatient services to Axiom,[85] it is not clear from the face of the Second Amended Complaint that Axiom's discounts are equivalent to a failure to pay back an overpayment from Medicaid or Medicare.  *Cf. U.S.* ex rel. *Lee*, Case No. 6:18-cv-01932-DCC, at *13-*14 (D.S.C. Aug. 30, 2021) (unpublished) (finding reverse claim properly alleged under Rule 9(b) where plaintiff averred that defendant falsely certified compliance with the AKS and the Stark Laws on its cost reports to avoid repayment of the interim payments already received from government healthcare programs).[86]  The Second Amended Complaint's ambiguity on this issue causes the Court to conclude that the appropriate course is to dismiss with leave to amend.  Fed. R. Civ. P. 9(b).  Presumably, Ginger could resolve that ambiguity with additional facts or clarifications.  *See Lopez*, 203 F.3d at 1127 (finding that a district court should grant leave to amend unless it determines that the pleading could not possibly be cured by the allegation of other facts).

---

[84]    SAC ¶ 299.

[85]    *See* Opp'n to Defs.' Mot. to Dismiss Relator's First Am. Compl. (the "Prior Opposition") [ECF No. 104] 23:23-24; SAC ¶ 258.  The Court advises Ginger's counsel to comply with the Local Rules regarding page limits and to refrain from circumventing that rule by incorporating past briefs, or "stuffing" the footnotes with analysis of case law that should properly be in the body of the text.  *See* L.R. 11-6.

[86]    *See* Opposition, Ex. A [ECF No. 131-2].

The Second Amended Complaint's only other mention of reverse false claims appears in the context of Ensign Group violating its CIA for failing to disclose its swapping scheme.[87]  However, Ginger makes no rebuttal and cites no counter-authority[88] to suggest that Ensign Group is incorrect when it argues that penalties under its CIA with HHS-OIG do not establish an "obligation" to pay the government under 31 U.S.C. § 3729(a)(1)(G).  *United States v. Astrazeneca Biopharmaceuticals, Inc.*, 2017 WL 1378128, at *3 (E.D.N.Y. Apr. 17, 2017); *see also U.S.* ex rel. *Booker v. Pfizer, Inc.*, 9 F. Supp. 3d 34, 50 (D. Mass. 2014); *U.S.* ex rel. *Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1195 (10th Cir. 2006).  Therefore, since alleged violations of the CIA do not serve as an adequate alternative basis for a reverse false claim, the Court **GRANTS** the Motion with respect to Ginger's third claim for relief **with leave to amend**.

**D.      Fourth Claim for Relief:  Conspiracy under 31 U.S.C. § 3729(a)(1)(C)**

Defendants offer several reasons why Ginger's fourth claim for relief for conspiracy should fall.  One is that "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves."  *U.S.* ex rel. *Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108, 117 (D.D.C. 2007); *see also United States* ex rel. *Lupo v. Quality Assurance Servs., Inc.*, 242 F. Supp. 3d 1020, 1027 (S.D. Cal. 2017).  "The logic for the doctrine comes directly from the definition of a conspiracy."  *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1057 (C.D. Cal. 2000).  "It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy.  A corporation cannot conspire with itself any more than a private

---

[87]      SAC ¶ 264.

[88]      *See generally* Opposition.

1  individual can, and it is the general rule that the acts of the agent are the acts of

2  the corporation." *Id.* (internal quotations omitted).

3       Ginger does not explicitly respond to those arguments in her

4  Opposition.[89]  Instead, she attempts to incorporate her previous memorandum,[90]

5  in which she argued in a footnote that this doctrine is undercut by Ensign

6  Group's claim that its SNFs were operated independently.[91]  In other words,

7  Ginger contends that Defendants cannot have it both ways; Defendants cannot

8  simultaneously assert that Ensign Group and its subsidiaries are entirely

9  independent entities (and thus susceptible to a corporate conspiracy claim) ***and***

10  are a single unified entity (and thus no longer susceptible to a corporate

11  conspiracy claim, but confirming Ginger's alter ego allegations).

12       Ginger is correct, but that logic rebounds on her.  Ultimately, she cannot

13  succeed on both her alter ego claims ***and*** her conspiracy-based claim.  But this

14  case is at the pleading stage, and "a plaintiff is allowed to assert inconsistent

15  theories of recovery" at the pleading stage.  *Vicuna v. Alexia Foods, Inc.*, 2012

16  WL 1497507, at *3 (N.D. Cal. Apr. 27, 2012); *see also* Fed. R. Civ. P. 8(e)

17  (permitting a court to construe pleadings so as to do justice).  Thus, the Court

18  **DENIES** the Motion with respect to Ginger's fourth claim for relief.

19  **E.**      **Seventh Claim for Relief:  Cal. Gov't Code § 12651(a)(8)**

20       The CFCA provides that "[a]ny person who . . . [i]s a beneficiary of an

21  inadvertent submission of a false claim, subsequently discovers the falsity of the

22  claim, and fails to disclose the false claim to the state or the political subdivision

23  within a reasonable time after discovery of the false claim" shall be "liable to the

24  state or to the political subdivision for three times the amount of damages that

25   

---

[89]  *See generally id.*

26  [90]  *Id.* at 2:11-12.

27  [91]  *See* Prior Opposition 25:18-22.  The Court again admonishes Ginger's counsel to refrain from incorporating past briefs as a way to circumvent page

28  limitations.

the state or political subdivision sustains because of the act of that person." Cal. Gov't Code § 12651(a)(8).  California state courts have interpreted the statute broadly, noting that "liability may be imposed under section 12651, subdivision (a)(8), on third persons who did not submit the false claims themselves." *Armenta* ex rel. *City of Burbank v. Mueller Co.*, 142 Cal. App. 4th 636, 647 (2006), *as modified* (Sept. 1, 2006), *as modified on denial of reh'g* (Sept. 28, 2006).  That liability extends to parent companies vis-à-vis their subsidiaries, even when the parent company is several layers removed from the offending subsidiary.  *Id.* at 646–47.

Defendants maintain that Ginger did not plead any facts in her Second Amended Complaint regarding inadvertent submissions.[92]  Indeed, the Court agrees that Ginger's allegations tend to indicate intentionality on behalf of Defendants, broadly speaking.[93]  However, this flaw is not a fatal, for two reasons.  First, California courts have held that the statute's reference to inadvertence "does not preclude the imposition of liability on the beneficiary of a false claim where the claim has been submitted intentionally."  *City of Burbank*, 142 Cal. App. 4th at 648.  And second, construing the Second Amended Complaint in the light most favorable to Ginger—the non-moving party—it would be sensible to consider this claim as pleaded in the alternative, in the event that Defendants succeed in proving that they did not ***intentionally*** submit false claims to the State of California.

Next, Defendants claim that Ginger fails to plead facts showing that either Ensign Group or Ensign Services was a beneficiary of these claims.[94]  But that is simply untrue.  The Second Amended Complaint unmistakable lays out the parent-subsidiary relationship of the SNFs, Ensign Group, and Ensign

---

[92]    Motion 25:19-20.

[93]    *See generally* SAC.

[94]    Motion 25:20.

Services.[95]  It further alleges that the SNFs, among other things, are required to pay the parent companies "monthly management fee[s]."[96]  It reasonably follows, therefore, that Ensign Group and Ensign Services would have benefited from any false claims that defrauded the State of California, even if such claims were submitted inadvertently.  Since Ginger also alleges that Defendants failed to disclose those false claims in a timely manner[97]—and at various points Ginger also describes specific situations that could be construed as putting Defendants on notice[98]—the Court finds that Ginger has adequately pleaded the elements of a claim under Section 12651(a)(8) of the CFCA.  Thus, the Court **DENIES** the Motion with respect to Ginger's seventh claim for relief.

## IV.  CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.      The Motion is **GRANTED** with respect to the third claim for relief.  That claim is **DISMISSED with leave to amend**.

2.      The Motion is **DENIED** with respect to the remaining claims for relief.

3.      Ginger is **DIRECTED** to file her amended pleading, if at all, no later than March 25, 2022.  If Ginger does not file her amended pleading in a timely manner, then the Court will **DISMISS** the third claim for relief **with prejudice**.

4.      If Ginger chooses to file an amended pleading, then she is also **DIRECTED** to file contemporaneously therewith a Notice of Revisions to

---

[95]    *See, e.g.*, SAC ¶ 78.
[96]    *Id.* at ¶ 57.
[97]    *Id.* at ¶ 15.
[98]    *See, e.g., id.* at ¶¶ 189-200.

Second Amended Complaint that provides the Court with a redline version that shows the amendments.

**IT IS SO ORDERED.**

Dated: March 10, 2022

John W. Holcomb
UNITED STATES DISTRICT JUDGE